## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DEBRA TAVERAS, On Behalf of Herself And
All Others Similarly Situated,

                    Plaintiff,

   vs.

UBS AG, PETER KURER, STEPHAN
HAERINGER, SERGIO MARCHIONNE,
ERNESTO BERTARELLI, GABRIELLE
KAUFMANN-KOHLER, ROLF A. MEYER,
HELMUT PANKE, DAVID SIDWELL, PETER
SPUHLER, PETER VOSER, LAWRENCE A.
WEINBACH, JOERG WOLLE, PETER A.
WUFFLI, CLIVE STANDISH, DAVID S.
MARTIN, EDWARD O'DOWD, BARBARA
AMONE, PER DYRVIK, THE RETIREMENT
BOARD AND SAVINGS PLAN
COMMITTEE, and JOHN DOE 1-10,

                    Defendants.

**Civil Action: 08-CV-6696**

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT
## INCOME SECURITY ACT ("ERISA")

      Plaintiff, a participant in the UBS Savings and Investment Plan (the "Plan"), covering substantially all employees of UBS AG and its subsidiaries (collectively "UBS" or the "Company"), individually and on behalf of all others similarly situated (the "Participants"), alleges as follows:

### INTRUCTION

      1.    This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, against the Plan's fiduciaries, including UBS, on behalf of Participants in and beneficiaries of the Plan.

2.     Throughout the Class Period (March 13, 2007 and the present), the Plan invested in UBS common stock ("UBS Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plan.

3.     Plaintiff's claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of the Participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

4.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

5.     As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plan has suffered substantial losses, resulting in the depletion of millions of dollars of the retirement savings and anticipated retirement income of the Plan's Participants.  Under ERISA, the breaching fiduciaries are obligated to restore to the Plan the losses resulting from their fiduciary breaches.

6.     Because Plaintiff's claims apply to the Participants and beneficiaries as a whole, and because ERISA authorizes Participants such as Plaintiff to sue for plan-wide relief for breach of fiduciary duty, Plaintiff brings this as a class action on behalf of all Participants and beneficiaries of the Plan during the Class Period.  Plaintiff also brings this action as a participant seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plan.

7.      In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief.  At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the following Counts below.

## JURISDICTION AND VENUE

8.      ***Subject Matter Jurisdiction.***  This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).  This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(l), 29 U.S.C. § 1132(e)(l).  In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

9.      ***Personal Jurisdiction***.  ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All of the Defendants are residents of the United States and/or do business in the United States, and this Court therefore has personal jurisdiction over them.  This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(l)(A), because they all would be subject to the jurisdiction of a court of general jurisdiction in the District of New York as they all reside in the State of New York and/or do business in the State of New York.

10.     ***Venue***.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district, and/or some Defendants reside or maintain their primary place of business in this district.

## PARTIES

**Plaintiff**

11.    ***Plaintiff Debra Taveras*** is a resident of the County of Nassau in the State of New York.  Plaintiff is a former UBS employee and is a participant in the Plan.

**Defendants**

12.    ***Defendant UBS*** is a Swiss bank and global financial services corporation with its principal executive offices in Zurich and Basel, Switzerland. UBS does business and maintains offices in the United States, including two offices in New York at 299 Park Avenue. New York. NY 10171 and 1285 Avenue of the Americas, New York, NY 10019 respectively. UBS also does business in the United States through several wholly-owned subsidiaries.  The Company's wealth management and business banking operations include the provision of a range of products and services for wealthy clients worldwide.  These services range from asset management to estate planning and from corporate finance advice to art banking.

13.    Throughout the Class Period, UBS's responsibilities included, along with its officers, directors and executives, broad oversight of and ultimate decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility. Throughout the Class Period, the Company exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.

14.    ***Defendant UBS Board of Directors***.   The Directors who served on the UBS Board of Directors (the "Board") were fiduciaries, because they exercised decision-making authority regarding the appointment of Plan fiduciaries and the management of the Plan's assets throughout the Class Period.   Among other things, the Board determines the annual profit sharing contributions that are made under the Plan.   Moreover, UBS acted through the Board in carrying out its Plan-related fiduciary duties and responsibilities, and, thus, members of the Board were fiduciaries to the extent of their personal exercise of such responsibilities.

15.    The "Director Defendant" who served on the Board and acted as fiduciary with respect to the Plan during the Class Period are as follows:

(a)    ***Defendant Peter Kurer ("Kurer")*** is, and at all relevant times was, the Chairman of the Company's Board.   Defendant Kurer also chairs the Corporate Responsibility Committee and the Strategy Committee.   During the Class Period, defendant Kurer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(b)    ***Defendant Stephan Haeringer ("Haeringer")*** is, and at all relevant times was, a member of the Company's Board.   Defendant Haeringer is also a member of the Corporate Responsibility Committee and the Risk Committee.   During the Class Period, defendant Haeringer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority

or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(c)    **Defendant Sergio Marchionne ("Marchionne")** is, and at all relevant times was, a member of the Company's Board.  Defendant Marchionne is also a member of the Governance and Nominating Committee and of the Strategy Committee.  During the Class Period, defendant Marchionne was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(d)    **Defendant Ernesto Bertarelli ("Bertarelli")** is, and at all relevant times was, a member of the Company's Board.   Defendant Bertarelli is also a member of the Governance and Nominating Committee and of the Strategy Committee.   During the Class Period, defendant Bertarelli was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(e)    **Defendant Gabrielle Kaufmann-Kohler ("Kaufmann-Kohler")** is, and at all relevant times was, a member of the Company's Board.  Defendant Kaufmann-Kohler also chairs the Governance and Nominating Committee.  During the Class Period, defendant Kaufmann-Kohler was a fiduciary within the meaning of ERISA, because she exercised discretionary authority or discretionary control with respect to the appointment of the Plan

fiduciaries and with respect to the management of the Plan, she possessed discretionary authority or discretionary responsibility in the administration of the Plan, and she exercised authority or control with respect to the management of the Plan's assets.

(f)     *Defendant Rolf A. Meyer ("Meyer")* is, and at all relevant times was, a member of the Company's Board.  Defendant Meyer is a member of the Audit Committee and of the Human Resources and Compensation Committee.  During the Class Period, defendant Meyer was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(g)     *Defendant Helmut Panke ("Panke")* is, and at all relevant times was, a member of the Company's Board.  Defendant Panke is also a member of the Human Resources and Compensation Committee and of the Risk Committee.  During the Class Period, defendant Panke was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(h)     *Defendant David Sidwell ("Sidwell")* is, and at all relevant times was, a member of the Company's Board.  Defendant Sidwell also chairs the Risk Committee.  During the Class Period, defendant Sidwell was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the

Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(i)     *Defendant Peter Spuhler ("Spuhler")* is, and at all relevant times was, a member of the Company's Board.  Defendant Spuhler is also a member of the Corporate Responsibility Committee.  During the Class Period, defendant Spuhler was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(k)     *Defendant Peter Voser ("Voser")* is, and at all relevant times was, a member of the Company's Board.  Defendant Voser also chairs the Audit Committee and is a member of the Strategy Committee.  During the Class Period, defendant Voser was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(l)     *Defendant Lawrence A. Weinbach ("Weinbach")* is, and at all relevant times was, a member of the Company's Board.  Defendant Weinbach is also a member of the Audit Committee.  During the Class Period, defendant Weinbach was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with

respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

(m)     *Defendant Joerg Wolle ("Wolle")* is, and at all relevant times was, a member of the Company's Board.  Defendant Wolle also chairs the Human Resources and Compensation Committee and is a member of the Governance and Nominating Committee. During the Class Period, defendant Wolle was a fiduciary within the meaning of ERISA, because he exercised discretionary authority or discretionary control with respect to the appointment of the Plan fiduciaries and with respect to the management of the Plan, he possessed discretionary authority or discretionary responsibility in the administration of the Plan, and he exercised authority or control with respect to the management of the Plan's assets.

