# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

IN RE UBS AG ERISA LITIGATION

No. 08 CV 06696 (RJS)

---

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT PURSUANT TO RULES 12(b)(1) AND 12(b)(6)

J. Mark Iwry
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330

Robert J. Giuffra, Jr. (RG9969)
Maite Aquino (MA0030)
Suhana S. Han (SH2407)
Matthew A. Schwartz (MS8359)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*

January 16, 2009

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ................................................................................. 1

**BACKGROUND** ........................................................................................................ 6

    A.    The Parties ............................................................................................. 6

        1.    Plaintiffs ....................................................................................... 6

        2.    Defendants ..................................................................................... 6

    B.    The Plans ................................................................................................ 8

        1.    Fiduciary Authority ...................................................................... 8

        2.    Nature of the Plans ....................................................................... 9

        3.    Plan Investment Options ............................................................. 10

    C.    The Allegations of the Complaint .......................................................... 12

        1.    Mortgage-Related Securities ....................................................... 12

        2.    Auction Rate Securities ("ARS") ................................................ 15

        3.    Tax Allegations ........................................................................... 16

        4.    Plaintiffs' Causes of Action ........................................................ 17

    D.    UBS Remained Well-Capitalized and Fully Viable Throughout the Putative Class Period .......................................................................... 18

**LEGAL STANDARD** ................................................................................................ 20

**ARGUMENT** ............................................................................................................ 22

I.    COUNT I DOES NOT ADEQUATELY ALLEGE THAT DEFENDANTS BREACHED ANY FIDUCIARY DUTY OF PRUDENCE AND LOYALTY ................................................................................................ 22

    A.    None of the Defendants (Except For the Members of the SIP Committee) Was an ERISA Fiduciary With Respect to Maintaining the UBS Stock Fund as a Plan Investment Option ................................... 23

        1.    The Appointing Defendants Were Not Fiduciaries with Regard to Offering Plaintiffs the Option to Invest in the UBS Stock Fund ............................................................................................ 23

*Page*

2.  The Plus Plan Administration Committee and Administrator Were Not Fiduciaries with Regard to Offering Plaintiffs the Option to Invest Their Plan Assets in the UBS Stock Fund Because They Had No Authority to Add or Remove Plus Plan Investment Options ..................................................................... 26

3.  None of the Plus Plan Defendants Were Fiduciaries with Regard to Offering Plaintiffs the Option to Invest Their Plan Assets in the UBS Stock Fund Because Such an Option Was Mandatory Under the Plan Documents ........................................ 27

4.  None of the Committees Are Liable under ERISA ..................... 28

B.  As a Matter of Law, Defendants Did Not Act Imprudently in Continuing to Allow Participants the Option of Investing in the UBS Stock Fund.................................................................................. 29

C.  Defendants Did Not Breach a Duty to Investigate ................................... 35

II.  COUNT II DOES NOT ADEQUATELY ALLEGE THAT DEFENDANTS BREACHED ANY FIDUCIARY DUTY TO "ADEQUATELY INFORM" ...... 37

A.  There Was No Generalized ERISA Requirement to Disclose Information about UBS's Financial Health to the Plans' Participants ..... 38

B.  The Challenged Disclosures Were Not ERISA Communications ........... 39

III.  THE COURT SHOULD DISMISS THE REMAINING COUNTS FOR FAILURE TO STATE A CLAIM ....................................................................... 42

A.  Plaintiffs Fail to State a Claim for Breach of the Duty to Monitor .......... 42

B.  Plaintiffs Fail to State an ERISA Claim for Conflict of Interest .............. 44

C.  Plaintiffs Fail to State a Claim for Breach of Co-Fiduciary Liability ...... 45

IV.  PLAINTIFFS' CLAIMS AND RELIEF SOUGHT ARE BARRED IN WHOLE OR IN PART BY THEIR FAILURE TO ALLEGE LOSS CAUSATION, LACK OF STANDING, AND WAIVER OF CLAIMS ........... 47

**CONCLUSION**...........................................................................................................50

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Agway, Inc., Employees' 401(k) Thrift Inv. Plan* v. *Magnuson*,
No. 03-cv-1060, 2006 WL 2934391 (N.D.N.Y. Oct. 22, 2006) ........................... 26, 30

*ATSI Commc'ns Inc.* v. *Wolfson*,
493 F.3d 87 (2d Cir. 2007) ................................................................................. 7, 22

*Baker* v. *Kingsley*,
387 F.3d 649 (7th Cir. 2004) ...................................................................................... 39

*Bd. of Trs. CWA/ITU Negotiated Pension Plan* v. *Weinstein*,
107 F.3d 139 (2d Cir. 1997) ........................................................................................ 38

*Beauchem* v. *Rockford Prods. Corp.*,
No. 01 C 50134, 2003 WL 1562561 (N.D. Ill. Mar. 24, 2003) ................................. 44

*Bell Atl. Corp.* v. *Twombly*,
127 S. Ct. 1955 (2007) ................................................................................... 20, 25, 31

*Boucher* v. *Williams*,
13 F. Supp. 2d 84 (D. Me. 1998) .............................................................................. 29

*Coan* v. *Kaufman*,
349 F. Supp. 2d 271 (D. Conn. 2004) ....................................................................... 47

*Conn. Nat'l Bank* v. *Fluor Corp.*,
808 F.2d 957 (2d Cir. 1987) .......................................................................... 21, 22, 42

*Coyne & Delany Co.* v. *Selman*,
98 F.3d 1457 (4th Cir. 1996) ..................................................................................... 43

*Credit Suisse Sec. (USA) LLC* v. *Billing*,
127 S. Ct. 2383 (2007) ................................................................................................. 2

*Crowley ex rel. Corning, Inc., Inv. Plan* v. *Corning, Inc.*,
234 F. Supp. 2d 222 (W.D.N.Y. 2002) ............................................................. passim

*Curtiss-Wright Corp.* v. *Schoonejongen*,
514 U.S. 73 (1995) ............................................................................................... 23, 38

*Deshawn E.* v. *Safir*,
156 F.3d 340 (2d Cir. 1998) ...................................................................................... 49

*Page(s)*

*Diduck* v. *Kaszycki & Sons Contractors, Inc.*,
    974 F.2d 270 (2d Cir. 1992) ................................................................. 47

*Donovan* v. *Cunningham*,
    716 F.2d 1455 (5th Cir. 1983)............................................................... 46

*Edgar* v. *Avaya, Inc.*,
    503 F.3d 340 (3d Cir. 2007)..................................................... 28, 31, 39

*Edgar* v. *Avaya, Inc.*,
    No. Civ.A. 05-3598, 2006 WL 1084087 (D.N.J. April 25, 2006) ............ 43

*Fink* v. *Nat'l. Sav. & Trust Co.*,
    772 F.2d 951 (D.C. Cir. 1985) .............................................................. 35

*Flanigan* v. *Gen. Elec. Co.*,
    242 F.3d 78 (2d Cir. 2001) ................................................................... 23

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).................................................................... 7

*Goldstein* v. *Pataki*,
    516 F.3d 50 (2d Cir. 2008) ................................................................... 20

*Graden* v. *Conexant Sys., Inc.*,
    574 F. Supp. 2d 456 (D.N.J. 2008) ....................................................... 31

*Haber* v. *Brown*,
    774 F. Supp. 877 (S.D.N.Y. 1991)................................................ 25, 46-47

*Harris Trust & Sav. Bank* v. *John Hancock Mut. Life Ins. Co.*,
    302 F.3d 18 (2d Cir. 2002)................................................................... 28

*Harzewski* v. *Guidant Corp.*,
    489 F.3d 799 (7th Cir. 2007)................................................................ 42

*Hecker* v. *Deere & Co.*,
    496 F. Supp. 2d 967 (W.D. Wis. 2007).................................................. 48

*Hogan* v. *E. Enters./Boston Gas*,
    165 F. Supp. 2d 55 (D. Mass. 2001) ..................................................... 50

*Howell* v. *Motorola, Inc.*,
    337 F. Supp. 2d 1079 (N.D. Ill. 2004) .................................................. 36

*Hull* v. *Policy Mgmt. Sys. Corp.*,
    No. CIV.A.3:00-778-17, 2001 WL 1836286 (D.S.C. Feb. 9, 2001).............. 40, 42, 44

*Page(s)*

*In re Bausch & Lomb Inc. ERISA Litig.*,
  No. 06-CV-6297, 2008 WL 5234281 (W.D.N.Y. Dec. 12, 2008) ...................... passim

*In re Bayou Hedge Fund Litig.*,
  534 F. Supp. 2d 405 (S.D.N.Y. 2007) ................................................................. 20, 25

*In re Calpine Corp. ERISA Litig.*,
  No. C 03-1685, 2005 WL 1431506 (N.D. Cal. Mar. 31, 2005) ............... 21, 32, 34, 45

*In re Coca-Cola Enters. ERISA Litig.*,
  No. 1:06-CV-0953, 2007 WL 1810211 (N.D. Ga. June 20, 2007) ............. 2, 21, 32, 43

*In re Cybershop.com Sec. Litig.*,
  189 F. Supp. 2d 214 (D.N.J. 2002) ........................................................................... 50

*In re Dell, Inc. ERISA Litig.*,
  563 F. Supp. 2d 681 (W.D. Tex. 2008) ..................................................................... 31

*In re Duke Ener. ERISA Litig.*,
  281 F. Supp. 2d 786, 793-95 (W.D.N.C. 2003) ........................................................ 32

*In re Dynegy, Inc. ERISA Litig.*,
  309 F. Supp. 2d 861 (S.D. Tex. 2004) ................................................................ 27, 43

*In re Enron Corp. Sec., Deriv., & ERISA Litigation*,
  284 F. Supp. 2d 511, 617 (S.D. Tex. 2003) ............................................................. 29

*In re Ford Motor Co. ERISA Litig.*,
  No. 06-11718, 2008 WL 5377955 (E.D. Mich. Dec. 22, 2008) ................................. 32

*In re Marsh ERISA Litig.*,
  No. 04 Civ. 8157, 2006 WL 3706169 (S.D.N.Y. Dec. 14, 2006) ............................... 23

*In re McKesson HBOC, Inc. ERISA Litig.*,
  391 F. Supp. 2d 812 (N.D. Cal. 2005) ................................................................ passim

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  273 F. Supp. 2d 351 ................................................................................................... 7

*In re Polaroid ERISA Litig.*,
  362 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................ passim

*In re RadioShack Corp. ERISA Litig.*,
  547 F. Supp. 2d 606 (N.D. Tex. 2008) ..................................................................... 31

*In re Sprint Corp. ERISA Litig.*,
  388 F. Supp. 2d 1207 (D. Kan. 2004) ....................................................................... 24

*Page(s)*

*In re Williams Cos. ERISA Litig.*,
    271 F. Supp. 2d 1328 (N.D. Okla. 2003) .................................................................... 24

*In re Worldcom, Inc. ERISA Litig.*,
    263 F. Supp. 2d 745 (S.D.N.Y. 2003) ........................................................ 8, 39, 41, 44

*Indep. Ass'n of Publishers' Employees, Inc.* v. *Dow Jones & Co., Inc.*,
    671 F. Supp. 1365 (S.D.N.Y. 1987) ........................................................................... 24

*IUE AFL-CIO Pension Fund* v. *Herrmann*,
    9 F.3d 1049 (2d Cir. 1993) ......................................................................................... 21

*Izzarelli* v. *Rexene Prods. Co.*,
    24 F.3d 1506 (5th Cir. 1994) ....................................................................................... 46

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001) ....................................................................................... 22

*Kirschbaum* v. *Reliant Energy, Inc.*,
    526 F.3d 243 (5th Cir. 2008) ............................................................................. passim

*Kling* v. *Fidelity Mgmt. Trust Co.*,
    323 F. Supp. 2d 132 (D. Mass. 2004) ........................................................................ 46

*Kuper* v. *Iovenko*,
    66 F.3d 1447, 1459 (6th Cir. 1995) ...................................................................... 30, 32

*Langbecker* v. *Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007) ...................................................................................... 48

*Laniok* v. *Advisory Comm. of the Brainerd Mfg. Co. Pension Plan*,
    935 F.2d 1360 (2d Cir. 1991) ..................................................................................... 49

*Lee* v. *Burkhart*,
    991 F.2d 1004 (2d Cir. 1993) ..................................................................................... 46

*Maniace* v. *Commerce Bank of Kan. City, N.A.*,
    40 F.3d 264 (8th Cir. 1994) .................................................................................. 45, 46

*Mellot* v. *Choicepoint, Inc.*,
    561 F. Supp. 2d 1305 (N.D. Ga. 2007) ...................................................................... 38

*Moench* v. *Robertson*,
    62 F.3d 553 (3d Cir. 1995) ................................................................................. passim

*Moore* v. *Metro. Life Ins. Co.*,
    856 F.2d 488 (2d Cir. 1988) ......................................................................................... 8

*Page(s)*

*Olson* v. *Chem-Trend Inc.*,
No. 94-CV-75201, 1995 WL 866221 (E.D. Mich. May 30, 1995)............................ 39

*Pedraza* v. *Coca-Cola Co.*,
456 F. Supp. 2d 1262 (N.D. Ga. 2006) ....................................................26-27, 35, 43

*Pegram* v. *Herdrich*,
530 U.S. 211 (2000) ..................................................................................... 23, 44

*Pugh* v. *Tribune Co.*,
521 F.3d 686 (7th Cir. 2008).......................................................................... 30, 36, 37

*Rombach* v. *Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................... 21

*Smith* v. *Delta Air Lines, Inc.*,
422 F. Supp. 2d 1310 (N.D. Ga. 2006) ........................................................ 27

*Stein* v. *Smith*,
270 F. Supp. 2d 157 (D. Mass. 2003) ........................................................ 46

*Swanson* v. *U.A. Local 13 Pension Plan*,
779 F. Supp. 690 (W.D.N.Y. 1991) .............................................................. 29

*Sweeney* v. *Kroger Co.*,
773 F. Supp. 1266 (E.D. Mo. 1991) ............................................................ 39

*Tatum* v. *R.J. Reynolds Tobacco Co.*,
02-cv-373, 2007 WL 1612580 (M.D.N.C. May 31, 2007) ......................................... 29

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 (2007) ..................................................................................... 2

*Toussaint* v. *JJ Weiser & Co.*,
No. 04 Civ. 2592, 2005 WL 356834 (S.D.N.Y. Feb. 13, 2005) ............................... 21

*Urban* v. *Comcast Corp.*,
No. 08-773, 2008 WL 4739519 (E.D. Pa. Oct. 28, 2008)........................................... 28

*Ward* v. *Avaya, Inc.*,
No. 07-3246, 2008 WL 4888494 (3d Cir. Nov. 13, 2008)................................... 31, 32

*West* v. *Prudential Sec., Inc.*,
282 F.3d 935 (7th Cir. 2002)........................................................................... 41

*Wright* v. *Or. Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004) .......................................................................32-33

*Page(s)*

*Wright* v. *Or. Metallurgical Corp.*,
  222 F. Supp. 2d 1224 (D. Or. 2002) .......................................................................... 32

*Yak* v. *Bank Brussels Lambert*,
  252 F.2d 127 (2d Cir. 2001) .................................................................................... 7

*Zappia Middle E. Constr. Co.* v. *Emirate of Abu Dhabi*,
  215 F.3d 247 (2d Cir. 2000) .................................................................................... 7

**STATUTES AND RULES**

Employee Retirement Income Security Act of 1974 ("ERISA")
  29 U.S.C. § 1002 .................................................................................................. 29
  29 U.S.C. §§ 1021-31 ........................................................................................... 39
  29 U.S.C. § 1104 ............................................................................................. 37, 48
  29 U.S.C. § 1105(a) ......................................................................................... 45, 46
  29 U.S.C. § 1107(d)(3) ........................................................................................... 9
  29 U.S.C. § 1109(a) ............................................................................................. 28

Private Securities Litigation Reform Act of 1995 ........................................................ 1-2

Securities Act of 1933 .............................................................................................. 7

Securities Exchange Act of 1934 ............................................................................... 7

Rule 9, Fed. R. Civ. P. ...................................................................................... passim

Rule 12, Fed. R. Civ. P. .................................................................................... passim

Rule 15, Fed. R. Civ. P. ......................................................................................... 50

Pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P., Defendants move this Court to dismiss with prejudice Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") brought under the Employee Retirement Income Security Act of 1974 ("ERISA").