## Officer Defendants

16.     *Defendant Peter A. Wuffli ("Wuffli")* was, at all relevant times, President of the Group Executive Board and Group Chief Executive Officer ("CEO") of the Company until July 2007.

17.     *Defendant Clive Standish ("Standish")* is, and at all relevant times was, Group Chief Financial Officer ("CFO") of the Company.

18.     *Defendant David S. Martin ("Martin")* was, at all relevant times, Global Head of Interest Rate Products until he was forced out of the Company in October 2007.

## The Retirement Board and Savings Plan Committee

19.     *Defendant Retirement Board and Savings Plan Committee (the "Retirement Committee")*.  The members of the Retirement Committee are plan fiduciaries and supervise the

investment of the assets of the Plan, and make decisions concerning investment options available under the Plan.  The Retirement Committee is comprised of the following defendants:

        (a)      ***Defendant Edward O'Dowd ("O'Dowd")*** is, and at all relevant times was, a member of the Retirement Committee.

        (b)      ***Defendant Barbara Amone ("Amone")*** is, and at all relevant times was, a member of the Retirement Committee.

        (c)      ***Defendant Per Dyrvik ("Dyrvik")*** is, and at all relevant times was, a member of the Retirement Committee.

20.      ***Defendant John Doe 1-10*** are or were fiduciaries of the Plan during the Class Period.  These defendants whose identities are currently unknown to Plaintiff, may include additional UBS employees.  Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## CLASS ACTION ALLEGATIONS

21.      Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who are participants in or beneficiaries of the Plan at any time between March 13, 2007 to the present (the "Class Period") and whose accounts included investments in UBS Stock.

22.      Plaintiff meets the prerequisites of Rule 23(a) to bring this action on behalf of the Class because:

23.      ***Numerosity.***  The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are,

at a minimum, thousands of members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

24.     *Commonality.*  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether Defendants acted as fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan, and the Plan's Participants and beneficiaries;

(c)     Whether Defendants violated ERISA;

(d)     Whether the Plan suffered a loss and, by extension, members of the Class sustained a diminution in vested benefits, and

(d)     What is the proper measure of loss to the Plan and subsequent allocation of vested benefits to the Plan's Participants.

25.     *Typicality.*  Plaintiff's claims are typical of the claims of the members of the Class because the Plan, the Plaintiff and the other members of the Class, each sustained a diminution in vested benefits arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

26.     *Adequacy.*  Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

27.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

28.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Plan and the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## THE PLAN

### The Plan

29.     The Plan is an "employee pension benefit plan" as defined by §§ 3(3) and (3)(2)(A) of ERISA, 29 U.S.C. §§ 1002(3) and 1002(2)(A).

30.    The Plan is a legal entity that can sue or be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).

31.    In this action for breach of fiduciary duty, the Plan is neither a plaintiff nor a defendant.  Rather, Plaintiff request relief for the benefit of the Plan and for the benefit of its Participants.

32.    The Plan is a "defined contribution plan" or "individual account" plan within the

meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participants' account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which may be allocated to such Participants' accounts. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

33.    The Plan is a voluntary contribution Plan whereby Participants make contributions to the Plan ("Voluntary Contributions") and direct the Plan to purchase investments with those contributions from options pre-selected by Defendants which are then allocated to Participants' individual accounts.

34.    In the Company's most recent filed Form 11-K, dated June 27, 2008, the Plan is described as the following:

> The Plan is a defined contribution plan, which provides retirement benefits to all eligible employees of the UBS United States Operations (the "Company"), which includes UBS Securities LLC, UBS AG, UBS Services LLC, UBS O'Connor LLC, UBS Energy LLC, UBS Alternative and Quantitative Investments LLC, UBS Global Asset Management (Americas) Inc., UBS Realty Investors LLC, UBS Americas Inc., UBS Clearing Services Corp., Dillon Read Capital Management LLC, UBS USA LLC and Prediction Company LLC. All Company employees on US payroll, including part-time employees, are eligible to participate in the Plan upon the completion of one hour of service.  The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

> The Plan is administered by the Retirement Board and Savings Plan Committee (the "Retirement Board") of the Company.  State Street Corporation (the "Trustee") is the Plan's trustee, Hewitt Associates LLC is the Plan's record keeper, and Callan Associates serves as the Plan's investment advisor.  At December 31, 2007 and 2006, there were 15,801 and 14,901 Plan participants, respectively.

> The Plan's assets are invested in a master trust which in turn invests in mutual funds, commingled funds, separately-managed accounts, and the UBS Company Stock Fund (the "UBS Stock Fund").

Certain accounting and other administrative services are provided by the Company at no charge to the Plan.

For the years ended December 31, 2007 and 2006, all expenses related to the administration of the Plan and all fees paid to the Trustee and third party service providers were paid by Plan Sponsor on behalf of the Plan.

35.     Each year, Plan Participants may elect to contribute, on a pre-tax basis, an amount representing from 1% to 50% of their eligible compensation, including all or a portion of their discretionary annual incentive bonus, subject to the maximum allowable contribution as established by the Internal Revenue Code (the "Code"). The maximum allowable contributions were $15,500 and $15,000 for 2007 and 2006, respectively. As a result of the Economic Growth and Tax Relief Reconciliation Act, the maximum allowable pre-tax contributions for Participants who attained age 50 on or before December 31, 2007 and 2006 were $20,500 and $20,000, respectively.

36.     The Company contributes an amount, up to 75% of the first 4% of each participant's eligible annual compensation contributed, subject to limitations, to each participant's account.

37.     Employees hired on or after December 2, 2001 automatically become Participants of the Plan and will receive the Retirement Contribution after meeting certain eligibility requirements. Employees hired on or before December 1, 2001 were provided a one-time option to elect to receive Retirement Contributions beginning January 1, 2002, or to continue receiving annual benefit accruals in the Plan.

38.     During 2007, 79 employees from the UBS Financial Services Inc. 401(k) Plus Plan joined the Plan and transferred their assets to the Plan. Also, 73 employees left the Plan and transferred their assets to the UBS Financial Services Inc. 401(k) Plus Plan. In aggregate, this resulted in a net transfer out of the Plan in the amount of $1,002,111.