## PRELIMINARY STATEMENT

The financial crisis of the past sixteen months—which the Federal Reserve and IMF have called the worst since the Great Depression[1]—has forced UBS AG ("UBS") to write down billions of dollars in previously AAA-rated securities backed by residential mortgages and driven down UBS's stock price. In taking these writedowns, UBS was far from alone: since October 2008, virtually every major financial institution—in the United States and abroad—has announced massive writedowns and sustained significant declines in their stock price.

Plaintiffs—four former employees of UBS and UBS Financial Services, Inc. ("UBSFS")—allegedly are participants in the UBS Savings and Investment Plan ("SIP") and the UBSFS 401(k) Plus Plan ("Plus Plan," together, the "Plan(s)"). Plaintiffs affirmatively elected (on their own) to invest some of their retirement plan assets in the UBS Stock Fund (a fund that tracks the price of UBS shares), one of many investment options for SIP and Plus Plan participants. Through this putative class action, Plaintiffs seek to hold Defendants liable for their losses in the UBS Stock Fund.

In their Complaint, Plaintiffs ignore that regulators and executives at peer firms failed to foresee the current global financial crisis. Nevertheless, bringing a legally

---

[1]    Ex. 1 (Tom Barkley *et al.*, *IMF Sees U.S. Maladies Infecting World Economy*, WALL ST. J., Apr. 10, 2008, at A9); Ex. 2 (Damian Paletta *et al.*, *At Moment of Truth, U.S. Forced Big Bankers To Blink*, WALL ST. J., Oct. 15, 2008, at A1). Unless otherwise indicated, all references to "Ex. __" are to the exhibits accompanying the Declaration of Robert J. Giuffra, Jr., dated January 16, 2009.

impermissible hindsight claim, Plaintiffs charge that Defendants were not sufficiently clairvoyant when they failed to remove the UBS Stock Fund as an investment *option* for Plan participants, including summarily liquidating Plan participants' investments in the Fund. Plaintiffs contend that Defendants should have taken these extraordinary steps, even though (a) no other major financial institution did so for its own stock in employee retirement accounts; (b) ERISA encourages employee ownership of employer stock; (c) the Plans expressly require (Plus Plan) or provide (SIP) that the UBS Stock Fund will be an investment option; and (d) UBS has been at all times a well-capitalized financial institution and has never faced the sort of "imminent" collapse that courts routinely hold is required to state a claim under ERISA.

At its core, Plaintiffs' lawsuit—based on allegations of misstatements concerning UBS's investments in mortgage-related and auction-rate securities, and certain cross-border tax issues—is "a securities fraud case masquerading as an ERISA case." *In re Coca-Cola Enters. Inc., ERISA Litig.*, No. 06 Civ. 0953, 2007 WL 1810211, at *8 (N.D. Ga. June 20, 2007). This is unsurprising.[2] Following the marketwide decline of financial industry stock, plaintiffs' lawyers brought putative securities class actions against those institutions, including against UBS in this Court. Now, those plaintiffs' lawyers who did not secure a lead position in these putative

---

[2]     Since Congress enacted the heightened substantive and procedural requirements of the Private Securities Litigation Reform Act of 1995 ("Reform Act") "[a]s a check against abusive litigation [in securities fraud actions] by private parties," *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504 (2007), the plaintiffs' bar has sought to evade the Reform Act's heightened pleading standards by invoking other federal statutes. *See Credit Suisse Sec. (USA) LLC* v. *Billing*, 127 S. Ct. 2383 (2007) (dismissing securities action brought as an antitrust case and holding that "[t]o permit an antitrust lawsuit [here] risks circumventing [the Reform Act's] requirements by permitting plaintiffs to dress what is essentially a securities complaint in antitrust clothing").

securities class actions have brought "copycat" claims under ERISA.[3]  Here, Plaintiffs lift their allegations almost wholly from the consolidated class action complaint in the related putative securities fraud class action before this Court, *In re UBS AG Securities Litigation*, 07-cv-11225 (RJS), filed two weeks before Plaintiffs filed this ERISA lawsuit.

Under settled law, ERISA is not an insurance policy against declines in a plan participant's investment choices.  Because Plaintiffs cannot meet ERISA's strict pleading requirements, this Court should dismiss the Complaint with prejudice.

*First*, Plaintiffs do not adequately plead that any Defendant (except the members of the SIP Committee) was an ERISA fiduciary in continuing to afford Plaintiffs the option to invest in the UBS Stock Fund—a necessary requirement to state any claim for breach of fiduciary duty.  Indeed, because the Plus Plan required the UBS Stock Fund to be an investment option, none of the Plus Plan Defendants had the requisite fiduciary discretion to remove the Fund as an option or to divest Plaintiffs' accounts of that Fund.  Moreover, both Plans clearly delineated the separate roles of the Defendants with respect to the Plans, and no Defendant (except the members of the SIP Committee) had any fiduciary responsibility whatsoever in connection with Plaintiffs' continuing option to invest in the UBS Stock Fund.  *See infra* pages 23 to 29.

*Second*, even if the Court holds that the Defendants were fiduciaries in relation to continuing to allow Plan participants the option of investing in the UBS Stock Fund, as a matter

---

[3]    The plaintiffs' bar has filed nearly identical ERISA stock drop class actions against other financial institutions whose share price declined because of the recent credit crisis, including AIG, Bear Stearns, Citigroup, Morgan Stanley, Lehman Brothers, Merrill Lynch, Wachovia, and Washington Mutual.  (Ex. 3 (Compilation of ERISA stock drop cases brought against other financial institutions).)

of law, none of Defendants (including members of the SIP Committee) acted imprudently in doing so.  As federal courts have consistently held, a decision to maintain an option to invest in employer stock is presumptively prudent, and Plaintiffs can overcome that presumption only by demonstrating that UBS faced "dire consequences" or "an impending collapse" from which UBS would not recover.[4]  Indeed, UBS remains one of the world's largest and most capitalized major financial institutions.  Because Plaintiffs have not pled "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest" the Plans of the UBS Stock Fund, *Kirschbaum* v. *Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008) (Jones, J.), Plaintiffs' claims fail as a matter of law.  *See infra* pages 29 to 37.

*Third*, Plaintiffs have not adequately pled a claim that Defendants failed to inform them about UBS's financial condition and the unprecedented financial crisis that drove down the stock prices of UBS and its peer financial institutions.  In fact, the Second Circuit has expressly rejected the notion that ERISA imposes such a duty to inform.  Rather, the alleged misstatements that Plaintiffs identify in their Complaint are from UBS's press releases and securities filings, all of which are governed by the securities laws, not ERISA.  Even if ERISA did impose such a duty to inform on plan fiduciaries, Plaintiffs' failure to disclose claim "sounds in fraud" and fails to meet the heightened pleading requirements of Rule 9(b), which courts repeatedly have held apply to such a claim.  *See infra* pages 38 to 42.

---

[4]    This presumption, first established by the Third Circuit in *Moench* v. *Robertson*, 62 F.3d 553 (3d Cir. 1995), recognizes that ERISA plans allowing investments in employer securities are designed to promote employee ownership and long-term retirement savings.  Thus, ERISA fiduciaries are not expected to prevent plan participants from investing in employer stock unless such an investment is not a viable long-term option.  *See infra* at pages 29 to 35.

*Fourth*, Plaintiffs' remaining claims for breaches of duty to monitor and to disclose information to co-fiduciaries, breach of the duty of loyalty, and breach of co-fiduciary duty should be dismissed because those claims rely on the same legally flawed allegations that Defendants (a) were fiduciaries and (b) acted imprudently by continuing to offer Plaintiffs the option to invest in the UBS Stock Fund. Thus, because none of the Defendants, except members of the SIP Committee, were fiduciaries in relation to the Plans' investment options, and because any decision to offer the UBS Stock Fund as an investment option was not imprudent as a matter of law, these claims fail. In addition, these claims fail on their own because Plaintiffs do not allege any well-pled facts showing that Defendants (i) suffered any conflict of interest between their personal interests and their fiduciary duties to the Plans, or (ii) had actual knowledge that any other Defendant was breaching a fiduciary duty.

*Finally*, numerous facts unique to the Plaintiffs in this action bar their claims in whole or in part. Plaintiffs Debra Taveras, Mary McKevitt and Brian Stanislaus cannot maintain a cause of action for damages suffered after they divested their individual accounts of the UBS Stock Fund and, to the extent Plaintiffs are no longer Plan participants, they lack standing to seek forward-looking relief. Moreover, because Plaintiffs' claims rest on the allegation that Defendants did not warn them of the financial crisis and its adverse impact on UBS's stock price, Plaintiffs cannot maintain claims for the period after which they filed their original complaints and purportedly "learned" that investing in the UBS Stock Fund was imprudent. And, Plaintiff McKevitt signed a severance agreement that waived her claims in this action.

In sum, the Court should dismiss Plaintiffs' legally baseless ERISA action in its entirety.

## BACKGROUND

### A.    The Parties

#### 1.    Plaintiffs

In this action, Plaintiffs claim to be four former UBS or UBSFS employees who are participants in the SIP or the Plus Plan and who affirmatively elected (on their own) to invest their plan assets in the UBS Stock Fund during the putative class period of March 13, 2007 to October 16, 2008 ("putative Class Period").  (Compl. ¶¶ 2, 12-15.)  In reality, three Plaintiffs, Taveras, McKevitt, and Stanislaus, left UBS or UBSFS and divested their entire plan accounts several months prior to the end of the putative Class Period on October 16, 2008 and, accordingly, were not Plan participants throughout this period.[5]

#### 2.    Defendants

Plaintiffs allege claims against UBS, UBS Americas, UBSFS, the UBS Executive Board, the UBSFS Executive Committee, the UBSFS Board, the SIP Retirement Board and Savings Plan Committee ("SIP Committee"), the Plus Plan Investment Committee, the Plus Plan Administration Committee, and the Plus Plan Administrator.  (*Id.* ¶¶ 16-33.)[6]

_____

[5]    Ex. 4 (Taveras SIP Investment Summary) at 1-2 (showing full plan divestment on July 8, 2008); Ex. 5 (McKevitt Plus Plan Investment Summary) at 1-2 (showing full plan divestment by Aug. 22, 2008); Ex. 6 (Stanislaus Plus Plan Investment Summary) at 1-2 (showing full plan divestment by Aug. 12, 2008).

[6]    Plaintiffs name the following defendants as members of the above committees: (i) UBS Executive Board: Robert Wolf, Joe Scoby, Marten Hoekstra, and Raoul Weil; (ii) SIP Committee: Barbara Amone, Stephen Baird, Simon Canning, Michael Daly, Richard Duron, Per Dyrvik, Ursula Mills, Edward O'Dowd, and Jaime Taicher; (iii) UBSFS Board: Dianne Frimmel, John Hannasch, Marten Hoekstra, Robert Chersi, and Michael Weisberg; (iv) Plus Plan Administration Committee: Robert McCormick; and (v) Plus Plan Investment Committee: Ken Castanella, Earle Dodd, Marilee Ferone, William Frey, Matthew Levitan, Robert McCormick, Ed O'Connor, Kevin Ruth, Rhonda Viapiano. (Compl. ¶¶ 18-33.)  The undersigned counsel do not represent Mr. Weil in this action.

UBS is a global financial institution incorporated in Switzerland as an *Aktiengesellschaft*, a corporation that issues ordinary shares to investors. (Ex. 7 (UBS, 2007 Annual Report (Form 20-F)) ch. 1, at 155 (Mar. 18, 2008).)[7] UBS has three core business groups: Global Wealth Management & Business Banking, Global Asset Management, and the Investment Bank. (*Id.* ch. 1, at 8.) UBS Americas is a wholly owned subsidiary of UBS, and UBSFS is a wholly owned subsidiary of UBS Americas. (Compl. ¶¶ 24-25.)

---

The Court should dismiss all claims against the following individuals for the period during which they are not alleged to have been fiduciaries: (i) Scoby prior to October 1, 2007 (Compl. ¶ 19); (ii) Hoekstra (as to the SIP) and Wolf prior to February 14, 2008 (*id.*); (iii) Baird, Dyrvik, and Daly after December 2007, March 2008, and May 2008, respectively (*id.* ¶ 21); (iv) Mills and Taicher prior to June 2008 (*id.*); (v) Chersi after March 14, 2008 (*id.* ¶ 29); (vi) Castanella, Ferone, and O'Connor prior to January 29, 2008 (*id.* ¶ 32); and (vii) Viapiano after January 29, 2008 (*id.*).