39.     During 2006, 512 employees from the UBS Financial Services Inc. 401(k) Plus Plan joined the Plan and transferred their assets to the Plan.  Also, 69 employees left the Plan and transferred their assets to the UBS Financial Services Inc. 401(k) Plus Plan.  This resulted in $64,798,035 of net assets transferred into the Plan.

40.     On August 7, 2006, $2,815,088 was transferred from the Prediction Company 401(k) Profit Sharing Plan to the Plan.  This amount represents the sum of 50 account balances in the Prediction Company 401(k) Profit Sharing Plan.

41.     As of December 31, 2007, the UBS Stock Fund was valued at $88,974,538.

**Plan Fiduciaries**

42.     ***Named Fiduciaries***.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

43.     ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

44. Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA in the manner and to the extent set forth in the governing Plan documents, through their conduct, and under ERISA.

45. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan -- and the Plan's investments -- solely in the interest of the Plan's Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

46. Plaintiff does not allege that each defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each defendant are based on such specific discretion and authority.

## FACTS BEARING ON FIDUCIARY BREACH

**A.    UBS Was An Imprudent Investment For The Plan During The Class Period Because Of Its Serious Mismanagement, Precipitous Decline In The Price Of Its Stock And The Company's Debt Securities Were Seriously Impaired**

### 1.    Background of Subprime Mortgages

47. Subprime lending is the practice of making mortgage loans to persons who are generally unable to access credit from traditional financial institutions because they do not satisfy credit, documentations or other underwriting standards mandated by these traditional mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

48.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

49.    Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

50.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors.

51.    In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions

that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

52.     In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined, the rate of home price appreciation decelerated and,  in some cases, home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties.  Subprime borrowers with adjustable rate mortgages ("ARMs") experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures.  Borrowers were not able to avoid sharp payment increases as they could in earlier years.  Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

53.     Starting in 2006, the real estate and mortgage industry, faced with news about the housing bubble softening and an impending "burst," responded with a plethora of published reports concerning, among other things, the impact they would have on mortgages and subprime mortgage backed securities.

54.     In September 2006, the Senate Banking Committee heard testimony from "leading economists" as to the economic ramifications of the housing bubble, including from Richard Brown of the FDIC, who stated, "According to the Federal Housing Finance Board, over 30 percent of all conventional mortgages closed in 2004 and 2005 were ARMs.  The ARM share moderated to 25 percent by the second quarter of 2006. The percentage of ARMs among subprime mortgages is higher. Within subprime mortgage backed securities, the share of ARMs was far higher, close to 80 percent. The prevalence of subprime loans among all mortgage originations doubled from 9 percent in 2003 to 19 percent in 2004."

55.     On October 23, 2006, <u>Bloomberg</u> reported that "'[d]elinquency trends and home prices' show a weakening real estate market, said Scott Eichel, head of credit trading for New York-based Bear Stearns & Co., the biggest underwriter of bonds backed by mortgages. 'A lot of investors that have concerns about the housing market' are using the ABX index to speculate on a continued drop," he said.

56.     Three days later, the Commerce Department reported that the median price for a new home sold in September was $217,100, a drop of 9.7 percent from September 2005. It was the lowest median price for a new home since September 2004 and the sharpest year-over-year decline since December 1970.  The weakness in new home prices was even sharper than a 2.5 percent fall in the price of existing homes last month, which had been the biggest drop on record.

57.     On December 14, 2006, the Mortgage Bankers Association reported in its quarterly National Delinquency Survey that late payments and new foreclosures on U.S. homes rose in the third quarter and were likely to grow as a massive wave of adjustable-rate mortgages reset at higher interest rates. The Association also reported that delinquencies rose for all home loans, but *most notably for adjustable loans to subprime borrowers who were already stretched* before mortgage rates climbed and predicted that between $1.1 trillion and $1.5 trillion of mortgages face rate resets in 2007.

58.     Later in that month, a Center for Responsible Lending (CRL) study revealed that 2.2 million American households are likely to lose their homes and as much as $164 billion due to foreclosures in the subprime mortgage market.  CRL's research suggested that risky lending practices had triggered the worst foreclosure crisis in the modern mortgage market, projecting that one out of five (19.4%) subprime loans issued during 2005-2006 would fail.

**2.     UBS Ignored the Risks of the Subprime Lending Industry
        and Failed to Provide Complete and Accurate Information to**

**Plan Participants Regarding the Impairment to Its Debt Securities**

59.     Signs of the subprime mortgage crisis were emerging way before the Company's

announcement on December 11, 2007.  However, Defendants failed to inform Plan Participants

of the inherent risk of the Company's holding of subprime debt securities.

60.     The following are some of the events that transpired prior to the December 11,

2007 announcement:

> •     On January 30, 2007, J.P. Morgan's CEO, speaking at a Citigroup annual financial services conference, stated that "defaults are rising at J.P. Morgan 'a little bit,'" adding, "'home equity is subject to deterioration' from a recession, but that the bank is well positioned to sustain a downturn in the economy.  The bank has largely exited the subprime lending area." MarketWatch, January 30, 2007 Article, "Dimon sees a sign of recession."

Bloomberg reported that the subprime market is facing record levels of collapse.  For example:

(1)     Defaults on mortgages to people with poor credit histories or large debt burdens rose in November above their worst levels during the last recession six years ago, according to Friedman Billings Ramsey Group Inc.

(2)     The percentage of subprime mortgages packaged into bonds and delinquent by 90 days or more, in foreclosure or already turned into seized properties climbed to 10.09 percent from 9.08 percent in October, analysts led by Michael D. Youngblood at the Arlington, Virginia-based firm said in a report today.  The default rate fell to 5.37 percent in May 2005 from 10.05 percent in November 2001, when economic growth resumed.

(3)     Defaults on subprime loans have surged as rates on ones made in 2002, 2003 and 2004 adjust higher as their fixed-rate periods end following an increase in short-term interest rates from the lowest in 45 years.  Subprime mortgages made in 2005 and 2006 are suffering from slumping home prices and looser lending standards.

(4)     "These borrowers are very leveraged and have little skin in the game" because they took out loans with small, or no, down payments and many of them haven't seen their properties appreciate, Debashish Chatterjee, an analyst at Moody's Investors Service in New York, said in an interview Jan. 26, 2007.

> •     On February 7, 2007, the Senate Banking Committee held the first hearing of the 110th Congress addressing

legislative solutions to predatory lending in the subprime sector.

- The Financial Express reported on February 9, 2007 online that HSBC Holdings Plc's Chief Executive Officer will change lending policies after the bank's losses from bad home loans in the US increased, stating "I am responding, and more action will be taken . . . [t]his is a problem, we have taken the severity on board." HSBC was forced to set aside nearly $2 billion of its funds for 2006 due to souring subprime-mortgage loans.

- On March 2, 2007, the Federal Reserve announced draft regulations to tighten lending standards and Fremont General not only stopped making subprime loans, but also put its subprime business up for sale.

- On March 8, 2007, New Century Financial, the second largest subprime lender in 2006, stopped making loans.

- On April 2, 2007 New Century Financial filed for bankruptcy.