[7]     In determining whether to exercise jurisdiction, this Court may consider material outside the pleadings, such as affidavits and UBS's public filings. *See Zappia Middle E. Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). In determining whether to dismiss the Complaint for failure to state a claim, this Court may consider documents incorporated by reference in the Complaint, such as the documents establishing the SIP and Plus Plan (Compl. ¶¶ 18, 30, 62, 185.a), communications to Plan Participants (*id.* ¶ 185), UBS's filings under the Securities Act of 1933 and the Securities Exchange Act of 1934 (*id.*), as well as documents on which Plaintiffs relied in bringing their claims. *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (on a Rule 12(b)(6) motion to dismiss, a court may consider statements or documents incorporated into a complaint by reference, "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"). The Court also may "take judicial notice of well-publicized stock prices without converting them into a motion to dismiss into a motion for summary judgment." *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000). Speeches by government officials and newspaper articles demonstrating what the public knew or believed at the time are also appropriate sources on a motion to dismiss. *See, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 273 F. Supp. 2d 351, 383 n.3, 383-88 (S.D.N.Y. 2003) (Pollack, J.) (considering speeches by the SEC chairman and newspaper and journal articles on a motion to dismiss under Rule 12(b)(6)). The Court may also consider severance agreements bearing on the claims brought in this action. *See Yak* v. *Bank Brussels Lambert*, 252 F.3d 127, 130-31 (2d Cir. 2001) (considering a severance agreement on a motion to dismiss under Rule 12(b)(6)).

## B.    The Plans

### 1.    Fiduciary Authority

UBS and UBSFS established the SIP and Plus Plan, respectively.  (Ex. 8 (SIP Plan Document, effective as of Jan. 1, 2007) §§ 1.1, 10.1; Ex. 9 (Plus Plan Document, effective as of Jan. 1, 2006) §§ 3.1, 3.2.)  As mandated by the documents that established and designed the plans (the "Plan Documents"),[8] UBS, the UBS Executive Board, UBSFS, the UBSFS Executive Committee, and the UBSFS Board have fiduciary authority *solely* with respect to appointing and removing members of the committees that administer the Plans.  (Ex. 8 (SIP Plan Document) § 10.1; Ex. 9 (Plus Plan Document) § 10.2.)   None of these Defendants has fiduciary responsibility for managing or controlling the administration of the Plans, establishing investment options, or controlling Plan assets; rather, the Plan Documents assign such responsibilities to the various committees.

*SIP.*   The SIP Plan Document names the SIP Committee as the entity that "administer[s] the [SIP] and . . . handle[s] the day-to-day administrative responsibilities with respect to the Plan."  (Ex. 8 (SIP Plan Document) § 10.1.)  The SIP Committee has "all powers necessary to accomplish such purposes and . . . the exclusive right and discretionary authority with respect to the administration of the Plan."  (*Id.*)  The SIP Committee, "in its sole discretion, shall instruct and advise the Trustee and the Members as to the addition or deletion of an

---

[8]    "Congress intended that plan documents and the [summary plan descriptions] exclusively govern an employer's obligations under ERISA plans."  *In re WorldCom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 764 (S.D.N.Y. 2003) (Cote, J.) (quoting *Moore* v. *Metro. Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988)).

authorized Investment Fund . . . ."  (*Id.* § 9.2.)  The members of the SIP Committee are appointed by the UBS Executive Board.  (Compl. ¶ 18.)

       ***Plus Plan.***  The Plus Plan Administration Committee has "responsibility for the interpretation and construction of the Plan and final authority with respect to the operation and administration of the Plan."  (Ex. 9 (Plus Plan Document) § 10.7(a).)  The Plus Plan Administrator has "day-to-day responsibility for the operation and administration of the Plan." (*Id.* § 10.8(a).)  In contrast, the Plus Plan Investment Committee has "responsibility for the selection of the Investment Funds," and for "determin[ing] the number and category of Investment Funds that will be offered under the Plan."  (*Id.* § 10.9(a)-(b).)  The UBSFS Board and UBSFS Executive Committee are responsible for appointing the members of the Plus Plan Investment Committee, the members of the Plus Plan Administration Committee, and the Plus Plan Administrator.  (Compl. ¶¶ 28, 30.)

## 2.    Nature of the Plans

       UBS and UBSFS automatically enroll all their U.S.-based employees in the Plans. (Compl. ¶¶ 47, 63.)  Both Plans are tax-qualified 401(k) "defined contribution plans" or "individual account plans" that provide individual accounts for each participant, the value of which is based solely upon (i) the amount contributed to the participant's account, and (ii) any income, expenses, gains, losses, and forfeitures on the participant's account investments.  (*Id.* ¶¶ 38, 41, 42, 60-61.)  Both Plans qualify as eligible individual account plans ("EIAPs") because they are expressly authorized by both statute and their plan documents to invest in employer stock.  *See* ERISA §§ 407(b)(1), (3), (d)(3), 29 U.S.C. §§ 1107(b)(1), (3), (d)(3).

       Throughout the putative Class Period, UBS and UBSFS made matching contributions to the plan accounts of certain eligible employees.  (Compl. ¶¶ 46, 65.)  Contrary to Plaintiffs' allegation that UBS and UBSFS made these contributions in UBS stock (*id.* ¶ 277),

these contributions were made in cash and, unless directed otherwise, were invested in mutual or lifecycle funds—not the UBS Stock Fund.[9]

### 3. Plan Investment Options

Each participant in the Plans has the ability to make plan contributions from his salary, and has the sole discretion to invest these contributions and all their account assets in one or more of several different investment options—approximately 17 options for the SIP and 90 options for the Plus Plan. (Compl. ¶¶ 41-43, 60-61; Ex. 11 (SIP SPD) at 2, 18-21 (May 2008); Ex. 12 (Plus Plan SPD) at 13 (2006).) Accordingly, each Plan participant reaps the gains and losses of his own individual investment decisions. The investment options included lifecycle funds, mutual funds, short term investment funds, and the UBS Stock Fund. (Ex. 11 (SIP SPD) at 2, 18-21; Ex. 12 (Plus Plan SPD) at 13-25 (2006).) Unless a participant specifically directed otherwise, his plan assets were invested in lifecycle or mutual funds. *See supra* at n.9.

The Plus Plan Document specifically requires that one of the options in which participants may choose to invest "***shall be the [UBS] Stock Fund.***" (Ex. 9 (Plus Plan Document) § 11.2(a) (emphasis added).) In fact, the Plus Plan Document states that its very purpose is to "attract and retain qualified individuals by providing them with an opportunity to accumulate assets for their retirement and ***to acquire [UBS] Common Stock***." (*Id.* § 1.2

---

[9]     Ex. 10 (UBSFS Plus Plan Notice) at 2 ("If you have not enrolled in the 401(k) Plus Plan and/or have not made a future investment election, any company contributions you receive will be invested in the Lifecycle fund that best corresponds to your normal retirement age (age 65). You may transfer balances to another investment election and/or change future investment elections at any time."); Ex. 11 (SIP Prospectus and Summary Plan Description ("SPD")) at 18 ("If you do not make a separate election for your Bank retirement contribution, it will be invested in the same funds in which you are investing your current before-tax and matching contributions. If you do not have a current investment election in effect . . . then all of your contributions to the UBS SIP will be invested in the UBS Multi-Asset Portfolio Collective Trust, where it will remain until you elect to transfer it to another investment fund").

(emphasis added).)  Thus, investment in the Fund *must* be available to Plus Plan participants. Although not mandating that the SIP maintain an option to invest in the UBS Stock Fund, the SIP Plan Document specifically provides that the SIP Committee may choose to give participants the option of investing in that Fund.  (Ex. 8 (SIP Plan Document) § 2.1(kk) ("It is hereby expressly provided that the Plan may acquire and hold [UBS Stock]"), § 9.7 (describing how dividends earned from the UBS Stock Fund are to be reinvested).)

Consistent with their objective of allowing individual participants to choose their own investments, neither Plan required nor encouraged participants to invest in the UBS Stock Fund.  To the contrary, Plus Plan participants were expressly warned to "diversify their investments," and that the UBS Stock Fund (i) "invests in the stock of only one company, UBS, and therefore is not diversified . . . .  Performance may deviate substantially from the market due to company-specific or industry-related risks," and (ii) is "an undiversified equity investment which represents significant company stock-specific risk."  (Ex. 12 (Plus Plan SPD) at 24-25.)[10] Similarly, SIP Participants were warned to "diversify [your] investments," that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified," and that "market or other economic conditions that cause one category of assets, or one particular security, to perform very well often cause another . . . to perform poorly."  (Ex. 14 (SIP Quarterly Statement Stuffer) (May 23, 2007).)

---

[10]    Indeed, on December 31, 2006, the Plus Plan administrator specifically warned participants that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified."  (Ex. 13 (Plus Plan Notice of Your Rights Concerning Investment in Employer Securities) (Dec. 31, 2006).)

### C.    The Allegations of the Complaint

The Complaint alleges that Defendants' decision to continue offering Plaintiffs the option to invest their plan accounts in the UBS Stock Fund during the putative Class Period was imprudent, because UBS stock was not a sound investment due to (i) the global credit crisis's effect on UBS's investments in mortgage-related (Compl. ¶¶ 99-140) and auction rate securities (*id.* ¶¶ 141-54), and (ii) investigations into UBS's alleged aiding of certain U.S. customers to avoid U.S. tax laws (*id.* ¶¶ 155-72).

#### 1.    Mortgage-Related Securities

As part of its strategy to grow its Investment Bank, in 2006 UBS began to acquire a large inventory of securities backed by U.S. residential mortgages.  (*Id.* ¶¶ 103-04.)  UBS repeatedly disclosed these investments in its SEC filings, stating that its investments in debt securities grew by (Swiss Francs) CHF 5 billion, CHF 69 billion, and CHF 50 billion in the first three quarters of 2006 respectively, all "mainly due to higher positions in . . . asset-backed securities."  (Ex. 15 (UBS, 1Q 2006 Report (Form 6-K)) at 50 (May 4, 2006); Ex. 16 (UBS, 2Q 2006 Report (Form 6-K)) at 52 (Aug. 15, 2006); Ex. 17 (UBS, 3Q 2006 Report (Form 6-K)) at 52 (Oct. 31, 2006).)

Plaintiffs allege that, as early as 2004, because of "warning flags" concerning the quality of subprime loans in the U.S. residential real estate market, Defendants knew or should have known that UBS's largely AAA-rated mortgage-related investments would decline significantly in value.  (Compl. ¶¶ 91-98, 112.)  Without alleging any motive for doing so, Plaintiffs claim that, instead of taking advantage of this knowledge, Defendants went to extraordinary lengths to "conceal the true financial condition of UBS" and substantially (and,

irrationally, given the allegations of the Complaint) increased UBS's investments in those toxic securities. (*Id.* ¶ 85.)[11]

As Plaintiffs acknowledge, almost all of UBS's investments in residential mortgages were in AAA-rated securities called "RMBS" and "CDOs." (*Id.* ¶¶ 106-09.)  Plaintiffs also accept that UBS invested primarily in the "super senior" tranches of these CDOs (*e.g.*, *id.* ¶ 106), the lowest-yielding and least-risky tranches, because they are the last to absorb losses caused by defaults on the underlying mortgages.  As Comptroller of the Currency John Dugan stated earlier last year, "[t]hese better-than-triple A [super senior] tranches were supposed to be the *least risky* parts of the subprime securities pyramid."  (Ex. 18 (John C. Dugan, Comptroller of the Currency, Remarks Before the Global Association of Risk Professionals (Feb. 27, 2008)) at 1 (emphasis added).)  Thus, the purported "warning flags"—the weakness of the U.S. housing market and rising defaults on subprime residential mortgages—could not serve to warn Defendants about UBS's highly rated securities.[12]

UBS, of course, was not the only financial institution that did not foresee the dramatic market events that occurred beginning in the second half of 2007.  While a more

---

[11]    The Complaint alleges that the Swiss Federal Banking Commission ("SFBC") is investigating whether UBS "breached market disclosure regulations" concerning its writedowns of mortgage-related securities.  (Compl. ¶ 123.)  But a September 30, 2008 SFBC Report— issued over one month before Plaintiffs filed the Complaint—concluded that UBS did not engage in any such fraud.  *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Rules 9(b) and 12(b)(6) at 8-9, *In re UBS AG Sec. Litig.*, 07-cv-11225 (RJS) (S.D.N.Y. Nov. 20, 2007).

[12]    The October 12, 2007 WALL STREET JOURNAL article concerning first quarter 2007 writedowns of mortgage-related securities at a UBS-affiliated hedge fund and a subsequent internal UBS investigation (Compl. ¶¶ 114-16) likewise fail to constitute "red flags," because those writedowns concerned poorly rated securities that suffered a major earlier exposure to a rise in subprime defaults.  (Ex. 19 (UBS, SHAREHOLDER REPORT ON UBS'S WRITE-DOWNS 12 (*cited in* Compl. ¶ 129).)

complete explanation of the financial crisis, its origins, and its effect on UBS and other financial institutions can be found at pages 1 through 33 of Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Class Action Complaint Pursuant to Rules 9(b) and 12(b)(6), filed in *In re UBS AG Securities Litigation*, 07-cv-11225 (RJS) (Docket Entry No. 62, filed on Nov. 20, 2007), the compilation below of the financial crisis's effect on various major institutions—many of whom are facing nearly identical ERISA class actions for failing to remove plan options to invest in company stock—shows the crisis's marketwide impact on such institutions:

| Financial Institution | Losses and Writedowns (as of June 30, 2008)[13] | Stock Price % Change (Mar. 13, 2007 to Oct. 16, 2008) |
|---|---|---|
| Washington Mutual | $14.8 billion | -100% |
| Lehman Brothers | $8.2 billion | -100% |
| Bear Stearns | $3.2 billion | -93% |
| Royal Bank of Scotland | $14.9 billion | -88% |
| Wachovia | $22.5 billion | -87% |
| Merrill Lynch | $51.8 billion | -76% |
| Morgan Stanley | $14.4 billion | -68% |
| Barclays | $9.1 billion | -67% |
| Citigroup | $55.1 billion | -65% |
| **UBS** | **$44.2 billion** | **-64%** |

[13]     Ex. 20 (Yalman Onaran, *Banks' Subprime Losses Exceed $500 Billion as Writedowns Spread*, BLOOMBERG NEWS, Aug. 12, 2008); *see also* Ex. 21 (Yalman Onaran, *Subprime Bank Losses Reach $312 Billion with RBS, Nomura*, BLOOMBERG.COM, Apr. 28, 2008); Ex. 22 (Meg Fletcher, *Trends: Subprime Fallout Could Cost Billions,* BUS. INS. INDUS. FOCUS, Apr. 1, 2008 (noting that at least "130 companies . . . reported $257 billion in subprime-related write-downs by early February [2008]")).  As of October 28, 2008, the losses reached $670 billion.  (Ex. 23 (Gabi Thesing, *German Consumer Confidence Rises on Oil-Price Drop,* BLOOMBERG.COM, Oct. 28, 2008).)

| Financial Institution | Losses and Writedowns (as of June 30, 2008)[13] | Stock Price % Change (Mar. 13, 2007 to Oct. 16, 2008) |
|---|---|---|
| Deutsche Bank | $10.8 billion | -60% |
| Bank of America | $21.2 billion | -46% |
| Credit Suisse | $10.5 billion | -34% |
| HSBC | $27.4 billion | -12% |
| JP Morgan Chase | $14.3 billion | -8.1% |
| Wells Fargo | $10 billion | 7.4% |

(Ex. 24 (Compilation of stock prices for financial institutions, Mar. 13, 2007 to Oct. 16, 2008 (adjusted for stock splits and dividends)).)