- Freddie Mac then announced plans to refinance up to $20 billion of loans held by subprime borrowers who would be unable to afford their adjustable-rate mortgages at the reset rate.

- On April 24, 2007, the National Association of Realtors announces that sales of existing homes fell 8.4% in March from February, the sharpest month-to-month drop in 18 years.

- One month later, the National Association of Realtors reported that sales of existing homes fell by 2.6 percent in April to a seasonally adjusted annual rate of 5.99 million units, the slowest sales pace since June 2003. The number of unsold homes left on the market reached a record total of 4.2 million.

- On June 12, 2007, RealtyTrac announced U.S. foreclosure filings surged 90 percent in May from May 2006. Foreclosure filings were up 19 percent from April. There were 176,137 notices of default, scheduled auctions and bank repossessions in May.

- Goldman Sachs reported flat profits from the prior year due to mortgage market problems.

- Bear Stearns had to pledge up to $3.2 billion to bail out one of its hedge funds because of bad bets on the subprime credit market.

61.     In fact, on October 12, 2007, The Wall Street Journal reported information actually known by officers of UBS in March 2007 regarding impaired debt securities –

information Defendants ignored when they refused to write down the impaired assets.  The

article stated in part:

> Since the invention of the ticker tape 140 years ago, America has been able to boast of having the world's most transparent financial markets.
>
> The tape and its electronic descendants ensured that crystal-clear prices for stocks and many other securities were readily available to everyone, encouraging millions to entrust their money to the markets.
>
> These days, after a decade of frantic growth in mortgage-backed securities and other complex investments traded off exchanges, that clarity is gone.  Large parts of American financial markets have become a hall of mirrors.
>
> The hazards of this new age of uncertainty became clear at Dillon Read in March, when rising defaults by homeowners were hammering the value of mortgage securities.  John Niblo, a hedge-fund manager at the firm, acted fast.  He twice slashed his fund's valuation of securities tied to "subprime" mortgages, knocking them down by about 20%, or nearly $100 million, say traders familiar with the matter.
>
> But managers at UBS AG, Dillon Read's parent company, were irate.  The Swiss banking giant was carrying similar securities on its books at a far higher price, the traders say. In conference calls, the UBS managers grilled Mr. Niblo on his move. "I'm marking to where I could reasonably sell them," Mr. Niblo responded during one call, according to the traders familiar with the conversations. UBS later shut down the in-house hedge fund, and Mr. Niblo was let go in August. Last week, UBS announced a $3.7 billion write-down on $23 billion of securities with mortgage exposure, including securities from the shuttered fund.
>
> * * *
>
> For Mr. Niblo, the Dillon Read hedge-fund manager, the problems began early this year. Mr. Niblo managed a portfolio of about $1 billion in CDOs and mortgage-backed securities.  By February, rising mortgage defaults by homeowners with poor credit were taking a toll on the mortgage-backed market.  Seeing the turmoil, Mr. Niblo, 47 years old, sought prices from more than a dozen Wall Street dealers, and in April marked down the portfolio of subprime mortgages by about $20 million, according to the traders with knowledge of the situation. Ramesh Singh, a UBS executive, scoured trading positions and asked Mr. Niblo how he was coming up with the prices to re-mark his portfolio, these traders say.
>
> The mortgage-backed market continued to deteriorate. Again, Mr. Niblo sought prices from dealers and marked his portfolio down – this time by $75 million, the traders say.
>
> Tense Conference Calls

A series of tense conference calls followed. Ramesh Chari, another UBS manager, complained about Mr. Niblo's valuations; they were lower than UBS's marks on similar securities, the traders say. He asked Mr. Niblo to explain his decision.

In response, Mr. Niblo asked how UBS could value the securities at a higher level "if we can't sell them at these prices?" according to traders. Messrs. Singh and Chari declined to comment, referring questions about the matter to a UBS spokesman. The spokesman says UBS doesn't discuss "specifics of the valuation of individual trading books and positions. Obviously the characteristics of securities and the make up of portfolios differ from book to book and there is no single standard valuation model for all securities."

In June, Mr. Niblo was put on administrative leave as UBS sorted out the losses and valuation issues at Dillon Read. Mr. Niblo had priced many of the mortgage-backed securities in the range of 50 to 80 cents on the dollar, while UBS valued similar securities in the 80s, the traders say.

Last week, when UBS announced its write-down, Chief Executive Marcel Rohner said the firm had done the best it could. "We feel that we have applied a prudent valuation" that "reflects the current expectation of what's going to happen."

Still, Mr. Rohner himself highlighted the bigger issue clouding the financial markets. The trouble, he said, arose because UBS had to mark a price on mortgagerelated securities "where there is no market price, where there is no trading."

62.    The true facts, which were known by the Defendants but concealed from the investing public (which included Plan Participants) during the Class Period, were as follows:

(a)    Defendants had been informed by executives at Dillon Read that debt Securities UBS held were impaired;

(b)    Defendants had reason to believe other debt securities besides those held by Dillon Read were impaired, yet defendants failed to investigate the value of these and similar debt securities; and

(c)    Defendants had failed to record impairment of debt securities which they knew or disregarded were impaired.

63.    As a result of Defendants' false statements, the Company's stock price traded at inflated levels during the Class Period.  However, after the above revelations seeped into the

market, the Company's shares were hammered by massive sales, sending them down more than 26% from their Class Period high.

### 3.    The Company's False Statements to Plan Participants Were Incorporated Into Plan Documents

64.    UBS is a global investment banking and securities firm which provides a range of financial services, including advisory services, underwriting, financing, market making, asset management, brokerage and retail banking on a global level.

65.    Plaintiff alleges that, during the Class Period, Defendants issued numerous statements regarding the Company's business and financial results. These statements were false and misleading because they failed to disclose the Company's failure to timely write-down impaired securities containing subprime debt.

66.    On May 3, 2007, the Company issued its results for the first quarter of 2007, in a press release which stated:

> UBS reports net profit attributable to shareholders of CHF 3,275 million in first quarter 2007. This figure comprises both continuing and discontinued operations, resulting in a decline of CHF 229 million from first quarter 2006, when results included a CHF 290 million after-tax gain from the sale of Motor-Columbus.
>
> In UBS's core operational businesses (financial businesses attributable profit from continuing operations), profit was a record CHF 3,182 million in first quarter 2007, up 4% from both first and fourth quarter 2006. Performance was driven by revenue growth in all businesses, despite negative trading revenues from the Investment Bank's proprietary capital managed by DRCM of approximately CHF 150 million in the context of difficult market conditions in US mortgage securities.
>
> "Fee and commission income has reached its highest level since 2001, and represents more than half of our total income. Invested asset levels totalled CHF 3.1 trillion, up 4% from the beginning of the year, reflecting strong net new money inflows. This drove

asset-based fees up in both the wealth and asset management businesses," said Clive Standish, UBS Chief Financial Officer.