### 2.    Auction Rate Securities ("ARS")

Plaintiffs also rely on the decline in the price of ARS, another type of security whose present values UBS marked down in connection with the illiquid conditions in the second half of 2007 resulting from the credit crisis.  (Compl. ¶¶ 141-54.)  As relevant to the Complaint's allegations, UBS offered ARS[14] as an investment option to its wealth management customers, underwrote ARS on behalf of issuers, and sponsored the auctions at which the interest rates on these securities were determined and reset.  (Id. ¶ 142.)  As part of their sponsorship of ARS auctions, UBS and other financial institutions frequently submitted bids to ensure that the auctions functioned smoothly, and they took ARS into their inventory.  (Id. ¶¶ 142-43.)[15]

_____

[14]    ARS are long-term bonds or preferred stock issued by municipalities, student loan companies, closed-end funds and other organizations, which pay interest or dividends at levels that periodically reset via Dutch auctions, generally sponsored by the investment banks that underwrote the securities.  (Compl. ¶ 142.)

[15]    UBS disclosed this practice in publicly available offering materials and in client brochures.  For example, a brochure posted on UBS's website in October 2007 stated:  "The Firm bids in a large percentage of auctions and believes that a significant number of auctions

- 15 -

As the global financial crisis worsened late in the fourth quarter of 2007 and into the first quarter of 2008, demand for ARS dropped, and UBS and other financial institutions continued supporting the auctions to prevent auction failures, thereby increasing their ARS inventories. (*Id.* ¶ 142.)  Ultimately, UBS and other banks were left holding ARS inventory that they could not sell at auction.  (*Id.* ¶ 144-45.)  In its 2007 Annual Report, UBS disclosed that, as a result of its auction support, it had accumulated an ARS exposure of $5.9 billion as of December 31, 2007.  (Ex. 7 (UBS 2007 Annual Report) ch. 2, at 14.)  On May 7, 2008, UBS announced that because of market illiquidity, it would write down the value of its ARS holdings by $974 million.  (Ex. 26 (UBS, 1Q 2008 Report (Form 6-K)) at 7 (May 6, 2008).)[16]

Plaintiffs allege that UBS intentionally misrepresented to its customers that ARS were liquid even in the face of auctions that would have failed if not for bank support. (Compl. ¶¶ 143-45.)  But Plaintiffs identify neither a single Defendant who was involved in this alleged scheme nor any instance where one of UBS's peer firms disclosed its own ARS exposure or wrote down that exposure in an earlier reporting period than UBS.

### 3.    Tax Allegations

Plaintiffs also allege that UBS aided certain U.S. clients in avoiding U.S. tax laws. (*Id.* ¶¶ 155-59.)  This allegation concerns UBS's U.S. cross-border private banking business,

---

would fail if it did not do so."  (Ex. 25 (UBS, PUTTING LIQUIDITY TO WORK: A GUIDE TO CASH ALTERNATIVES 6 (2006)).)

[16]    Following the failure of the ARS market in February 2008, regulators began industry-wide investigations of how banks marketed ARS to their customers.  These investigations resulted in settlements with several firms, including UBS, Citigroup, Bank of America, Wachovia, Deutsche Bank, Merrill Lynch, Goldman Sachs, Morgan Stanley, and JPMorgan Chase.  (Ex. 27 (Marcy Gordon, *Citigroup, UBS Buying Back $30B in Securities*, ASSOCIATED PRESS ONLINE, Dec. 11, 2008).)

which was an extremely small part of UBS's overall business, employing approximately 45 to 60 private bankers located in Switzerland and, from 2002 to 2007, generating approximately $200 million in annual revenue.[17]  By comparison, UBS had operating income in 2007 of nearly $30 billion.  (Ex. 7 (UBS 2007 Annual Report) ch. 1, at 36.)  Thus, the revenues of UBS's U.S. cross-border business were less than 1% of UBS's total operating income.

UBS, of course, recognized that no institution of its scale can fully ensure that every employee will act according to company rules, and specifically warned investors that UBS might "tak[e] technically incorrect positions on tax matters, or *fail[] to comply with tax withholding or reporting requirements on behalf of clients* . . . or as a result of our involvement in tax-sensitive products or transactions."  (*Id.*) (emphasis added).  (Ex. 29 (UBS, 2006 Annual Report (Form 20-F) Handbook 2006/2007 at 60 (Mar. 21, 2007)).)  And, besides Raoul Weil, the former CEO of UBS's Global Wealth Management business unit—whom Plaintiffs try to link to the Plans through his membership on the UBS Executive Board—Plaintiffs do not connect a single Defendant to the alleged tax scheme.

### 4.    Plaintiffs' Causes of Action

Based on these allegations, Plaintiffs assert a hodge-podge of purported ERISA claims against the 40-plus Defendants related to the UBS Plans.  None sufficiently states a claim:

Count I alleges that Defendants breached their fiduciary duties of loyalty and prudence by continuing to offer Plan participants the option to invest in the UBS Stock Fund.  (Compl. ¶¶ 225-36.)  Count II alleges that Defendants breached their duty to inform and misled

---

[17]    Ex. 28 (Evan Perez & Carrick Mollenkamp, *Top Banker Cited in Tax-Dodge Case*, WALL ST. J., Nov. 13, 2008, at A1).  *After the end of the putative Class Period*, Raoul Weil, the CEO of UBS's Global Wealth Management and Business Banking division, was indicted in connection with the DOJ investigation.  (Compl. ¶ 165.)

Plaintiffs by referencing UBS's purportedly inaccurate SEC filings and reports in communications to Plan participants.  (*Id*. ¶¶ 237-50.)  Count III alleges that certain Defendants breached their duty to "monitor" other Defendants by failing to insure that they had adequate information.  (*Id*. ¶¶ 251-59.)  Count IV alleges that Defendants' conduct constituted a conflict of interest.  (*Id*. ¶¶ 260-65.)  Count V alleges a breach of co-fiduciary duty against all Defendants.  (*Id*. ¶¶ 266-74.)  And, Count VI alleges a claim for *quantum meruit*, based on the false assumption that UBS made its employee contributions in company stock.  (*Id*. ¶¶ 275-77.)

### D.    UBS Remained Well-Capitalized and Fully Viable Throughout the Putative Class Period.

Prior to the overall yearly loss that UBS suffered in 2007 as a result of the financial crisis, UBS reported nine straight overall yearly profits.  (Ex. 30 (Compilation of UBS yearly profits).)    Like almost every other major international financial institution, UBS announced quarterly losses for the third and fourth quarters of 2007 and the first and second quarters of 2008, based almost entirely on the Investment Bank's writedowns of investments in AAA-rated securities backed by residential mortgages.  (Ex. 31 (UBS, 3Q 2007 Report (Form 6-K)) at 1-2 (Oct. 30, 2007); Ex. 32 (UBS, 4Q 2007 Report (Form 6-K)) at 2 (Feb. 14, 2008); Ex. 26 (UBS 1Q 2008 6-K) at 1; Ex. 33 (UBS, 2Q 2008 Report (Form 6-K)) at 2-4 (Aug. 12, 2008).)

Contrary to Plaintiffs' unsupported allegation that UBS faced a "substantial risk of collapse" as a result of the financial crisis (Compl. ¶ 174), UBS remains one of the world's leading financial institutions.  As of September 30, 2008, UBS had more than 75,000 employees working in more than 50 countries (Ex. 34 (UBS, Press Release (Form 6-K)) at 6 (Oct. 16, 2008)), with quarterly operating income of CHF 5.6 billion and total assets of CHF 2 trillion (Ex. 35 (UBS, 3Q 2008 Report (Form 6-K)) at 1 (Nov. 4, 2008)).  As of September 30, 2008, UBS

maintained a ratio of Tier 1 capital[18] to Risk-Weighted Assets of 10.8% (*id.* at 1)—more than double the 4% ratio required by the Federal Reserve and the Federal Deposit Insurance Corporation ("FDIC"), *see* 12 C.F.R. pt. 325, app. A, § III—indicating that UBS is strongly positioned to survive unexpected losses.  And throughout the putative Class Period, UBS has maintained investment grade credit ratings from Moody's, Standard & Poor's, and Fitch (Ex. 36 (Compilation of UBS's credit ratings).)

Indeed, Global Wealth Management & Business Banking and Global Asset Management—core UBS businesses—remained profitable throughout the putative Class Period. (Ex. 37 (Compilation of UBS's profitability by division).)[19]  As a Goldman Sachs analyst stated in a November 2007 report, "even if we value the [I]nvestment [B]ank"—the UBS entity that wrote down its mortgage-related securities and ARS—"at zero, we can justify a valuation of [CHF] 62 per share."  (Ex. 38 (Compilation of analyst statements concerning UBS) at 1.)

UBS took several steps to help weather the current financial crisis.  In December 2007, UBS raised CHF 13 billion from large placements with the Government of Singapore Investment Corporation and a Middle East investor.  (Ex. 39 (UBS, Press Release (Form 6-K)) at 1 (Dec. 12, 2007).)  On April 25, 2008, UBS issued a stock dividend of 98.7 million shares (each UBS shareholder received one new UBS share for every twenty shares it held), and on June 17, 2008, successfully raised an additional CHF 15.6 billion in capital from a rights offering that

---

[18]     Tier 1 Capital generally consists of "[c]ommon stockholders' equity capital," "[n]oncumulative perpetual preferred stock," and "[m]inority interests in the equity capital accounts of consolidated subsidiaries."  12 C.F.R. pt. 325, app. A, § I.A.1.

[19]     During the Class Period, Ernst & Young ("E&Y") audited and certified UBS's financial statements.  (Ex. 7 (UBS 2007 Annual Report) ch. 3, at 40.)  E&Y has not required UBS to restate any of these financial statements.

allowed UBS shareholders to purchase 7 UBS shares at $20.59 per share for every 20 shares they held. (Ex. 33 (UBS 2Q 2008 6-K) at 58-59.) Both of these events occurred <u>after</u> UBS announced the vast bulk of its writedowns of mortgage-related securities and ARS, and <u>after</u> UBS's May 6, 2008 announcement of an investigation into its cross-border business. (Compl. ¶¶ 120, 145; Ex. 26 (UBS 1Q 2008 6-K) at 1.) Furthermore, on October 16, 2008, UBS entered into an agreement whereby the Swiss National Bank agreed to acquire up to $60 billion of UBS's illiquid assets. (Ex. 34 (UBS, Press Release (Form 6-K)) at 1-7 (Oct. 16, 2008).) And throughout the putative Class Period, even after UBS had taken writedowns on mortgage-related and auction rate securities, numerous financial analysts recommended buying UBS shares because of the company's inevitable return to profitability. (Ex. 38 (Compilation of analyst statements concerning UBS).)

## LEGAL STANDARD

Pursuant to Rule 12(b)(6), this Court must dismiss a complaint if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1974 (2007). Stated differently, to survive a motion to dismiss, a complaint must "provide the grounds upon which [its] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Goldstein* v. *Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation marks omitted). After *Twombly*, "a formulaic recitation of the elements of a cause of action will not do." *In re Bayou Hedge Fund Litig.*, 534 F. Supp. 2d 405, 413 (S.D.N.Y. 2007) (McMahon, J.) (quoting *Twombly*, 127 S. Ct. at 1964).

Moreover, Plaintiffs' allegations that Defendants knowingly issued false or misleading statements concerning UBS's financial health "sound in fraud"[20] and must satisfy the heightened pleading requirements of Rule 9(b). *See Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004). The Second Circuit has held that Rule 9(b) applies to all claims relying on a purported fraud, "*regardless of the cause of action in which they appear*," because Rule 9(b) is needed "to provide [Defendants] with fair notice of a plaintiff's claim, to safeguard [Defendants'] reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit."[21]  *Id.* (emphasis added) (citations and internal quotation marks omitted); *see IUE AFL-CIO Pension Fund* v. *Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993) (applying Rule 9(b)'s pleading requirements to an ERISA claim).

To satisfy Rule 9(b)'s requirements, a Complaint "must state with particularity the circumstances constituting fraud or mistake," and also plead sufficient facts that "give rise to a

---

[20]  For example, Plaintiffs allege that "Defendants went to extraordinary lengths to conceal the true financial condition of UBS," and that "UBS hid the magnitude of its exposure to subprime losses by providing a positive outlook for the company when the Defendants knew, or should have known, that the company's true financial condition differed from its more rosy public statements." (Compl. ¶ 85; *see also id.* ¶¶ 4, 81, 84-85, 103-04, 106-11, 112, 114-15, 117-20, 141-44, 163-67, 175, 179, 188-89, 192, 197, 199, 201, 203-10, 232-33, 242-45, 247, 254, 268, 279.)

[21]  *See also Toussaint* v. *JJ Weiser & Co.*, No. 04 Civ. 2592, 2005 WL 356834, at *9 (S.D.N.Y. Feb. 13, 2005) (Mukasey, J.) (an ERISA claim resting on allegations of fraud must satisfy Rule 9(b), and the pled facts must give rise "to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth" (quoting *Conn. Nat'l Bank* v. *Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)));  *In re Calpine Corp. ERISA Litig.*, No. C 03-1685, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) (dismissing breach of fiduciary duty claim under ERISA and finding that Rule 9(b) applies to "all averments of fraud regardless of whether fraud is an essential element of the underlying cause of action."); *In re Coca-Cola Enters. ERISA Litig.*, No. 06-CV-0953, 2007 WL 1810211, at *6 (N.D. Ga. June 20, 2007) (dismissing ERISA claims under Rule 9(b) and noting that "[n]one of the Plaintiffs' claims can succeed if this fraudulent scheme cannot be proven").

strong inference that the defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *See Fluor*, 808 F.2d at 962 (internal quotation marks omitted). Plaintiffs may establish a "strong inference of scienter" only by pleading particularized facts that "(1) show[] that the defendants had both motive and opportunity to commit the fraud or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. Where "a plaintiff has failed to demonstrate that defendants had a motive to defraud . . . he must produce a stronger inference of recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 143 (2d Cir. 2001). Here, the Complaint fails to allege misstatements by any specific Defendant, let alone provide any inference of scienter for committing the purported fraud. *See infra* page 40.