\*       \*       \*

Net income from trading businesses rose in first quarter 2007, with equities, in particular, being positively impacted by favorable market conditions in Europe and Asia Pacific. The prime services business benefited from increased client balances and fixed income revenues improved compared with the same quarter last year on strong performances in the structured credit, global credit strategies and syndicated finance businesses. Foreign exchange and cash collateral trading was strong across the board, with high volumes more than offsetting the effect of global increases in interest rates. Emerging markets, base metals and structured products all had a very strong quarter marked by significant growth.

The record first quarter 2007 performance shows the strength of the wealth management business, whose power remains unmatched across the industry. Wealthy clients around the globe entrusted UBS with a total of CHF 44.8 billion in net new money in first quarter, 85% of the total net new money inflow.

67.     On that same day, the Company filed its Form 6-K for the first quarter of 2007, which included the Company's previously reported financial results. Upon information and belief, this Form 6-K was a fiduciary communication as it was incorporated into the Company's Summary Plan Description ("SPD").

68.     On July 23, 2007, the Company issued a release to investors (which included Plan Participants) entitled *Investor Optimism Declines Slightly in July; Investors More Optimistic About Their Portfolios, But Cautious About Economy; Energy Prices and International Tension Top Investor Concerns*. The press release stated in part:

Investor optimism dipped slightly in July, slipping two points to a level of 87, according to the UBS/Gallup Index of Investor Optimism. The Index is conducted monthly and had a baseline score of 124 when it was established in October 1996.

The record performance of the equity markets during the first half of July fueled a rise in the Personal Dimension of the Index, which measures investors' optimism about their individual investment portfolios, causing it to increase four points to 71. In contrast, the Economic Dimension, which measures investors' optimism about the US economy, fell six points to 16, suggesting that investors are more cautious about the outlook for the economy over the next 12 months.

"Despite the sharp rise in the stock market this summer, investors are showing concern about the health of the overall US economy given the ongoing weakness in the housing market, rising food and energy prices, and turmoil in the sub-prime mortgage market," said Maury Harris, Chief US Economist, UBS Investment Bank.

Energy prices continue to worry investors with seven in ten respondents saying they believe energy prices are hurting the current investment climate "a lot."

This number is down somewhat from the 76 percent in May and the 73 percent in June who held this view. Still, investor concern remains well above the 63 percent in March and 58 percent in February who felt this way.

Investors on average report paying $2.96 for a gallon of gas during the first half of July and say that they expect this to rise to an average of $3.12 over the next three months. Not surprisingly given the expectations of higher gas prices during the months ahead, 49 percent of investors say they plan to cut back on their summer driving, 40 percent expect to cut back on vacations and 62 percent said they will reduce spending in general.

International tensions remain among the greatest concerns of investors with 55 percent of investors pointing to this issue as hurting the investment climate "a lot." Investors are also increasingly concerned about the federal budget deficit, with 53 percent pointing to it as hurting the investment climate "a lot," up from 48 percent in June. The issue of illegal immigration continues to worry investors, with 45 percent saying it hurts the investment climate, unchanged from last month.

Local real estate remains a concern among investors, with 60 percent saying that conditions in their local community's residential market are getting worse, not getting better. This is up from 58 percent who held this view last month. Forty-one percent say that they are worried about the potential for a real estate crash in some local markets, up from 38 percent in June. Investors also worry about the problems in the sub-prime mortgage market spreading, as four in ten investors say that they are worried about a potential consumer credit crunch.

These findings are part of the 112th Index of Investor Optimism, which was conducted July 1-12, 2007. To track and measure Index changes on an ongoing basis, new samplings are taken monthly. Dennis J. Jacobe, Chief Economist for Gallup, said the sampling included 800 investors randomly selected from across the country. For this study, the American investor is defined as any person who is head of a household or a spouse in any household with total savings and investments of $10,000 or more. Nearly 40 percent of American households have at least this amount in savings and investments. The sampling error in the results is plus or minus four percentage points.

69.    On August 14, 2007, the Company issued its second quarter of 2007 results in a

release stating in relevant part:

UBS reports net profit attributable to shareholders of CHF 5,622 million in second quarter 2007. This quarter's results include two items that had a significant impact on performance. The first item is the CHF 1,926 million post-tax gain from the sale of the 20.7% stake in Julius Baer, a result of the disposal of Private Banks & GAM in 2005. As the stake was held as a financial investment available-for-sale in UBS's accounts, the gain from its sale is included in performance from continuing operations. It is, however, no longer part of the continuing business, and UBS believes that isolating its impact provides a clearer picture of performance. The second item is the charge of CHF 229 million after tax related to the closure of Dillon Read Capital Management (DRCM), recorded in Global Asset Management. Excluding these two items, attributable profit in UBS's core operational businesses (financial businesses' attributable profit from continuing operations) would have been CHF 3,455 million, up 14% from the same period a year earlier and 9% higher than the record first quarter 2007 performance.

                        *        *        *

The performance in fixed income, however, was not satisfactory. Continued difficulties in the US mortgage securities market led to lower revenues in the rates business and further losses on some of DRCM's former portfolios, which contributed net negative revenues of approximately CHF 230 million in second quarter 2007. These developments were partially offset by robust credit fixed income results, which rose on global credit trading and proprietary strategies.

Total operating expenses rose 21% to CHF 9,695 million in second quarter 2007 from the same quarter a year earlier. Approximately a fourth of the cost rise was attributable to the closure of DRCM. For the other parts of UBS, accruals for performance-related payments increased in line with revenues. Personnel expenses rose due to higher numbers of personnel, partially related to acquisitions, including Piper Jaffray and McDonald Investments. General and administrative expenses rose, with administration costs up partly due the inclusion of the acquisition of Banco Pactual. Professional fees rose due to the closure costs related to DRCM and higher legal fees. The expansion of UBS's businesses and the related increases in personnel drove travel and entertainment costs and expenses for office space higher. IT and other outsourcing costs rose on the increased business volume. The number of personnel in the financial businesses was 81,557 on 30 June 2007, up 920 compared with the end of first quarter 2007, with staff levels increasing across most business groups.

                        *        *        *

Closure of Dillon Read Capital Management

In May, UBS announced that DRCM, an alternative investment venture launched in 2006, had not met expectations and, as a result, it had decided to close the business. This process has now been completed. UBS paid back CHF 1.5 billion in outside investor interests, with clients receiving a positive return on their

original investment. The portfolios, plus UBS's own capital that was previously managed by DRCM, have moved to the Investment Bank and are now managed within the fixed income division in an integrated fashion. The closure of DRCM led to a charge against profits of CHF 384 million pre-tax (CHF 229 million after tax). This includes accelerated amortization of deferred compensation of former DRCM employees and, to a lesser extent, write-downs for DRCM office leasehold improvements. Moreover, 122 of the 230 DRCM employees were transferred from Global Asset Management to the Investment Bank.

Outlook

This quarter's downturn in credit and equity markets was a timely reminder of the nature of financial risk, and has continued into third quarter. The asset and wealth management businesses show sustained strength, and investment banking deal pipelines remain promising. However, markets are currently very volatile, and forecasting is even more difficult than usual. If the current turbulent conditions prevail throughout the quarter, UBS will probably see a very weak trading result in the Investment Bank, offset by predictable earnings from wealth and asset management. This makes it likely that profits in the second half of 2007 will be lower than in the second half of last year.