## ARGUMENT

### I.    COUNT I DOES NOT ADEQUATELY ALLEGE THAT DEFENDANTS BREACHED ANY FIDUCIARY DUTY OF PRUDENCE AND LOYALTY.

This Court should dismiss Count I for breach of fiduciary duty of prudence and loyalty as to all Defendants for three reasons. *First*, except for members of the SIP Committee, none of the Defendants had fiduciary authority to terminate the Plaintiffs' option to invest in the UBS Stock Fund, and so, no Defendant was an ERISA fiduciary for that purpose. *Second*, continuing to offer Plaintiffs the *option* of investing in the UBS Stock Fund was, as a matter of law, not imprudent, because at no point did UBS face imminent collapse as an on-going business concern. *Third*, contrary to Plaintiffs' claims, Defendants did not, as a matter of law, breach their duty of prudence and loyalty by failing to investigate the prudence of continuing to allow Plan participants the option to invest in the UBS Stock Fund because (i) continuing to offer the *option* of investing in the UBS Stock Fund was not imprudent, and (ii) Plaintiffs fail to allege plausible facts showing that Defendants could have learned of the effects of the financial crisis before its onset in the summer of 2007.

**A.    None of the Defendants (Except For the Members of the SIP Committee) Was an ERISA Fiduciary With Respect to Maintaining the UBS Stock Fund as a Plan Investment Option.**

As a matter of law, the Complaint suffers from the fundamental and fatal defect that, except for the members of the SIP Committee, none of the other Defendants was an ERISA fiduciary and, thus, cannot be sued under ERISA.

**1.    The Appointing Defendants Were Not Fiduciaries with Regard to Offering Plaintiffs the Option to Invest in the UBS Stock Fund.**

The Court should dismiss Count I against the Defendants whose sole responsibility was to appoint the members of the various plan committees (the "Appointing Defendants"),[22] because the Appointing Defendants were not, as a matter of law, fiduciaries with regard to the option to invest in the UBS Stock Fund.

The "threshold question" in every ERISA case alleging breach of fiduciary duty is "whether [the defendant] was acting as a fiduciary . . . *when taking the action subject to the complaint.*" *Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000) (emphasis added); *see also In re Marsh ERISA Litig.*, No. 04 Civ. 8157, 2006 WL 3706169, at *5 (S.D.N.Y. Dec. 14, 2006) (Kram, J.) ("[A]n individual is assigned fiduciary status 'only to the extent that he has or exercises the described authority or responsibility'" (quoting *Flanigan* v. *Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2001))).

It is settled that "a [plan sponsor] does not act in a fiduciary capacity when deciding to amend or terminate [an ERISA plan]." *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U.S. 73, 78 (1995) (quotation omitted).  Here, UBS and UBSFS, as Plan sponsors, specifically

---

[22]    The "Appointing Defendants" are UBS, UBS Americas, UBSFS, the UBS Executive Board, Scoby, Wolf, Hoekstra, Weil, the UBSFS Executive Board, the UBSFS Board of Directors, Frimmel, Hannasch, Chersi, and Weisberg.

authorized the SIP and Plus Plan Investment Committees—and no one else—to make decisions concerning the Plans' investment options.  *See supra* pages 8-9.

Plaintiffs try to evade this basic rule of ERISA by alleging that the Appointing Defendants exercised authority to terminate the option to invest in the UBS Stock Fund through (i) their duty to monitor "the [various Committee Defendants], or any other committee that oversees the . . . Plan[s'] assets and investments," and (ii) their "control and oversight responsibility over the activities of its employees that performed fiduciary functions with respect to the Plus Plan."  (Compl. ¶¶ 53, 72-76.)  But, as a matter of law, such appointment power did not turn the Appointing Defendants into fiduciaries with respect to Plan investment options.

*First*, the Appointing Defendants' power to appoint and remove the committee members is irrelevant to a claim of breach of duty of prudence and loyalty, because fiduciary responsibility for appointment extends only to the acts and duties inherent in appointment.  *See Crowley ex rel. Corning, Inc., Inv. Plan* v. *Corning, Inc.*, 234 F. Supp. 2d 222, 229 (W.D.N.Y. 2002) ("The only power the Board had under the Plan was to appoint, retain, or remove members of the Committee.  Thus, the Board's fiduciary obligations can extend only as to those acts.") (citation omitted); *Indep. Ass'n of Publishers' Employees* v. *Dow Jones & Co.*, 671 F. Supp. 1365, 1367 (S.D.N.Y. 1987) (Cederbaum, J.) (same); *In re Williams Cos. ERISA Litig.*, 271 F. Supp. 2d 1328, 1339 (N.D. Okla. 2003) (same).[23]

---

[23]    For the same reasons, the Court should dismiss Plaintiffs' claim of breach of fiduciary duty to inform (Count II) against the Appointing Defendants.  *See In re Sprint Corp. ERISA Litig.*, 388  F. Supp. 2d  1207, 1229-30 (D. Kan. 2004) (dismissing breach of duty to inform claims against certain defendants because "[t]hey were not charged under the plans with responsibility for making investment decisions or communicating with plan participants."). Moreover, for the reasons stated *infra* pages 42-44, 44-45, and 45-47, the Appointing Defendants' responsibility to appoint and remove members of the various committees cannot be transformed into claims for failure to monitor (Count III), conflict of interest (Count IV), or

*Second*, Plaintiffs' allegations that the Appointing Defendants exercised authority and control over the "activities of [their] employees that performed fiduciary functions with respect to the [Plans]" (Compl. ¶¶ 53-54, 72, 74) include no explanation of *how* these Defendants exercised such authority and control, *whom* they controlled, or *which* activities were fiduciary functions.   Such bald allegations are exactly the types of conclusory statements that—even before *Twombly*—courts routinely held were insufficient to state a claim.   *See*, *e.g.*, *Haber* v. *Brown*, 774 F. Supp. 877, 879 (S.D.N.Y. 1991) (Patterson, J.) (dismissing claims, because "no facts are alleged [in the complaint] to provide grounds for the claim that Washington National knowingly participated in Brown's fiduciary breaches"); *Crowley*, 234 F. Supp. 2d at 229 (dismissing a "control" argument where the complaint "contains no factual allegations which support a claim that the Board had *de facto* control over the Committee members").[24]

In short, the Appointing Defendants did not serve in any fiduciary capacity with regard to the decision to continue offering the UBS Stock Fund as an investment option and, thus, cannot be held liable under Count I as a matter of law.

---

breach of co-fiduciary duty (Count V).  Although none of the Appointing Defendants had any fiduciary responsibility with respect to the UBS Stock Fund, these counts are all premised on the legally flawed allegation that continuing to offer this investment option constituted a breach of duty.

[24]     While *In re Polaroid ERISA Litig*., 362 F. Supp. 2d 461, 474 (S.D.N.Y. 2005) (Pauley, J.), held that a plaintiff's bald allegation that a defendant was a "functional fiduciary" was sufficient because it "echo[ed] the ERISA definition," this is no longer the law after *Twombly*. After *Twombly*, "a formulaic recitation of the elements of a cause of action will not do."  *Bayou*, 534 F. Supp. 2d at 413.

2.    **The Plus Plan Administration Committee and Administrator Were Not Fiduciaries with Regard to Offering Plaintiffs the Option to Invest Their Plan Assets in the UBS Stock Fund Because They Had No Authority to Add or Remove Plus Plan Investment Options.**

The Plus Plan Administration Committee and the Plus Plan Administrator are not ERISA fiduciaries for purposes of this action, because, like the Appointing Defendants, they had no discretion to eliminate the option to invest in the UBS Stock Fund.  Rather, the Plus Plan Administration Committee's and the Administrator's roles were limited to day-to-day administration of the Plan, and only the Plus Plan Investment Committee had the authority to add or remove investment options.  *See supra* page 9.

Numerous courts have dismissed exactly these types of claims against administration committees that do not have authority over a plan's investment options.  For example, in *Agway, Inc., Employees' 401(k) Thrift Inv. Plan* v. *Magnuson*, No. 03 Civ. 1060, 2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006), plaintiffs alleged that the administration committee acted as a fiduciary with respect to plan investments.  The court dismissed the claim, holding that "[u]nder the Plan's express terms . . . the discretion not to invest . . . does not fall within the ambit of the Administration Committee Defendants' fiduciary duties."  *Id.* at *14. The district court in *Pedraza* v. *Coca-Cola Co.*, 456 F. Supp. 2d 1262, 1273 (N.D. Ga. 2006), dismissed a similar claim, holding that it could not survive "as against the Benefits Committee and its members" because the plan documents "make clear that the Benefits Committee has no prerogatives regarding selection of the Plan's investments."  Therefore, "the Benefits Committee

was not a fiduciary with respect to investment decisions and cannot be sued for breach of fiduciary duty in that regard." *Id.*[25]

### 3. None of the Plus Plan Defendants Were Fiduciaries with Regard to Offering Plaintiffs the Option to Invest Their Plan Assets in the UBS Stock Fund Because Such an Option Was Mandatory Under the Plan Documents.

Because the Plus Plan Document requires that one of the investment options available to its participants "***shall be the [UBS] Stock Fund***" (Ex. 9 (Plus Plan Document) § 11.2(a)), and specifically states that one of its two primary purposes is "to acquire [UBS] Common Stock," (*id.* § 1.2), none of the Plus Plan Defendants had fiduciary authority to eliminate the UBS Stock Fund as an investment option.

Numerous courts have recognized that where a plan directs the maintenance of an investment option in employer stock, fiduciaries are immune from judicial review for not terminating such a mandatory option. For example, in *Delta Air Lines*, participants in Delta's ERISA plan brought suit claiming that the plan investment committee should have diversified the plan's assets outside of investing wholly in Delta stock. 422 F. Supp. 2d at 1314-15. The district court granted defendant's motion to dismiss, "because the Investment Committee did not have the right to prohibit investment in the Delta Common Stock Fund" and thus, was not an ERISA fiduciary for that purpose. *Id.* at 1330.

---

[25]    *See also Smith* v. *Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1326 (N.D. Ga. 2006) (dismissing claims against administrative committee that had "no discretion to discontinue investment into the [company stock fund] or alter or modify the ESOP"); *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 892 (S.D. Tex. 2004) (dismissing ERISA claims against committee defendants where plan documents did not confer discretion over plan investments).

Likewise in *Kirschbaum* v. *Reliant Energy, Inc.*, 526 F.3d 243 (5th Cir. 2008) (Jones, J.), plaintiffs sought to hold defendants liable for allowing participants to continue to invest in company stock. The district court granted summary judgment as to the claims against the company and the administration committee. The Fifth Circuit unanimously affirmed, explaining that, "[b]ecause the Plan's requirements to invest in [company] stock are mandatory . . . no fiduciary duties are inherent in the Plan other than to follow its terms." *Id.* at 253; *see also Crowley*, 234 F. Supp. 2d at 228 (dismissing under Rule 12(b)(6) because "it is clear from the amended complaint that [the company] could not control investment options"); *Edgar* v. *Avaya, Inc.*, 503 F.3d 340, 346 (3d Cir. 2007) ("if the trust 'requires' the trustee to invest in a particular stock, then the trustee is 'immune from judicial inquiry'") (quotation omitted); *Urban* v. *Comcast Corp.*, No. 08 Civ. 773, 2008 WL 4739519, at *12 (E.D. Pa. Oct. 28, 2008) ("[W]here a plan's settlor mandates investment in employer securities, the plan fiduciaries are immune from judicial inquiry related to such investments, essentially because they are implementing the intent of the settlor.") (internal quotation marks omitted); *see generally Harris Trust & Sav. Bank* v. *John Hancock Mut. Life Ins.Co.*, 302 F.3d 18, 29 (2d Cir. 2002) ("[A]dherence to [plan] terms by a plan administrator cannot constitute a breach of its fiduciary duties, barring a grant of discretionary authority to the fiduciary").

### 4.    None of the Committees Are Liable under ERISA.

The Court also should dismiss all the claims against the UBS Executive Board, the UBSFS Executive Committee, the UBSFS Board, the SIP Committee, the Plus Plan Investment Committee, and the Plus Plan Administration Committee. By its terms, ERISA limits liability to "[a]ny *person* who is a fiduciary with respect to the plan," 29 U.S.C. § 1109(a) (emphasis added), and defines "person" as "an individual, partnership, joint venture, corporation,

mutual company, joint-stock company, trust, estate, unincorporated organization, association, or

employee organization." *Id.* § 1002(9).

"Given the comprehensive nature of ERISA, the omission of 'committee' from

that definition cannot be considered simply a drafting oversight. Committees are, therefore, not

properly subject to ERISA breach of fiduciary duty claims." *Tatum* v. *R.J. Reynolds Tobacco

Co.*, No. 02 Civ. 373, 2007 WL 1612580, at *8 (M.D.N.C. May 31, 2007) (citing *Boucher* v.

*Williams*, 13 F. Supp. 2d 84, 93 (D. Me. 1998) (holding that a plan "is not a 'person' as that term

is defined by ERISA and is therefore not subject to claims of breach of fiduciary duty")); *see

also Swanson* v. *U.A. Local 13 Pension Plan,* 779 F. Supp. 690, 702 (W.D.N.Y. 1991) (holding

"that a pension plan is not a proper defendant" because it is not included in the statutory

definition of "person").[26]

### B. As a Matter of Law, Defendants Did Not Act Imprudently in Continuing to Allow Participants the Option of Investing in the UBS Stock Fund.

Even assuming that any of the Defendants were fiduciaries, Count I fails as to all

Defendants, because Plaintiffs cannot overcome the presumption that an ERISA fiduciary's

decision to continue an option to invest in company stock is prudent.