70.     The Evening Standard reported on August 14, 2007, in an article entitled *UBS warns of blow from global turmoil*, that:

Swiss bank UBS today warned that recent blood-letting in financial markets around the world will hit profits this year.

The firm a major employer in London with offices across the City said the turmoil will take its toll on its investment banking arm.

The warning came as UBS delivered strong results for the second quarter when it became the first bank to report since stock markets starting plummeting last week.

Chief executive Marcel Rohner, who took over from the recently ousted Peter Wuffli, said: "If the current turbulent conditions prevail throughout the quarter, UBS will probably see a very weak trading result in the investment bank, offset by predictable earnings from wealth and asset management." Other banks are also expected to be hit as the true cost the uncertainty on financial markets hits home in the City, on Wall Street and further a field in the coming months.

Shares around the world dived last week as fears of a global credit crunch sent investors running for cover.

*          *          *

UBS has struggled with internal uncertainty following the ousting of Wuffli last month.

> He paid the price for his defense of in-house hedge fund Dillon Read Capital Management, which collapsed after it ran up heavy losses from bad debts on the American subprime mortgage market.
>
> UBS was today hit by a charge of Swfr384m (£158.9m) relating to the collapse as the subprime crisis continued to spread.
>
> It also paid back Swfr1.5 billion to outside investors.

71.     On this news, the Company's stock dropped to close at $51.49 per share on August 14, 2007, a decline of 16%, from July 2007.

72.     On October 30, 2007, the Company issued a press release announcing its financial results for the third quarter of 2007.  The press release stated in relevant part as follows:

> UBS reports an operating loss, before tax and minority interests, of CHF 726 million in third quarter 2007. This is within the range given in the announcement on 1 October 2007 forecasting a loss of CHF 600-800 million. After tax and minority interests, the net loss attributable to shareholders was CHF 830 million.
>
> "Our third quarter result was unquestionably disappointing. However, we have introduced a number of measures to improve performance.  With the new management team, we are implementing changes to address the weaknesses that led to the losses. These include the management, structure, and size of our balance sheet.  We are also taking steps to strengthen our market risk management and control framework," said Marcel Rohner, UBS Chief Executive Officer.
>
> The deterioration in UBS's performance in third quarter was mainly due to the substantial losses and writedowns in trading positions related to the US sub-prime residential mortgage-backed securities market, leading to revenues of negative CHF 4.2 billion in the Investment Bank's fixed income, currencies and commodities business.
>
> When these positions, which are sizeable, were taken and of which UBS still holds a proportion, UBS offset them to some extent with hedges that were designed to mitigate risk in normal market conditions.  However, the deterioration in the US sub-prime market, especially in August, was so severe and sudden that markets turned illiquid.  There was a substantial deterioration in the value of these securities – including those with high credit ratings. Conditions in the US housing market continued to be weak in the quarter, and the end-September valuations UBS has put on its holdings of US mortgage-linked securities reflect this.
>
> UBS's other businesses, however, showed sustained strength. The wealth management businesses had an excellent quarter, with record levels of profitability.  Asset gathering performance remained strong, with inflows of net new money in the wealth management businesses totaling CHF 40.2 billion in the quarter. Fees in both wealth and asset management remained high, driven

> by the level of invested assets, which stood at CHF 3.1 trillion on
> 30 September 2007.

73.     In the days following this announcement, the price of the Company's stock

declined to as low as $49.27 per share.

74.     Then, on December 10, 2007, the Company issued a press release entitled *UBS*

*strengthens capital base and adjusts valuations*.    The press release stated in relevant part as

follows:

> UBS revises its outlook for its fourth quarter 2007 from an overall
> Group profit, as anticipated in its announcement of 30 October
> 2007, to a loss.  It is now possible that UBS will record a net loss
> attributable to shareholders for the full year 2007.
>
> In response to continued deterioration in the US sub-prime
> mortgage securities market, partly driven by increased homeowner
> delinquencies but mainly fuelled by worsening market
> expectations of future developments, UBS has revised the
> assumptions and inputs used to value US sub-prime mortgage
> related positions.  This will result in further writedowns of around
> USD 10 billion, primarily on CDO and "super senior"1 holdings.
> In light of continued deterioration in the sub-prime market,
> valuations of UBS's remaining sub-prime positions reflect the
> extreme loss projections implied by the prices achieved in the very
> limited number of observable market transactions in US sub-prime
> related securities and indices up to the end of November.

75.     Following this Company announcement, the price of the Company's stock

declined to $48.78 per share, a 26% decline from the Class Period high.

76.     The true facts, which were known or recklessly disregarded by Defendants but

concealed from the investing public (which includes Plan Participants) during the Class Period,

were as follows:

(a)     Defendants had been informed by executives at Dillon Read that debt

securities UBS held were impaired;

(b)     Defendants had reason to believe other debt securities besides those held

By Dillon Read were impaired, yet defendants failed to investigate the value of these and similar

debt securities; and

(c)    Defendants had failed to record impairment of debt securities which they knew or disregarded were impaired.

## THE LAW UNDER ERISA

77.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

78.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

79.    ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

80.    These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence, and are the "highest known to the law."  They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance the Plan, which invested in UBS Stock, to ensure that each investment is a suitable option for the Plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the Plan's sponsor; and

(c)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

81.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that ". . . [i]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(l), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

82.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(l) and ERISA § 405(a).

## DEFENDANTS' FIDUCIARY STATUS

83.    ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." § 402(a)(l), 29 U.S.C. § 1102(a)(l).

84.    During the Class Period, all of the Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A) and the law interpreting that section. As outlined herein, Defendants all had discretionary authority and control with respect to the management of the Plan and/or the management or disposition of the Plan's investments and assets, and/or had discretionary authority or responsibility for the administration of the Plan.

85.    During the Class Period, Defendants' direct and indirect communications with the Plan's Participants included statements regarding investments in Company Stock. Upon information and belief, these communications included, but were not limited to, SEC filings, annual reports, press releases, Company presentations made available to the Plan's Participants via the Company's website and Plan-related documents which incorporated and/or reiterated these statements. Defendants also acted as fiduciaries to the extent of this activity.

86.    In addition, under ERISA, in various circumstances, non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the

Defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the breaches of fiduciary duty described below.

## CAUSES OF ACTION

## COUNT I

87.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

88.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

89.     As alleged above, Defendants were responsible, in different ways and to differing extents, for the selection and monitoring of the Plan's investment options, including the option of Company Stock.

90.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in UBS Stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are therefore liable for losses incurred as a result of such investments being imprudent.

91.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it

allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

92.     Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to prevent the Plan, and indirectly the Plan's Participants and beneficiaries, from suffering losses as a result of the Plan's investment in UBS Stock.  Further, given that such a high concentration of the assets of the Plan was invested in the stock of a single company (UBS), Defendants were obliged to have in place some financial strategy to address the extreme volatility of single equity investments.  All categories of Defendants failed to implement any such strategy.