In the seminal case of *Moench* v. *Robertson*, the Third Circuit considered a claim

brought against ERISA fiduciaries for failure to divest the plans at issue of company stock. 62

F.3d at 556. The Third Circuit recognized that while ERISA imposes a duty on fiduciaries to

disallow investment options that are financially imprudent, ERISA also encourages long-term

---

[26]    Although *In re Enron Corp. Sec., Deriv., & ERISA Litigation*, 284 F. Supp. 2d 511, 617 (S.D. Tex. 2003), held that "when an administrative committee acts . . . in breach of its fiduciary duties, it may be sued [under ERISA]," the court cited no textual or other supporting authority for this proposition.

retirement savings and employee stock ownership "as . . . device[s] for expanding the national

capital base among employees—an effective merger of the roles of capitalist and worker." *Id.* at

568 (alterations in original).  The Third Circuit found "a way for the competing concerns to

coexist," *id.* at 570:

> Where an ERISA fiduciary "is not absolutely required to invest in employer
> securities but is more than simply permitted to make such investments," that
> fiduciary "is entitled to a presumption that it acted consistently with ERISA by
> virtue of that decision" to continue allowing the option to invest in employer
> stock.  "[T]he plaintiff may overcome that presumption [only] by establishing that
> the fiduciary abused its discretion by investing in employer securities."

*Id.* at 571.[27]  The *Moench* court further held that the plaintiff could overcome the presumption of

prudence by introducing evidence that "owing to circumstances not known to the settlor and not

anticipated by him," investing in employer securities "would defeat or substantially impair the

accomplishment of the purposes of the trust."  *Id.*

        While the Second Circuit has yet to address the *Moench* presumption, the Third,

Fifth, Sixth, and Seventh Circuits—all of the Circuit Courts that have directly addressed the

issue—and district courts within this Circuit, have adopted the *Moench* presumption of prudence

for investments in employer stock.[28]

        Since *Moench*, courts have repeatedly held that, to state a breach of fiduciary duty

claim under ERISA for imprudently allowing participants to invest in employer stock, plaintiffs

---

[27]    The *Moench* presumption has been extended to EIAPs, like the SIP and Plus Plan, in
which the plan documents authorize company stock as an investment option for plan participants.
*See Kirschbaum*, 526 F.3d at 254 ("The *Moench* presumption logically applies to any allegations
of fiduciary duty breach for failure to divest an EIAP . . . of company stock.").

[28]    *See, e.g.*, *Kirschbaum*, 526 F.3d at 254 (5th Cir. 2008); *Pugh* v. *Tribune Co.*, 521 F.3d
686, 701 (7th Cir. 2008); *Kuper* v. *Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995); *Polaroid*, 362
F. Supp. 2d at 474; *Agway*, 2006 WL 2934391, at *22.

must allege facts showing that the employer faced a "dire situation," *Edgar*, 503 F.3d at 348, and

that the company's "overall viability appear[ed] to be in jeopardy," *In re Bausch & Lomb Inc.*

*ERISA Litig.*, No. 06 Civ. 6297, 2008 WL 5234281, at *6 (W.D.N.Y. Dec. 12, 2008) (dismissing

ERISA complaint under Rule 12(b)(6)).[29]   "[B]road allegations that [the defendant] issued

misleading statements about its business and financial conditions that allegedly caused the price

of [its] stock to be inflated . . . are insufficient to constitute a breach of fiduciary duty" where

there is no threat to the company's viability. *Bausch & Lomb*, 2008 WL 5234281, at *6 (citation

omitted).[30]   Moreover, plaintiffs also must show that the fiduciary had "'knowledge of [the

company's] impending collapse.'"   *Polaroid*, 362 F. Supp. 2d at 475 (quoting *Moench*, 62 F.3d

at 572).   Here, Plaintiffs' allegations fail to overcome the *Moench* presumption.

        *First*, UBS's putative Class Period share price decline of 64.3% is insufficient to

establish that UBS faced a "dire situation."[31]   Courts regularly hold that class period price

---

[29]    Courts have reasoned that the presumption is based on the fact that plan investment options in employer stock are designed to "be both an employee *retirement* benefit plan and a technique of corporate finance that would encourage employee ownership," and so ERISA fiduciaries may be caught between their duties to follow plan instructions and terminate potentially imprudent investment options.   *Moench*, 62 F.3d at 569 (emphasis added) (internal quotation marks omitted).

[30]    While pre-*Twombly* courts differed on whether the *Moench* presumption should be applied at the motion to dismiss stage, post-*Twombly* courts routinely consider the *Moench* presumption as a matter of law and dismiss ERISA claims on Rule 12(b)(6) motions. *See Edgar*, 503 F.3d at 340; *Ward* v. *Avaya, Inc.*, No. 07-3246, 2008 WL 4888494, (3d Cir. Nov. 13, 2008); *Graden* v. *Conexant Sys., Inc.*, 574 F. Supp. 2d 456 (D.N.J. 2008); *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681 (W.D. Tex. 2008); *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606 (N.D. Tex. 2008); *Bausch & Lomb*, 2008 WL 5234281.   As the Western District of Texas explained, *Twombly* compels a court to "determine at the motion to dismiss stage whether the Plaintiffs have plead facts which, taken as true, could overcome the *Moench* presumption."   *In re Dell*, 563 F. Supp. 2d at 693.

[31]    Plaintiffs erroneously allege that UBS's share price declined by 74% (Compl. ¶ 86)—a number still less than the 95% decline that courts have held to be insufficient to overcome the

declines of up to 95% in a company's stock are insufficient to overcome the *Moench* presumption. *See Ward*, 2008 WL 4888494, at *4 (95% drop in stock price); *Kuper*, 66 F.3d at 1451 (80% drop in stock price); *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 838-39 (N.D. Cal. 2005) (75% drop in stock price); *Wright* v. *Or. Metallurgical Corp.*, 360 F.3d 1090, 1096 (9th Cir. 2004) (73% drop in stock price).[32]

As the Ninth Circuit explained in *Wright*, "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption." *Wright*, 360 F.3d at 1099. The *Wright* court specifically distinguished a situation in which (i) "the stock market suffered dramatic losses" leading to a decline in employer stock from (ii) losses peculiar to the employer that "would indicate [that the employer] or the Plan should have had reason to think the decline in the price of [the employer's stock] was anything unusual or specifically related to [the employer's] *viability as a company.*"

---

*Moench* presumption. Plaintiffs calculate this inflated number by comparing UBS's share price high during the putative Class Period with the October 16, 2008 share price, without adjusting for the rights and dividend offerings that the Plans' participants who invested in the UBS Stock Fund at the time all received. *See*, *e.g.*, *Crowley*, 234 F. Supp. 2d at 227 (comparing share prices from the first and last days of the putative class period).

[32]     *See also Coca-Cola Enters.*, 2007 WL 1810211, at *10 (granting motion to dismiss when company was not "on the verge of financial collapse"); *Calpine*, 2005 WL 1431506, at *5 (granting motion to dismiss ERISA complaint when company's "viability as an ongoing concern" was not called into question); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 793-95 (W.D.N.C. 2003) (granting motion to dismiss ERISA complaint where company was "solid," "viable" and "far from impending collapse") (internal quotation marks omitted); *Wright* v. *Or. Metallurgical Corp.*, 222 F. Supp. 2d 1224, 1234 (D. Or. 2002) (granting motion to dismiss ERISA complaint when company was "far from an impending collapse" and "at all times . . . a viable concern"), *aff'd*, 360 F.3d 1090 (9th Cir. 2004); *McKesson*, 391 F. Supp. 2d at 833 (granting motion to dismiss ERISA complaint when company's "viability as an ongoing concern" was not at stake (internal quotation marks omitted)); *but see In re Ford Motor Co. ERISA Litig.*, No. 06-11718, 2008 WL 5377955, at *7 (E.D. Mich. Dec. 22, 2008) (declining to apply the *Moench* presumption and holding that "a stock can be imprudently risky for an employee savings plan even in the absence of fraud or imminent collapse.").

360 F.3d at 1099 (affirming dismissal under Rule 12(b)(6) for failure to overcome the *Moench* presumption) (internal quotation marks omitted).  Here, of course, Plaintiffs bring their claims in a global marketwide downturn that is patently not peculiar to UBS.

        *Second*, numerous judicially noticeable facts rebut any allegation in the Complaint that UBS faced "imminent collapse" during the putative Class Period:

- UBS's overall annual loss for 2007 was its first annual loss in nine years, *see supra* page 1;

- As of September 30, 2008, even after writing down $43 billion in mortgage-related securities, UBS had over 75,000 employees in 50 countries, CHF 2 trillion in assets, and CHF 5.6 billion in quarterly operating income, *see supra* page 18;

- UBS raised CHF 13 billion from private capital in December 2007 and an additional CHF 15.6 billion from a June 2008 rights offering, *see supra* page 19;

- Throughout the putative Class Period, UBS maintained investment grade ratings from Fitch, Moody's, and Standard & Poor's, *see supra* page 19;

- As of September 30, 2008, UBS maintained a Tier 1 capital ratio of 10.8%—more than twice the required amount by the Federal Reserve and the FDIC for well-capitalized financial institutions, *see supra* pages 18-19;

- UBS's share price on the New York Stock Exchange closed higher than the day before on at least 196 of the 405 trading days during the putative Class Period (Ex. 40 (UBS Stock Prices, Mar. 13, 2007 to Oct. 16, 2008)), refuting the suggestion that UBS faced a death-spiral towards bankruptcy;

- On October 16, 2008, UBS entered into an agreement whereby the Swiss National Bank agreed to acquire up to $60 billion of UBS's illiquid assets, *see supra* page 20; and

- Throughout the putative Class Period, and even after UBS announced its writedowns of mortgage-related securities and ARS and the investigation into the tax allegations, financial analysts consistently rejected the notion that UBS would fail as an institution, and even opined that UBS shares were undervalued.  (Ex. 38 (Compilation of analyst statements concerning UBS)):

    - On July 14, 2008, a Bank of America analyst report stated that "[d]espite recent negative headlines & reputation knocks, given still favorable secular growth trends & a leading global presence, we continue to expect UBS will remain a global leader in wealth mgmt & flows to improve over time," (*id.* at 5);

o   On September 22, 2008, an ABN-Amro analyst report stated that "[a]lthough we expect a difficult [second half of 2008], we believe that 2009 should present an inflection point allowing UBS's core franchise value to show through. We upgrade to Buy," (*id.*); and

o   In the wake of UBS's announced agreement with the Swiss National Bank, Deutsche Bank issued an October 16, 2008 analyst report stating that "[w]e see this as a smart move by UBS, which substantially de-risks the balance sheet. We reiterate our Buy recommendation thanks to upside to our new target price of CHF 27 and the turnaround potential we see." (*id.* at 6).

As a matter of law, these facts "demonstrate that [UBS] was a viable concern throughout the alleged class period and was not in the sort of deteriorating financial circumstances that must be pled to rebut the presumption of prudence under [*Moench*]." *Calpine*, 2005 WL 1431506, at *5.

Moreover, Plaintiffs' allegations that UBS's share price was artificially inflated due to Defendants' purported fraud involving UBS's writedowns of mortgage-related securities and ARS and alleged assistance in helping certain U.S. customers avoid U.S. tax laws do not overcome the *Moench* presumption. In *Bausch & Lomb*, plaintiffs alleged that "the defendants breached their fiduciary duty of prudence, because they did not remove the B & L Stock Fund from the Plan when the price of B & L stock allegedly became artificially inflated through fraud." 2008 WL 5234281, at *4. The court dismissed the claim under Rule 12(b)(6), holding that, despite the alleged fraud, plaintiffs' allegation "did not reach the magnitude that would have caused the Plan's fiduciaries to conclude that B&L's financial condition required divestiture of the B&L Stock Fund." *Id.* at *6. Plaintiffs' allegations likewise fail here.

Plaintiffs also cannot overcome the *Moench* presumption, because UBS's share price actually rose by 22% from the first day of the putative Class Period on March 13, 2007 to the putative Class Period high on April 26, 2007. Had Defendants forcibly liquidated Plan accounts of the UBS Stock Fund before April 26, 2007—as Plaintiffs allege that Defendants were legally obligated to do—Defendants undoubtedly would have faced breach of fiduciary

duty claims for acting contrary to the intent of the settlors and denying the participants who had invested in the UBS Stock Fund an increase in the value of their investments.  Indeed, without the *Moench* presumption, a fiduciary faces "the untenable position of having to predict the future of the company stock's performance.  In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded." *Kirschbaum*, 526 F.3d at 256; *see also Pedraza*, 456 F. Supp. 2d at 1276 ("A fiduciary who decides to scrap the ESOP is just as apt to be sued as he would be if he enforced the plan provisions.").

Because Plaintiffs cannot overcome the *Moench* presumption of prudence, their breach of fiduciary duty of prudence claim as to both Plans fails as a matter of law.

### C.    Defendants Did Not Breach a Duty to Investigate.

Plaintiffs cannot save Count I by alleging that the Defendants "failed to conduct an appropriate investigation into whether [the UBS Stock Fund] was a prudent investment for the Plans."  (Compl. ¶ 181.)

*First*, for the reasons stated above, Plaintiffs have failed to plead that it was imprudent to offer Plan participants the option of investing in the UBS Stock Fund.  It is black letter law that Plaintiffs "must show that [investing in the UBS Stock Fund] actually was imprudent before [they] can state a claim for failing to investigate." *McKesson*, 391 F. Supp. 2d at 833 (citing *Fink* v. *Nat'l. Sav. & Trust Co.*, 772 F.2d 951, 962 (D.C. Cir. 1985) (Scalia, J., concurring in part and dissenting in part)).

*Second*, the supposed "red flags" here could not plausibly have triggered any duty to investigate.  As described *supra* page 13, these "warnings" focused broadly on problems at mortgage lenders, and also included various analyst and media reports on housing prices and

loan defaults.  They did not serve as "warnings" for UBS's AAA-rated securities, which were specifically designed not to lose value in the wake of a real estate downturn or rising defaults on residential mortgages.  *See id.*

Nor do Plaintiffs identify which Defendants had knowledge of the impact of these "red flags" or the basis for such purported knowledge.  And, Plaintiffs do not explain how Defendants—none of whom  (besides Mr. Weil) are alleged to have even worked in areas related to the devalued securities or cross-border tax operations—would even have had access to information suggesting that a financial crisis or government investigation might harm UBS's financial health.  Rather, they allege only that "[a]ll Defendants, and particularly the Board Defendants, as senior executives and high-level officials, were in the position to know of the various 'red flags.'"[33]  (Compl. ¶ 177.)  This allegation based merely on a defendant's position is insufficient to hold any of the Defendants liable for their purported knowledge.  *See Pugh*, 521 F.3d at 700-01 (dismissing plaintiffs' "conclusory statement" that "defendants, by virtue of their positions alone, should have possessed information that disclosed the misconduct" as insufficient to state a claim); *Howell* v. *Motorola, Inc.*, 337 F. Supp. 2d 1079, 1089-92 (N.D. Ill. 2004) (collecting cases finding that allegation that a defendant was a member of a plan's investment committee is, without more, an insufficient basis for inferring that he should have been privy to certain company information).