93.     The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

94.     Defendants breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the failure to prudently and loyally manage the Plan's assets with respect to offering Company Stock as an investment option in the Plan; enabling Defendants' failure to prudently manage the Plan's assets with respect to the Plan's investments; and, having knowledge of the failure to prudently manage the Plan's assets, yet not making any effort to remedy the breach.

95.     Specifically, at least some of the defendants had actual knowledge of UBS's corporate malfeasance and questionable reporting and business.  In addition, in light of their high-ranking positions as high ranking officers at the Company, Director Defendants had/should have had constructive knowledge of these activities.

96.     Despite this knowledge, Defendants participated in each other's failures to prudently manage the Plan's assets and knowingly concealed such failures by not informing Participants that the Plan's holdings of UBS Stock were not being prudently managed.  They also failed to remedy their mutual breaches of the duty to prudently manage the Plan's investment in UBS Stock, despite inarguably having knowledge of such breaches.

97.     Furthermore, through their own failure to prudently and loyally manage the Plan's investment in UBS Stock, or to undertake any genuine effort to investigate the merits of such investment, or to ensure that other fiduciaries were doing so, Defendants enabled their co-fiduciaries to breach their own independent duty to prudently and loyally manage the Plan's investment in UBS Stock.

98.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

99.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

100.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

101.    As alleged above, the scope of Defendants' fiduciary duties and responsibilities included disseminating Plan documents and information to Participants regarding the Plan and

assets of the Plan. In addition, Defendants had a duty to provide Participants with information they possessed that they knew or should have known, would have an extreme impact on the Plan.

102.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the Plan or the Plan's assets, and to disclose information that Participants need in order to exercise their rights and interests under the Plan. This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plan's investment options such that Participants can make informed decisions with regard to investment options available under the Plan, this duty applies to all of the Plan's investment options, including investment in UBS Stock.

103.    Because a substantial percentage of the Plan's assets were invested in UBS Stock, and Defendants chose to invest overwhelmingly in UBS Stock, such investment carried with it an inherently high degree of risk. This inherent risk made Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

104.    Specifically, UBS, through its officers and directors, issued a multitude of false and misleading statements through SEC filings and press releases regarding value of UBS Stock and the financial health of the Company.

105.    Upon information and belief, such communications were disseminated directly to all Participants, which incorporated by reference the Company's materially misleading and inaccurate SEC filings and reports furnished by UBS, through its officers and Director Defendants. In addition, upon information and belief, the Company communicated directly with all Participants regarding the merits of investing in UBS Stock in company-wide and uniform

communications, and, yet, in the context of such communications failed to provide complete and accurate information regarding UBS Stock as required by ERISA.

106.    In addition, Defendants were responsible for providing Participants in the Plan with investment education and communication.  Defendants, however, failed to disclose any information to Plan Participants regarding UBS's deceitful business practices and how these activities adversely affected Company stock as a prudent investment option under the Plan. Defendants thus breached their duty to provide Participants with complete and accurate information necessary for making informed investment decisions with regard to investment options under the Plan.

107.    Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding UBS Stock, making material misrepresentations about the Company's financial condition, and, generally, by conveying inaccurate information regarding the soundness of UBS Stock and the prudence of investing retirement contributions in the Company's stock.

108.    These failures were particularly devastating to the Plan and the Participants, as a significant percentage of the Plan's assets were invested in UBS Stock during the Class Period and, thus, the stock's precipitous decline had an enormous impact on the value of Participants' retirement assets.

109.    In addition, UBS and the other defendants knew or should have known that information they possessed regarding the true condition of UBS would have an extreme impact on the Plan.  Yet, in violation of their fiduciary duties, these Defendants failed to provide Participants with this crucial information.

110.    As a consequence of the failure of Defendants to satisfy their disclosure obligations under ERISA, Participants lacked sufficient information to make informed choices regarding investment of their retirement savings in UBS Stock, or to appreciate that under the circumstances known to the fiduciaries, but not known by Participants, UBS Stock was an inherently unsuitable and inappropriate investment option for their Plan accounts.  Had accurate information been provided, Participants could have protected themselves against losses accordingly, and consequently, Participants relied to their detriment on the incomplete and inaccurate information provided by Defendants in their fiduciary communications and failures thereof.

111.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If these Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

112.    Pursuant to ERISA §§ 409 and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III

113.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

114.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  At all relevant times, as alleged above, the scope of the fiduciary responsibilities of Defendants included the responsibility to appoint,

evaluate, and monitor other fiduciaries.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  Defendants had the duty to:

(a)    Ensure that the appointed Plan fiduciaries possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, as noted above, and the behavior of the Plan's Participants;

(b)    Ensure that the appointed Plan fiduciaries are provided with adequate financial resources to do their job;

(c)    Ensure that the appointed Plan fiduciaries have adequate information to do their job of overseeing the Plan's investments;

(d)    Ensure that the appointed Plan fiduciaries have ready access to outside, impartial advisors when needed;

(e)    Ensure that the appointed Plan fiduciaries maintain adequate records of the information on which they base their decisions and analysis with respect to the Plan's investment options; and

(f)    Ensure that the appointed Plan fiduciaries report regularly to the Company, the Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

115.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know

that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

116.    Defendants breached their fiduciary monitoring duties by, among other things, (a) failing to ensure that the appointed Plan fiduciaries were given adequate information about the Company's business problems alleged above, which made Company Stock an imprudent investment, which was necessary for them to perform their duties of overseeing the Plan's investments, and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment by rank and file employees in an undiversified employer stock fund which was made up primarily of Company Stock, an investment that was imprudent and inherently subject to significant downward movements, especially here where the stock was artificially inflated by non-public corporate malfeasance and illicit activities.

117.    Defendants also breached this duty by not properly disclosing information, that they knew or should have known, about the Company's improper business practices to the Trustee.  The Trustee is responsible for investing and managing assets of the Plan.  However, in doing so, the Trustee shall be subject to the direction and guidance of UBS.

118.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were (a) imprudently allowing the Plan to continue offering UBS Stock as an investment alternative for the Plan, and (b) continuing to invest the assets of the Plan in UBS Stock when it no longer was prudent to do so.  Despite this knowledge, Defendants failed to take action to protect the Plan, and concomitantly the Plan's Participants, from the consequences of these fiduciaries' failures.

119.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the appointed Plan fiduciaries, they enabled

the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

120.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their investments meant to help Participants save for retirement.

121.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C., § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT IV

122.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

123.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

124.    ERISA § 404(a)(l)(A), 29 U.S.C. § 1104(a)(l)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his/her duties with respect to a plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and beneficiaries.

125.    Given the allegations listed above, Defendants clearly placed the interests of themselves and the Company, as evidenced by the longstanding artificial inflation of Company Stock, before the interests of the Plan and its Participants and beneficiaries.  These conflicts of interest put Defendants in the inherently problematic position of having to choose between their own interests as directors, officers, executives (and UBS stockholders), and the interests of the

Plan's Participants and beneficiaries, in whose interests Defendants were obligated to loyally serve with an "eye single."