Moreover, almost every major financial institution suffered large losses on similar investments in mortgage-related securities during the putative Class Period.  *See supra* pages 13-15.  Tellingly, Plaintiffs do not—and cannot—allege that any of these institutions disallowed

---

[33]    The Complaint does not define the term "Board Defendants."

their own stock as a retirement plan investment option or otherwise divested their plans of company stock. Indeed, the plaintiffs' bar has brought suit against several of these institutions for failing to do just that. (Ex. 3 (Compilation of ERISA stock drop cases brought against UBS peer institutions).)[34]

Plaintiffs' failure to allege any facts establishing Defendants' knowledge of issues with UBS's investment in mortgage-related or auction rate securities is fatal to their "duty to investigate" claim. As the *Bausch & Lomb* court explained, in granting a motion to dismiss a claim under ERISA for failure to investigate:

> [T]he Complaint alleges no specific facts suggesting that the [Defendants] . . . were aware of any material information regarding the financial condition of B&L other than what was publicly disclosed. Accordingly, the allegations set forth against the [Defendants] qualify as "unwarranted inferences" and "unsupported conclusions" "cast in the form of factual allegations" that a Court may reject when examining 12(b)(6) motions to dismiss.

2008 WL 5234281, at *8 (citation omitted).

Because Plaintiffs here offer "nothing but pure speculation" to support their allegations that certain "warning flags" should have triggered an investigation at the time, the "alleged red flags fail as a matter of law." *Pugh*, 521 F.3d at 700.

## II.    COUNT II DOES NOT ADEQUATELY ALLEGE THAT DEFENDANTS BREACHED ANY FIDUCIARY DUTY TO "ADEQUATELY INFORM."

Count II—alleging breach of fiduciary duty to inform Plaintiffs about UBS's financial health—fails, because (i) ERISA does not impose a general fiduciary duty to disclose

---

[34]    The fact that none of these plans divested of company stock demonstrates that Defendants' similar decision not to divest the UBS Plans of the UBS Stock Fund was not a breach of the duty of prudence, which requires only that a fiduciary act with "the care, skill, prudence, and diligence *under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters* would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B) (emphasis added).

information to the Plan Participants, and (ii) the statements at issue here were made pursuant to the federal securities laws, not ERISA. And, in any event, Plaintiffs' allegations, which "sound in fraud," do not satisfy Rule 9(b), as they must to survive.

### A. There Was No Generalized ERISA Requirement to Disclose Information about UBS's Financial Health to the Plans' Participants.

ERISA Sections 101 to 111 impose a "comprehensive set of 'reporting and disclosure' requirements," *Curtiss-Wright Corp.*, 514 U.S. at 83 (citing 29 U.S.C. §§ 1021-31), and an ERISA fiduciary's duty of disclosure is limited to those requirements, *Mellot* v. *Choicepoint, Inc.*, 561 F. Supp. 2d 1305, 1318 (N.D. Ga. 2007) ("ERISA's fiduciary duty standards should not be expanded to include disclosure of information that is not explicitly required under ERISA.").

Plaintiffs do not allege a breach of any of ERISA's specific disclosure requirements. Instead, they claim Defendants failed to disclose information concerning UBS's investments in mortgage-related securities and ARS, and UBS's alleged aiding of U.S. customers to avoid U.S. taxes. (*E.g.*, Compl. ¶ 240.) But, as shown *infra* pages 39-42, such communications are governed by the U.S. securities laws, and Plaintiffs, who appear to be members of the related putative securities class action, should look to that suit to press their securities claims.

Indeed, the Second Circuit has flatly rejected the notion that ERISA fiduciaries have a general obligation to disclose information about a company's financial condition, holding that it would be "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure." *Bd. of Trs. CWA/ITU Negotiated Pension Plan* v. *Weinstein*, 107 F.3d 139, 143, 146-47 (2d Cir. 1997) (affirming summary judgment holding that plan fiduciary did not need to produce plan actuarial table to participant because "ERISA's

disclosure requirements were meant to arm plan participants with specific knowledge of their rights and remedies with respect to employee benefit plans").  Nor does ERISA impose on Defendants any duty to keep Plaintiffs informed of UBS's financial developments, even when such developments might affect the value of UBS's stock.  *See Edgar*, 503 F.3d at 350 (affirming a Rule 12(b)(6) dismissal of duty to inform claim under ERISA, because defendants "did not have a duty to 'give investment advice' or 'to opine on' the stock's condition.").[35]

Thus, Plaintiffs' failure to disclose claim fails as a matter of law.

### B.    The Challenged Disclosures Were Not ERISA Communications.

Seeking to bring their securities claims under the guise of an ERISA action, Plaintiffs allege that even if Defendants had no affirmative duty to inform them of UBS's overall financial health, Defendants breached their fiduciary duties by making fraudulent misrepresentations in UBS's "SEC filings and press releases regarding value [sic] of UBS Stock and the financial health of the Company."  (Compl.  ¶ 242.)  This claim fails because ERISA simply does not govern such communications to all shareholders of a company.

---

[35]    *See also Baker* v. *Kingsley*, 387 F.3d 649, 662 (7th Cir. 2004) ("We hold that these vague allegations of 'assessments' of the general economic well-being of an employer, especially in the absence of specific allegations of intent to deceive, are not sufficient to state a claim for breach of fiduciary duty under ERISA . . . . [I]f we were to create a new fiduciary duty, as plaintiffs request, we run the risk of disturbing the carefully delineated corporate disclosure laws."); *Olson* v. *Chem-Trend Inc*., No. 94 Civ. 75201, 1995 WL 866221, at *6 (E.D. Mich. May 30, 1995) (no fiduciary duty to inform plan participants of "material factors affecting the value of [company] stock"); *Sweeney* v. *Kroger Co*., 773 F. Supp. 1266, 1269 (E.D. Mo. 1991) ("[P]lan administrators are not required to inform . . . participants . . . of every corporate event, especially contingent events, that might impact the value of the company's stock."); *but see WorldCom*, 263 F. Supp. 2d at 764 ("Those who are ERISA fiduciaries, however, cannot in violation of their fiduciary obligations, disseminate false information to plan participants, including false information contained in SEC filings.").

*First*, to recover under ERISA "for alleged misrepresentations that the company made concerning its financial condition," Plaintiffs "must demonstrate that the representations were made in a fiduciary capacity." *Kirschbaum*, 526 F.3d at 256; *see also Bausch & Lomb*, 2008 WL 5234281, at *8 ("ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations.") (internal quotation marks omitted).

Here, the only purported misstatements that Plaintiffs attribute to Defendants are those made by UBS in its press releases and SEC filings. (Compl. ¶ 242.) Thus, Plaintiffs have not alleged that Defendants were acting in a fiduciary capacity under ERISA when making these investor communications. *See Kirschbaum*, 526 F.3d at 257 (affirming summary judgment against ERISA plaintiff who did not show that "defendants were acting in anything other than a corporate capacity in making these statements"); *Crowley*, 234 F. Supp. 2d at 228 (dismissing ERISA claim because the public statements and omissions concerning financial performance, "regardless of truth or falsity, were not made by [the company] in any fiduciary capacity regarding the Plan").[36]

*Second*, Plaintiffs cannot save their disclosure claim by arguing that Defendants are liable for incorporating by reference the alleged misstatements in certain communications to the Plans' participants. (Compl. ¶ 243.) An ERISA communication that merely references a company's public SEC statements does not trigger fiduciary liability under ERISA.

For example, in *Kirschbaum*, plaintiffs alleged that the defendants breached their fiduciary duty by referencing false or misleading SEC filings in plan communications to the

---

[36]    *See also Hull* v. *Policy Mgmt. Sys. Corp.*, No. CIV.A.3:00-778-17, 2001 WL 1836286, at *8 (D.S.C. Feb. 9, 2001) ("[D]uties of disclosure owed to the Plan by the corporate defendants are not based on the duties owed by an ERISA fiduciary to a Plan and its participants, but the general duties of disclosure owed by a corporation and its officers to . . . shareholders.").

participants. 526 F.3d at 257. The Fifth Circuit affirmed the district court's summary judgment

order dismissing the claim:

> [Plaintiffs have not shown that Defendants] were acting in anything other than a
> corporate capacity in making these statements or incorporating them into other
> documents. [The company's] obligation to file a Form S-8 incorporating its SEC
> filings is a corporate obligation arising under the securities laws. The same is true
> of its obligation to incorporate its SEC filings into a 10a Prospectus, and to
> distribute that Prospectus to Plan participants. When it incorporated its SEC
> filings into the Forms S-8 and 10a Prospectus, [the company] was discharging its
> corporate duties under the securities laws, and was not acting as an ERISA
> fiduciary.

*Id.* (internal citations omitted); *see also Bausch & Lomb*, 2008 WL 5234281, at *8 ("[T]he

SPD's incorporation by reference of B&L's SEC filings" does not state a claim for breach of

duty to disclose); *Worldcom*, 263 F. Supp. 2d at 760 (incorporation of SEC filings in summary

plan description "is insufficient to state a claim that [defendants] were ERISA fiduciaries").[37]

      *Third*, the Court should dismiss Plaintiffs' failure to disclose claim under ERISA,

because this claim fails to meet the pleading standards of Rule 9(b). *See supra* pages 21-22.

---

[37]    Plaintiffs also cannot show that their alleged damages were proximately caused by any
supposed failure to disclose, because disclosure of the allegedly withheld information about
UBS's alleged problems would have immediately depressed the stock price and Plaintiffs would
have suffered the same alleged loss. In *Edgar*, the Third Circuit held, in affirming the district
court's dismissal of an ERISA claim based on a failure to disclose, that had the defendants
"publicly released any adverse information," such a disclosure "would have resulted in a swift
market adjustment" and would have been immediately reflected in the price of employer stock.
503 F.3d at 350 (internal quotation marks omitted); *see also West* v. *Prudential Sec.*, *Inc.*, 282
F.3d 935, 938 (7th Cir. 2002) ("[F]ew propositions in economics are better established than the
quick adjustment of securities prices to public information."). Thus, the Third Circuit held,
"[t]he Plans would not have been able to sell their [employer] stock holdings at the higher, pre-
announcement price, and the Plans would have sustained the same losses they incurred when the
Company [subsequently] made negative disclosures]." *Edgar*, 503 F.3d at 350 (internal quotation
marks omitted); *McKesson*, 391 F. Supp. 2d at 837 ("[A]ny such disclosure would immediately
cause the company's stock price to drop" and "would severely harm plan participants.");
*Kirschbaum*, 526 F.3d at 256 ("[F]rom a practical standpoint, compelling fiduciaries to sell off a
plan's holdings of company stock may bring about precisely the result plaintiffs seek to avoid: a
drop in the stock price.").

Throughout their 84-page Complaint, Plaintiffs fail to attribute any of the alleged misstatements to a particular Defendant or provide any strong inference of scienter for *any individual Defendant* by pleading "an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Fluor*, 808 F.2d at 962 .[38]

Accordingly, the Court should dismiss Count II.

## III.   THE COURT SHOULD DISMISS THE REMAINING COUNTS FOR FAILURE TO STATE A CLAIM.

The Court should dismiss Counts III, IV, and V, which respectively allege secondary ERISA violations of breach of the duty to monitor, conflict of interest, and co-fiduciary liability.

### A.   Plaintiffs Fail to State a Claim for Breach of the Duty to Monitor.

Count III fails because Plaintiffs have not adequately alleged that UBS, UBSFS and the "Board Defendants" breached their duty to monitor by (a) "failing to ensure that the appointed Plan fiduciaries were given adequate information about [UBS's] business problems,"

---

[38]    To the extent Plaintiffs claim that the Defendants should have disclosed information to the Plan Participants prior to making disclosures to the market, or used non-public information to prevent Plan participants from choosing to invest in the UBS Stock Fund, Plaintiffs seek to hold Defendants liable for failing to take actions that would violate the federal securities laws. *See Kirschbaum*, 526 F.3d at 256 ("[I]n some cases, requiring a fiduciary to override the terms of a company stock purchase plan could suggest the necessity of trading on insider information. Such a course is prohibited by the securities laws."); *Harzewski* v. *Guidant Corp.*, 489 F.3d 799, 808 (7th Cir. 2007) (Posner, J.) ("It probably would have been unlawful . . . for Guidant to sell the Guidant stock held by the pension plan on the basis of inside knowledge of the company's problems.  If so, there are no damages, and indeed no breach of fiduciary duty; for the fiduciary's duty of loyalty does not extend to violating the law."); *Hull*, 2001 WL 1836286, at *8 (rejecting imposition of a duty on a company "to keep the Committee informed of what can only be characterized as 'inside information' for use in the making of its investment decisions"); *see also McKesson*, 391 F. Supp. 2d at 836-37 (divesting plan of company stock prior to disclosure of non-public information would have violated securities laws).

or (b) "failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment . . . [in the UBS Stock Fund]."  (Compl. ¶ 254.)

   *First*, to establish their duty to monitor claim, Plaintiffs must allege facts showing that the "entity charged with this duty to monitor also had knowledge of or participated in fiduciary breaches by the appointees."  *Bausch & Lomb*, 2008 WL 5234281 at *10; *Edgar* v. *Avaya, Inc.*, No. Civ. A. 05-3598, 2006 WL 1084087, at *11-12 (D.N.J. Apr. 25, 2006); *Dynegy*, 309 F. Supp. 2d at 900-04.  Because Plaintiffs have failed to allege adequately that UBS, UBSFS and the "Board Defendants" were responsible for appointing or removing any Defendants who actually breached any fiduciary obligations, the Court should dismiss the duty to monitor claim. *See*, *e.g.*, *Coca-Cola Enters.*, 2007 WL 1810211, at *11 (dismissing duty to monitor claim because plaintiffs failed to state a claim that investing in company stock was imprudent).

   *Second*, Plaintiffs cannot transform the Appointing Defendants' fiduciary responsibility to appoint and remove other fiduciaries into a duty to oversee the decisions of the appointed fiduciaries to offer or not offer certain investment options to plan participants.  *See Polaroid*, 362 F. Supp. 2d at 229 ("ERISA does not attach liability for investment decisions to fiduciaries whose roles were limited to appointing, retaining, and removing other fiduciaries.") Rather, an appointing fiduciary cannot be liable unless such fiduciary was on notice "of possible misadventure by [its] appointees."  *Coyne & Delany Co*. v. *Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996) (citation omitted); *see also Pedraza*, 456 F. Supp. 2d at 1278.