126.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in UBS Stock; failing to notify appropriate federal agencies, including the SEC of the facts and transactions which made UBS Stock an unsuitable investment for the Plan; failing to take such other steps as were necessary to ensure that Participants' interests were loyally and prudently served; with respect to each of these above failures, doing so in order to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company and themselves above the interests of the Participants with respect to the Plan's investment in Company Stock.

127.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT V

128.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

129.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (a) he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (b) he fails to comply with § 1104(a)(l) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other

fiduciary to commit a breach; or (c) he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

130.    As alleged herein, UBS, through its officers and employees, withheld material information from the Plan's Participants and provided misleading disclosures, by the conduct set forth above, and profited from such practices, and, thus, knowledge of such practices is imputed to these Defendants as a matter of law.  In addition, as alleged herein on information and belief, Defendants participated in and/or knew about the Company's misrepresentations regarding the Company's financial condition.  Thus, these defendants as well had knowledge at all relevant times of the factual matters pertaining to the imprudence of UBS Stock as an investment for the Participants' retirement assets.

131.    Despite this knowledge, Defendants knowingly participated in their co-fiduciaries' failures to prudently and loyally manage the Plan's investment and holding of UBS Stock during the Class Period.  They did so by themselves making imprudent and disloyal decisions respecting the Plan's investment in UBS Stock in the manner alleged herein in violation of ERISA § 405(a)(l)(A).  In addition, these same Defendants failed to undertake any effort to remedy their co-fiduciaries' and one-another's failures to prudently and loyally manage the Plan's investment in UBS Stock despite knowing such failures were breaches of fiduciary duty under ERISA. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(l)(C).

132.    In further violation of ERISA § 405(a)(l)(C), Defendants also knew that inaccurate and incomplete information had been provided to Participants, yet, they failed to undertake any effort to remedy this breach by ensuring that accurate disclosures were made to Participants and the market as a whole.  Instead, they compounded the problem by downplaying

the significance of UBS's problems and further concealing such practices from Participants and the market as a whole.

133.    In addition, Defendants enabled the imprudent asset management decisions of any and all other Defendants -- including any appointed Plan fiduciaries -- who lacked knowledge of the circumstances rendering the stock imprudent, by failing to provide such persons with complete and accurate information regarding the stock, or to the extent all such persons possessed the information, by failing to ensure that they appreciated the true risks to the Plan caused by the Company's improper practices, so that these other Defendants could effectively discharge their obligation to prudently and loyally manage the Plan's investment in UBS Stock. In so doing, these Defendants breached ERISA § 405(a)(l)(B).

134.    Further, through their failure to properly and effectively monitor and remove those fiduciaries whose performance was inadequate as alleged above, Defendants enabled these appointed Plan fiduciaries' imprudent management of the UBS Stock in the Plan.

135.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

136.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT VI

137.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

138.    To the extent that UBS is found not to have been a fiduciary or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, UBS knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such is liable for equitable relief as a result of participating in such breaches.

139.    UBS benefited from the breaches by discharging its obligations to make contributions to the Plan in amounts specified by contributing UBS Stock to the Plan while the value of the stock was inflated as the result of the breaches of fiduciary duty alleged herein and as a result of UBS providing the market with materially misleading statements and omissions. Accordingly, UBS may be required to disgorge this benefit or a constructive trust should be imposed on treasury shares of UBS Stock which would have been contributed to the Plan, but for UBS's participation in the foregoing breaches of fiduciary duty.

## CAUSATION

140.    The Plan suffered millions of dollars in losses in plan benefits because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in UBS Stock during the Class Period, in breach of Defendants' fiduciary duties.  These losses to the Plan were reflected in the diminished account balances of the Plan's Participants.

141.    Defendants are responsible for losses in Plan benefits caused by the Participants' direction of investment in UBS Stock, because Defendants failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.  Defendants concealed material, non-public facts from Participants, and provided inaccurate, incomplete and materially misleading information to them regarding the true health and ongoing profitability of the Company, thereby misrepresenting the

Company's soundness as an investment vehicle.  As a consequence, Participants could not exercise independent control over their investments in UBS Stock, and Defendants remain liable under ERISA for losses caused by such investment.

142.    Defendants are also responsible for all losses in Plan benefits caused by the investment of the Plan's Company Contributions in UBS Stock during the Class Period, as Defendants controlled the investment, and the investment was imprudent.

143.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in UBS Stock, eliminating such Company Stock as an investment alternative when it became imprudent, and divesting the Plan from its holdings of UBS Stock when maintaining such an investment became imprudent, the Plan would have avoided a substantial portion of the losses that it suffered.

144.    Also, reliance is presumed in an ERISA breach of fiduciary duty case. Nevertheless, to the extent that reliance is an element of the claim, Plaintiff relied to their detriment on the misstatements and omissions that Defendants made to Plan Participants.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

145.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in UBS Stock during the Class Period.  As a consequence of Defendants' breaches, the Plan suffered significant losses.

146.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary. . . who breaches any of the . . . duties imposed upon fiduciaries . .

. to make good to such plan any losses to the plan . . . ." Section 409 also authorizes Asuch other equitable or remedial relief as the court may deem appropriate . . . ."

147.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been, properly administered.

148.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (c) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (d) taxable costs; (e) interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

149.    Under ERISA, each defendant is jointly and severally liable for the losses suffered by the Plan in this case.

### ERISA SECTION 404(c) DEFENSE INAPPLICABLE

150.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from Participants' exercise of control over investment

decisions.  In order for § 404(c) to apply, Participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.

151.    Those provisions were not complied with here as, among other reasons, instead of taking the necessary steps to ensure effective participant control by complete and accurate material information disclosure, Defendants did exactly the opposite.  As a consequence, Participants in the Plan did not have informed control over the portion of the Plan's assets that were invested in UBS Stock as a result of their investment directions, and Defendants remained entirely responsible for losses that result from such investment.

152.    Because ERISA § 404(c) does not apply here, Defendants' liability to the Plan, the Plaintiff and the Class for relief stemming from Participants' decisions to invest contributions in UBS Stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period.

153.    Furthermore, under ERISA, fiduciaries -- not Participants -- exercise control over the selection of investment options made available to Participants.  Thus, whether or not Participants are provided with the ability to select among different investment options, and whether or not Participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment is selected by the fiduciaries and presented as an option to Participants, and as a result of such action the Plan suffers a loss.  Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plan.

154.    Finally, Defendants remain liable for Plan losses that pertain to UBS Stock acquired by the Plan with employer contributions, as Participants did not exercise any control.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(l)(B), 29 U.S.C. § 1104(c)(l)(B);

C.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

D.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.    An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in UBS Stock;

G.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts as benefits due in proportion to the accounts' diminution in value;

        H.       An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

        I.       An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

        J.       An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: July 28, 2008

**GAINEY & McKENNA**

By:    \_\_\_\_\_**/s/**_____
        Thomas J. McKenna
        295 Madison Avenue
        New York, NY 10017
        Telephone: (212) 983-1 300
        Facsimile: (212) 983-0383
        Email:  tjmlaw2001@yahoo.com
                 tjmckenna@gaineyandmckenna.com

        *Attorneys for Plaintiff*