   Here, Plaintiffs fail to allege any improper behavior, such as theft or gross negligence, by any members of the Plan committees that were appointed to their positions by the Appointing Defendants.  Rather, Plaintiffs allege only that the appointed fiduciaries continued to allow the Plan participants the option to invest in the UBS Stock Fund and sent communications

to Plan participants that referenced UBS's SEC filings.  *See, e.g., Beauchem* v. *Rockford Prods.*, No. 01 C 50134, 2003 WL 1562561, at *1 (N.D. Ill. Mar. 24, 2003) (dismissing failure to monitor claim because "[n]othing requires or allows [the appointing fiduciary to exercise] control over the Plan Committee beyond appointing its members"); *WorldCom*, 263 F. Supp. 2d at 760-61 (dismissing failure to monitor claim against board because plaintiffs' argument "would make any supervisor of an ERISA fiduciary also an ERISA fiduciary"); *Hull*, 2001 WL 1836286, at *7 (dismissing claim of breach of duty to provide information against board member whose only fiduciary responsibility was to appoint the investment committee).  Even then, as shown *supra* pages 29-35, Plaintiffs have failed to adequately allege that the "Board Defendants" (whoever they may be) knew of significant threats to UBS's overall financial health.

Accordingly, the Court should dismiss Count III for failure to state a claim.

### B. Plaintiffs Fail to State an ERISA Claim for Conflict of Interest.

Count IV fails because Plaintiffs provide no support for their allegation that due to "the longstanding artificial inflation of [UBS] stock," "Defendants clearly placed the interests of themselves and [UBS] . . . before the interests of the Plans."  (Compl. ¶ 263.)  Indeed, the Complaint makes no attempt to specify any Defendant's alleged conflict.

By its terms, ERISA recognizes that a fiduciary:

> may have financial interests adverse to beneficiaries. Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries, when they act as employers . . . or even as plan sponsors (*e.g.*, modifying the terms of a plan as allowed by ERISA to provide less generous benefits).

*WorldCom*, 263 F. Supp. 2d at 768 (quoting *Pegram*, 530 U.S. at 225).  Applying this established rule, courts consistently reject "conflict of interest" ERISA claims in circumstances such as these even when plaintiffs allege that the defendants had specific and personal financial motives of the type not alleged here—*e.g.*, insider trading—that might indicate that the

defendants unjustly favored their personal interests over those of the plans at issue.  *See*, *e.g.*, *Polaroid*, 362 F. Supp. 2d at 479 (dismissing a breach of loyalty claim based on allegation that "[d]efendants' compensation was stock-based"); *McKesson*, 391 F. Supp. 2d at 835 (dismissing breach of loyalty claim against defendant who owned company stock).  Moreover, Plaintiffs have not alleged that the Appointing Defendants were conflicted when exercising their limited responsibilities of appointing the plan committee members, or that they made such appointments in an attempt to retain the UBS Stock Fund as an investment option.

Accordingly, the Court should dismiss the conflict of interest claim.

### C.   Plaintiffs Fail to State a Claim for Breach of Co-Fiduciary Liability.

Count V fails to state a claim that Defendants are liable for breaches by the other Defendants under a theory of co-fiduciary liability.  (Compl. ¶¶ 266-74.)  To state such a claim, Plaintiffs must adequately plead that Defendants  (1) "participate[d] knowingly in, or knowingly under[took] to conceal" another fiduciary's breach "knowing such act or omission is a breach" of fiduciary duty; (2) enabled another to commit a fiduciary breach by failing to comply with "the administration of his specific responsibilities which give rise to his status as a fiduciary"; or (3) knew of another's fiduciary breach and failed to make "reasonable efforts under the circumstances to remedy the breach."  29 U.S.C. § 1105(a).  Plaintiffs' allegations do not meet this standard.

*First*, as described *supra*, because Plaintiffs have not stated a claim for breach of fiduciary duty by any Defendant, the Court should dismiss the claim for co-fiduciary liability. *See Calpine*, 2005 WL 1431506, at *8 ("Plaintiff cannot state a claim for co-fiduciary liability without first stating a claim for breach of fiduciary duty under ERISA."); *Maniace* v. *Commerce Bank of Kan. City, N.A.*, 40 F.3d 264, 268-69 (8th Cir. 1994) (plaintiff must establish primary

breach of fiduciary duty to maintain a claim for co-fiduciary liability); *Izzarelli* v. *Rexene Prods. Co.*, 24 F.3d 1506, 1525 n.34 (5th Cir. 1994) (same).

*Second*, to be charged with co-fiduciary liability, each Defendant must have actually functioned as an ERISA fiduciary with respect to the Plans. As demonstrated *supra* pages 23-29, Defendants were fiduciaries only for specific tasks and did not have fiduciary responsibility for the acts alleged in the Complaint. *See Kling* v. *Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 145 (D. Mass. 2004) ("Kling has failed to plead fiduciary status on the part of the Pension Committee, however, and thus cannot plead co-fiduciary breach against it."); *Haber*, 774 F. Supp. at 879 (dismissing co-fiduciary claim when plaintiff failed to allege facts supporting allegation that defendant was a fiduciary). Moreover, because the Complaint does not challenge the Appointing Defendants' act of appointing or removing members of the Plan committees—*i.e.*, their "specific responsibilities which give rise to [their] status as fiduciaries," 29 U.S.C. § 1105(a)—it fails to state a claim against the Appointing Defendants for a breach of co-fiduciary duty.

*Third*, although allegations of "actual knowledge" or knowing participation or concealment of a fiduciary breach are required to state a claim, Plaintiffs have failed to make such allegations. *Donovan* v. *Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983) (co-fiduciary liability requires "actual knowledge" that the other person is a fiduciary, that the fiduciary participated in a fiduciary act, and that the act was a breach). Plaintiffs' boilerplate allegations (Compl. ¶¶ 266-72) are inadequate, and therefore, the Court should dismiss Count V. *See Lee* v. *Burkhart*, 991 F.2d 1004, 1010-11 (2d Cir. 1993) (dismissing co-fiduciary liability claim for failure to allege knowledge of co-fiduciary's breach); *Stein* v. *Smith*, 270 F. Supp. 2d 157, 175 (D. Mass. 2003) (same); *Haber*, 774 F. Supp. at 879 (dismissing co-fiduciary liability claim

because "no facts [were] alleged to provide grounds for the claim that [defendant] knowingly

participated in [another's] fiduciary breaches").[39]

## IV. PLAINTIFFS' CLAIMS AND RELIEF SOUGHT ARE BARRED IN WHOLE OR IN PART BY THEIR FAILURE TO ALLEGE LOSS CAUSATION, LACK OF STANDING, AND WAIVER OF CLAIMS.

Plaintiffs' claims are barred in whole or in part by their failure to allege loss

causation, their lack of standing, and waiver of claims.

*First*, Plaintiffs Taveras, Stanislaus and McKevitt divested their entire Plan

accounts of all assets (including the UBS Stock Fund) by July 7, 2008, August 12, 2008, and

August 22, 2008, respectively. (Ex. 4 (Taveras SIP Investment Summary); Ex. 5 (McKevitt Plus

Plan Investment Summary); Ex. 6 (Stanislaus Plus Plan Investment Summary).) Therefore,

although the putative Class Period ends on October 16, 2008, Taveras, McKevitt, and Stanislaus

have no basis to allege damages for the period after which they fully divested their Plan assets.

*Second*, none of the Plaintiffs can allege loss causation for the entire putative

Class Period. *See Diduck* v. *Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 279 (2d

Cir. 1992) ("[A] causal connection is required between a breach of fiduciary duty and the loss

alleged."), *overruled on other grounds as recognized in Coan* v. *Kaufman*, 349 F. Supp. 2d 271,

274-75 (D. Conn. 2004). Plaintiffs (Taveras, Ludlum, Stanislaus, and McKevitt) knew that

investing in the UBS Stock Fund was "imprudent," at the latest, when they filed their original

---

[39]  Count VI, which alleges that plaintiffs are entitled to *quantum meruit* relief against UBS and UBSFS, is founded on the false allegation that UBS and UBSFS "contribu[ted] UBS Stock to the Plans while the value of the stock was inflated." (Compl. ¶ 277.) This allegation is simply incorrect, as UBS and UBSFS made their putative Class Period matching and employer contributions in cash. *See supra* pages 9-10. Count VI should therefore be dismissed.

complaints on July 28, July 31, August 28, and September 19, 2008 respectively.[40]  Because

Plaintiffs had the unfettered discretion to divest their Plan assets of the UBS Stock Fund, they

cannot claim that Defendants caused their losses after those dates.[41]

_Third_, because Plaintiffs Taveras, McKevitt and Stanislaus no longer are

participants in the Plans, they lack standing to seek their requested injunctive relief (i) enjoining

Defendants from "any _further violations_ of their ERISA fiduciary obligations," and (ii)

"requiring Defendants to appoint one or more independent fiduciaries to participate in the

---

[40]    _See_ Complaint, _In re UBS AG ERISA Litig._, 08-cv-6696 (RJS) (S.D.N.Y. July 28, 2008);
Complaint, _Ludlum_ v. _UBS AG, et al._, 08-6868 (RJS) (S.D.N.Y. July 31, 2008); Complaint,
_Stanislaus_ v. _UBS AG, et al._, 08-cv-7606 (RJS) (S.D.N.Y. Aug. 28, 2008); Amended Class
Action Complaint, _Ludlum_ v. _UBS AG, et al._, 08-cv-6868 (RJS) (S.D.N.Y. Sept. 19, 2008).

[41]    Plaintiffs' claims also are barred by ERISA § 404(c), which exempts plan fiduciaries
from liability for losses to EIAPs that result from a participant's own investment decisions.
Specifically, Section 404(c) states that, where a plan "provides for individual accounts and
permits a participant or beneficiary to exercise control over the assets in his account," no
fiduciary "shall be liable . . . for any loss, or by reason of any breach, which results from such
participant's or beneficiary's exercise of control."  29 U.S.C. § 1104(c).
          Although Plaintiffs acknowledge that Section 404(c) creates an "exception to fiduciary
liability for losses that result from Participants' exercise of control over investment decisions"
(Compl. ¶ 288), Plaintiffs plead that Defendants are not entitled to the 404(c) defense for two
reasons (_id._ ¶¶ 289, 291), both of which are incorrect.
          _First_, Plaintiffs argue that Section 404(c) does not apply because Defendants failed to
supply complete and accurate information to Plaintiffs to enable them to make an informed
decision to invest in the UBS Stock Fund.  As discussed _supra_ pages 38-42, the disclosure claim
fails as a matter of law, so the argument that Section 404(c) does not apply fails as well.  _See
Hecker_ v. _Deere & Co._, 496 F. Supp. 2d 967, 973-74 (W.D. Wisc. 2007) (holding that
nondisclosure of a fee-sharing arrangement did not run afoul of Section 404(c)'s disclosure
requirements).
          _Second_, Plaintiffs claim that Section 404(c) does not apply because it does not immunize
fiduciaries from liability for selecting and offering the UBS Stock Fund stock as an investment
option.  This logic, however, "would render the § 404(c) defense applicable only where plan
managers breached no fiduciary duty, and thus only where it is unnecessary."  _Langbecker_ v.
_Elec. Data Sys. Corp._, 476 F.3d 299, 310-11 (5th Cir. 2007) (reversing the district court and
holding that the Section 404(c) defense barred plaintiffs' claims); _see also Hecker_, 496
F. Supp. 2d at 976-77 (dismissing ERISA claims and agreeing with the _Langbecker_ court's view
of § 404(c)).

management of the Plans' investment in UBS stock." (Compl., Prayer for Relief E, F) (emphasis added); *see*, *e.g.*, *Deshawn E.* v. *Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.").

> *Fourth*, Plaintiff McKevitt has waived her claims in this action. Upon leaving UBSFS, she entered into a Severance Agreement and General Release ("Severance Agreement") whereby she received severance payment (Ex. 41 (McKevitt Severance Agreement) at 2) in exchange for, *inter alia*

> irrevocably and unconditionally waiv[ing], releas[ing], and forever discharg[ing] UBSFS, and its past, present and future affiliates and related entities, parent and subsidiary corporations, divisions, shareholders, ***employee benefit plans and/or pension plans or funds***, predecessors, successors, and assigns, and its and their past, present or future officers, directors, trustees, ***fiduciaries***, administrators, employees, agents, representatives, shareholders, predecessors, successors and assigns (hereinafter . . . "Releasees") from, ***any and all claims***, charges, demands, sums of money, actions, rights, promises, agreements, ***causes of action***, obligations and liabilities of any kind or nature suspected or unsuspected, apparent or concealed  . . . which [McKevitt] now or in the future may have or claim to have against UBSFS or any of the other Releasees . . . .  The Claims being released include, but are not limited to . . . any claims or actions under . . . the **Employee Retirement Income Security Act.**

(*Id.* ¶ 8 (emphasis added).)  The Severance Agreement specifically advised McKevitt, a high school graduate (Ex. 42 (McKevitt Employment Application) at 7), that she should consult an attorney before entering the agreement, that she had 45 days to decide whether to execute it, and that she could withdraw from the agreement within seven days of execution (Ex. 41 (McKevitt Severance Agreement) ¶¶ 24e, 24f).  Thus, McKevitt's waiver is valid and enforceable.  *See Laniok* v. *Advisory Comm. of the Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991) (listing the factors to consider when determining the validity of a waiver).

Accordingly, the Court should dismiss McKevitt as a plaintiff in this litigation.

*See Hogan* v. *E. Enters./Boston Gas*, 165 F. Supp. 2d 55 (D. Mass. 2001) (dismissing action under Rule 12(b)(6) because plaintiff had waived his ERISA claim).

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint in its entirety for failure to state a claim and deny leave to further amend.[42]

Respectfully Submitted,

J. Mark Iwry
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330

Robert J. Giuffra, Jr. (RG9969)
Maite Aquino (MA0030)
Suhana S. Han (SH2407)
Matthew A. Schwartz (MS8359)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*

January 16, 2008

---

[42] *See* Fed. R. Civ. P. 15(a)(2) (After a responsive pleading, the Court should grant leave to amend only "when justice so requires"). Here, Plaintiffs Taveras, Ludlum, Stanislaus, and McKevitt had 109, 106, 78, and 56 days, respectively, from the filing of their original complaints, and all Plaintiffs had 42 days from this Court's October 3, 2008 Consolidation Order to draft proper amended allegations. Their failure to do so should not force Defendants into a second round of briefing on Plaintiffs' meritless claims. *See, e.g., In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 236 (D.N.J. 2002) ("Plaintiff had ample opportunity to craft a sufficiently pled complaint when the Court . . . consolidated the . . . pending cases into this single class action, and ordered the lead Plaintiff to file an amended class action complaint.").