**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE UBS AG ERISA LITIGATION

No. 08 CV 06696 (RJS)

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR RENEWED MOTION TO DISMISS THE AMENDED CLASS**
**ACTION COMPLAINT PURSUANT TO RULES 12(B)(1) AND 12(B)(6)**

Robert J. Giuffra, Jr.
Matthew A. Schwartz
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*

September 25, 2013

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................5

    A.    The Parties ....................................................................................................5

        1.    Plaintiff Taveras .............................................................................5

        2.    Defendants .....................................................................................5

    B.    The SIP.........................................................................................................6

        1.    Fiduciary Authority........................................................................6

        2.    Plan Investment Options ................................................................7

    C.    Administrative Remedies Under the SIP ........................................................7

    D.    The Allegations of the Amended Complaint ...................................................7

        1.    Mortgage-Related Securities...........................................................8

        2.    Auction Rate Securities.................................................................10

        3.    Cross-Border Tax Allegations .......................................................11

        4.    Allegations of Fiduciary Knowledge..............................................11

ARGUMENT ............................................................................................................................12

I.    PLAINTIFF DOES NOT ALLEGE A BREACH OF THE DUTY OF PRUDENCE AS A MATTER OF LAW..........................................................................12

    A.    Because the Appointing Defendants Had No Role in Making the UBS Stock Fund an Investment Option, They Were Not ERISA Fiduciaries ..............12

    B.    The Members of the SIP Committee Did Not Breach Their Duty of Prudence.......................................................................................................15

        1.    Plaintiff Does Not Allege That the Members of the SIP Committee "Knew or Should Have Known" That UBS Was an Imprudent Investment.....................................................................15

        2.    The Second Circuit Has Now Made Clear That Members of the SIP Committee Had No Duty To Seek Out and To Use Inside Information ...................................................................................18

        3.    The Amended Complaint Does Not Plausibly Allege That Publicly Available Facts Put SIP Committee Members on Notice That the UBS Stock Fund Was an Imprudent Investment .......................................19

*Page*

**II.**     **ERISA § 404(C) ALSO BARS PLAINTIFF'S PRUDENCE CLAIM** ........................21

**III.**    **THE COURT SHOULD DISMISS THE REMAINING COUNTS FOR FAILURE TO STATE A CLAIM** ................................................................23

**IV.**     **ALTERNATIVELY, PLAINTIFF LACKS STANDING TO BRING SUIT HERE** ................................................................................................24

**CONCLUSION** ................................................................................................26

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Almonor* v. *BankAtlantic Bancorp, Inc.*,
  No. 07 Civ. 61862, 2009 WL 8412125 (S.D. Fla., July 15, 2009) .........................................25

*Am. Med. Ass'n* v. *United HealthCare Corp.*,
  No. 00 Civ. 2800, 2007 WL 1771498 (S.D.N.Y. June 18, 2007) ...........................................24

*Amaro* v. *Cont'l Can Co.*,
  724 F.2d 747 (9th Cir. 1984) ..................................................................................................24

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ................................................................................................................12

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ........................................................................................................5

*Bell Atl. Corp.* v. *Twombly*,
  550 U.S. 544 (2007) ................................................................................................................12

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
  506 F. App'x 32 (2d Cir. 2012) .................................................................................................9

*Brown* v. *Medtronic, Inc.*,
  628 F.3d 451 (8th Cir. 2010) ..................................................................................................25

*Coulter* v. *Morgan Stanley & Co., Inc.*,
  No. 11 Civ. 1849, 2013 WL 1285298 (S.D.N.Y. Mar. 28, 2013) ..........................................16

*Coyne & Delany Co.* v. *Selman*,
  98 F.3d 1457 (4th Cir. 1996) ..................................................................................................23

*Crowley ex rel Corning, Inc. Inv. Plan* v. *Corning, Inc.*
  234 F. Supp. 2d 222 (W.D.N.Y. 2002) ...............................................................................13-14

*Day* v. *Moscow*,
  955 F.2d 807 (2d Cir. 1992) ....................................................................................................22

*Deshawn E.* v. *Safir*,
  156 F.3d 340 (2d Cir. 1998) ....................................................................................................25

*DiFelice* v. *U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ..................................................................................................22

*Page(s)*

*Donovan* v. *Cunningham*,
    716 F.2d 1455 (5th Cir. 1983) ............................................................23

*Gearren* v. *McGraw–Hill Cos.*,
    660 F.3d 605 (2d Cir. 2011)................................................................17

*Gearren* v. *McGraw–Hill Cos.*,
    690 F. Supp. 2d 254 (S.D.N.Y. 2010)..................................................19

*Hecker* v. *Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ..............................................................22

*In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*,
    756 F. Supp. 2d 330 (S.D.N.Y. 2010)..................................................14

*In re Bos. Scientific Corp. ERISA Litig.*,
    254 F.R.D. 24 (D. Mass. 2008)............................................................25

*In re Citigroup ERISA Litig.*,
    662 F.3d 128 (2d Cir. 2011)........................................................ *passim*

*In re Lehman Bros. Sec. & ERISA Litig.*,
    683 F. Supp. 2d 294 (S.D.N.Y. 2010)........................................ 12-13, 16

*In re Lehman Bros. Sec. & ERISA Litig.*,
    No. 08 Civ. 5598, 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011) ...................................2, 13, 16

*In re Morgan Stanley ERISA Litig.*,
    696 F. Supp. 2d 345 (S.D.N.Y. 2009)..................................................22

*In re UBS AG Sec. Litig.*,
    No. 07 Civ. 11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)................................ *passim*

*In re UBS ERISA Litig.*,
    No. 08 Civ. 6696, 2011 WL 1344734 (S.D.N.Y. Mar. 24, 2011) .................................. *passim*

*In re UBS ERISA Litig.*,
    No. 08 Civ. 6696, 2012 WL 1034445 (S.D.N.Y. Mar. 23, 2012) ...........................................15

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)..................................................................22

*In re Wilmington Trust Corp. ERISA Litig.*,
    No. 10 Civ. 1114, 2013 WL 1855756 (D. Del. May 3, 2013)................................25

*Kennedy* v. *Empire Blue Cross & Blue Shield*,
    989 F.2d 588 (2d Cir. 1993)................................................................24

*Page(s)*

*Kirschbaum* v. *Reliant Energy, Inc.*
526 F.3d 243 (5th Cir. 2008) ........................................................................19, 20

*Lanfear* v. *Home Depot, Inc.*,
679 F.3d 1267 (11th Cir. 2012) .........................................................................19

*Lanfear* v. *Home Depot, Inc.*,
536 F.3d 1217 (11th Cir. 2008) ..................................................................... 24-25

*Langbecker* v. *Elec. Data Sys. Corp.*,
476 F.3d 299 (5th Cir. 2007) ........................................................................22, 23

*Lee* v. *Burkhart*,
991 F.2d 1004 (2d Cir. 1993)...............................................................................24

*Levin* v. *Credit Suisse, Inc.*,
No. 11 Civ. 5252, 2013 WL 1296312 (S.D.N.Y. Mar. 19, 2013) .................... 14-15

*Local 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*,
430 F. App'x 63 (2d Cir. 2011) .............................................................................9

*Majad ex rel. Nokia Ret. Sav. & Inv. Plan* v. *Nokia, Inc.*,
No. 12-4064-CV, 2013 WL 3111263 (2d Cir. June 21, 2013) ..................... 4, 16-17

*Nechis* v. *Oxford Health Plans, Inc.*,
421 F.3d 96 (2d Cir. 2005)...................................................................................24

*PBGC* v. *Morgan Stanley Inv. Mgmt. Inc.*,
712 F.3d 705 (2d Cir. 2013).........................................................2-3, 17-18, 21

*Pegram* v. *Herdrich*,
530 U.S. 211 (2000)..................................................................................2, 12

*Powell* v. *Am. Tel. & Tel. Commc'ns, Inc.*,
938 F.2d 823 (7th Cir. 1991) ...............................................................................24

*Rinehart* v. *Akers*,
722 F.3d 137 (2d Cir. 2013)........................................................................ *passim*

*Taveras* v. *UBS AG*,
513 F. App'x 19 (2d Cir. 2013) .........................................................1, 15, 22, 23

*Taylor* v. *Keycorp*,
680 F.3d 609 (6th Cir. 2012) ...............................................................................25

*Tibble* v. *Edison Int'l*,
711 F.3d 1061 (9th Cir. 2013) .............................................................................22

*Page(s)*

*Vermeylen* v. *ProQuest Co.*,
No. 06 Civ. 12327, 2007 WL 1218713 (E.D. Mich. Apr. 23, 2007) ......................................25

*White* v. *Marshall & Illsley Corp.*,
714 F.3d 980 (7th Cir. 2013) ................................................................................. 19-20

*Zappia Middle E. Constr. Co.* v. *Emirate of Abu Dhabi*,
215 F.3d 247 (2d Cir. 2000)...........................................................................................5

STATUTES

Employee Retirement Income Security Act of 1974
29 U.S.C. § 1104................................................................................................ *passim*

OTHER AUTHORITIES

Meg Fletcher, *Subprime Fallout Could Cost Billions,* BUS. INS. IND. FOCUS, April 28,
2008, ECF No. 47-24 ................................................................................ App'x A

Yalman Onaran, *Banks' Subprime Losses Exceed $500 Billion as Writedowns Spread,*
BLOOMBERG NEWS, Aug. 12, 2008, ECF No. 47-22 ................................... App'x A

Yalman Onaran, *Subprime Bank Losses Reach $312 Billion with RBS, Nomura,*
BLOOMBERG.COM, Apr. 28, 2008, ECF No. 47-23 ...................................... App'x A

Evan Perez & Carrick Mollenkamp, *Top Banker Cited in Tax-Dodge Case,* WALL ST. J.,
Nov. 13, 2008, ECF No. 47-30 ........................................................................11

Gabi Thesing, *German Consumer Confidence Rises on Oil-Price Drop,*
BLOOMBERG.COM, Oct. 28, 2008, ECF No. 47-25...................................... App'x A

**PRELIMINARY STATEMENT**

The issues before this Court on remand are now substantially narrowed. The Second Circuit affirmed the Court's application of the *Moench* "presumption of prudence" to dismiss claims brought on behalf of the UBS Financial Services, Inc. 401(k) Plus Plan, the far larger of the two UBS AG ("UBS") retirement plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See Taveras* v. *UBS AG*, 513 F. App'x 19, 23-24 (2d Cir. 2013) ("Plus Plan Order"). As to the smaller UBS Savings and Investment Plan ("SIP"), the Second Circuit affirmed this Court's dismissal of Counts II (the "candor" claim) and Count IV (the "conflicts" claim), leaving remaining only the "Prudence Claim" (Count I) and secondary liability claims (Counts III, V, and VI) (with the Prudence Claim, the "Remaining Claims"). *Id.* at 24-25.

In remanding, the Second Circuit held that the Court should not have applied the *Moench* presumption in evaluating whether Defendants breached their fiduciary duty of prudence by not barring SIP plan participants from electing to invest in the UBS Stock Fund. *See Taveras* v. *UBS AG*, 708 F.3d 436, 443-46 (2d Cir. 2013). At the same time, the Second Circuit specifically declined to rule on the other grounds that Defendants had raised supporting the dismissal of all claims of SIP participants. *Id.* at 446 & n.8. In fact, since its decision in this case, the Second Circuit has issued decisions in other ERISA cases confirming that the Remaining Claims should be dismissed as a matter of law.

Of the four named Plaintiffs, only one Plaintiff, Debra Taveras, purports to have been a member of the SIP. The Remaining Claims rest on Plaintiff's theory that Defendants should have taken the exceptional step—not taken by any of UBS's peer financial firms—of barring SIP plan participants from investing in UBS's own stock during the period prior to, and at the start of, the recent financial crisis. Although application of the *Moench* presumption narrows the scope of a court's inquiry on a motion to dismiss a claim for breach of fiduciary duty

under ERISA, courts have dismissed such ERISA claims, even without applying that presumption, where, as here, the plaintiff (i) has brought those claims against entities or persons who are not ERISA fiduciaries as a matter of law, *or* (ii) does not allege that any ERISA fiduciaries should have known that the challenged investment option was imprudent.  Because Supreme Court and Second Circuit precedent bars Plaintiff Taveras's Remaining Claims, the Court should extinguish what remains of this ERISA "stock drop" litigation.

      *First*, this Court should dismiss the Remaining Claims against UBS and the UBS Group Executive Board ("GEB") ("Appointing Defendants"), because those Defendants had no authority to make decisions regarding the SIP's investment options.  *See Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000) ("threshold question" in ERISA case alleging a breach of fiduciary duty is "whether that [defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint"); *In re Lehman Bros. Sec. & ERISA Litig.*, 08 Civ. 5598, 2011 WL 4632885, at *7 (S.D.N.Y. Oct. 5, 2011) (Kaplan, J.) ("*Lehman II*") (dismissing claims against Lehman directors based solely on their power to appoint fiduciaries, because "[p]ersons who are fiduciaries by virtue of the exercise of control and authority over a plan are subject to fiduciary duties only 'to the extent' they have or have exercised such power"), *aff'd on other grounds*, *Rinehart* v. *Akers*, 722 F.3d 137 (2d Cir. 2013).

      *Second*, to plead a breach of fiduciary duty by the SIP Committee members—the only Defendants with authority over SIP investment options—Plaintiff must plead facts that "give rise to a *reasonable* inference" that these Defendants "committed the alleged misconduct, thus permitting the court to infer more than the *mere possibility* of misconduct."  *PBGC* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks omitted) (affirming dismissal of a breach of fiduciary duty of prudence claim, without applying

any presumption of prudence, where the "allegations in the [complaint] do not, individually or in combination, give rise to a reasonable inference that [the defendant's] investment decisions . . . were imprudent").

Here, the Consolidated Amended Class Action Complaint ("Amended Complaint" or "AC") contains no allegations whatsoever about the members of the SIP Committee other than referencing their names.  Instead, Plaintiff conclusorily alleges that, during the putative class period, UBS's share price was "artificially inflated" and an "unduly risky" investment option, because of alleged secret malfeasance involving (i) UBS's positions in mortgage-related and auction-rate securities ("ARS"), and (ii) conduct by certain employees of UBS's very small, Swiss-based U.S. cross-border business assisting some customers in avoiding U.S. taxes.  But, fatally for Plaintiff's Remaining Claims, the Amended Complaint contains no allegations whatsoever suggesting that any members of the SIP Committee knew about any of this allegedly secret wrongdoing or were in a position to learn about these matters.

To try to end-run her pleading obligation, Plaintiff baldly ascribes knowledge of such undisclosed malfeasance to *all* Defendants, including "UBS" as a company, and the members of the UBS GEB (none of whom was on the SIP Committee).  But, as the Second Circuit made clear in its recent *PBGC* decision, Plaintiff cannot plead a breach of Defendants' duty of prudence based on such "general accusations of imprudence, unsupported by well-pleaded factual allegations." 712 F.3d at 724.  Moreover, in another recent Second Circuit decision so devastating to Plaintiff's case that she asked to delay filing her opposition to this motion pending the ruling on the petition for rehearing of that decision (Pl.'s July 31, 2013 Letter (ECF No. 81)), the Second Circuit rejected any notion that ERISA fiduciaries must undertake to discover and to use inside information about a company's financial condition for the benefit of

plan participants, because ERISA fiduciaries are not expected to "violate federal securities laws" in conducting their responsibilities.  *Rinehart*, 722 F.3d at 146-47.

Thus, to plead a breach of their duty of prudence, Plaintiff must plead that publicly available "red flags" about the weakness of the housing market support her allegation that the *members of the SIP Committee* should have known that the UBS Stock Fund was an imprudent investment.  But the Amended Complaint does not attempt to allege such "red flags" concerning UBS's positions in ARS or UBS's cross-border business.   And, Plaintiff never explains why the members of the SIP Committee should have known that UBS's investments in then AAA-rated securities backed by U.S. residential mortgages made the UBS Stock Fund imprudent.  *See In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *16 (S.D.N.Y. Sept. 28, 2012) (Sullivan, J.) ("UBS Securities Opinion") (noting that "UBS's AAA-rated securities continued to trade at or near par value" until mid-2007).

Because "no allegations plausibly ascribe knowledge of [the company's] overall financial straits, real or perceived, to Plan fiduciaries," Plaintiff has not stated a claim under ERISA's "prudent man" standard.  *Majad ex rel. Nokia Ret. Sav. & Inv. Plan* v. *Nokia, Inc.*, 2013 WL 3111263, at *2 (2d Cir. June 21, 2013) (summary order) (affirming the dismissal of an ERISA "stock drop" complaint without applying the *Moench* presumption, because "the proposed amended complaint fails to state an ERISA prudence claim under any standard of review").

*Third*, Plaintiff's claims are independently barred by ERISA § 404(c), a safe harbor that absolves fiduciaries of liability from loss that "results from [a Plan] *participant*'s or beneficiary's exercise of control over the assets in his account."  29 U.S.C. § 1104(c)(1)(A) (emphasis added).  Because the Plan participants—not Defendants—elected to invest their retirement funds in the UBS Stock Fund, ERISA § 404(c) supports dismissal of this action.

*Finally*, Plaintiff lacks standing to bring this action, because (i) she did not exhaust the administrative remedies available to her under the Plan, and (ii) assuming that UBS's share price was "artificially inflated," she actually *benefited* from this inflation by electing to sell all of her holdings in the UBS Stock Fund right in the middle of the putative class period.

## BACKGROUND

### A.   The Parties

#### 1.   Plaintiff Taveras

Plaintiff vaguely alleges that she "is a former UBS employee and is a participant in the SIP." (AC ¶ 12.) In reality, Plaintiff fully divested from the SIP on July 8, 2008—five months before the end of the putative class period on October 16, 2008—and accordingly was not a Plan participant throughout this period. (Ex. 1.)[1]

#### 2.   Defendants

The Remaining Claims are brought against UBS—a global financial institution incorporated in Switzerland, *see In re UBS ERISA Litig.*, 2011 WL 1344734, at *1 (S.D.N.Y. Mar. 24, 2011) ("March 24, 2011 ERISA Order")—the GEB and four of its members (Robert Wolf, Joe Scoby, Marten Hoekstra, and Raoul Weil[2]), and the SIP Committee and all of its nine members (Barbara Amone, Stephen Baird, Simon Canning, Michael Daly, Richard Duron, Per

---

[1]    "Ex. _" refers to exhibits annexed to the Declaration of Robert J. Giuffra, Jr., dated September 25, 2013, filed herewith. In determining whether to exercise jurisdiction, this Court may consider material outside the pleadings, such as affidavits and UBS's public filings. *See Zappia Middle E. Constr. Co.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). In determining whether to dismiss the Amended Complaint for failure to state a claim, this Court may consider documents incorporated by reference in the Amended Complaint, such as the documents establishing the SIP (AC ¶¶ 18, 185.a), communications to Plan Participants (*id.* ¶ 185), UBS's securities filings (*id.*), *see, e.g., In re Citigroup ERISA Litig.*, 662 F.3d 128, 132, 145 (2d Cir. 2011), as well as documents on which Plaintiff relied in bringing her claims, *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[2]    Undersigned counsel do not represent Mr. Weil and understand that he has never been served.

Dyrvik, Ursula Mills, Edward O'Dowd, and Jaime Taicher).  (AC ¶¶ 16-21.)

    **B.**      **The SIP**

        **1.**      **Fiduciary Authority**

The SIP is a "defined contribution plan" or "individual account plan" that provides an individual account for each participant, the value of which is based solely on (i) the amount contributed to the participant's account, and (ii) any income, expenses, gains, losses, and forfeitures on the participant's account investments.  (AC ¶¶ 38, 41-42.)

Effective as of January 1, 2007, UBS established the SIP.  (Ex. 2 (SIP Plan Document § 1.1).)  As mandated by the SIP Plan Document, the GEB was responsible only for appointing and removing members of the committees that administer the Plan.  (*Id.* § 10.1 ("The [UBS] Executive Board shall appoint a 'Committee' to administer the Plan and to handle the day-to-day administrative responsibilities with respect to the Plan.").)  *Accord* March 24, 2011 ERISA Order, at *2.  The SIP Plan Document assigned no role to UBS or the GEB for selecting Plan investment options.  Accordingly, none of these Defendants had fiduciary responsibility for managing or controlling the administration of the Plan, establishing investment options, or controlling Plan assets during the putative class period.

The SIP Plan Document named the SIP Committee as the entity that "administer[ed] the [SIP] and . . . handle[d] the day-to-day administrative responsibilities with respect to the Plan."  (Ex. 2 (SIP Plan Document) § 10.1.)  The SIP Committee had "all powers necessary to accomplish such purposes and . . . the exclusive right and discretionary authority with respect to the administration of the Plan."  (*Id.*)  The SIP Committee, "in its sole discretion, shall instruct and advise the Trustee and the Members as to the addition or deletion of an authorized Investment Fund."  (*Id.* § 9.2.)

2.      **Plan Investment Options**

Throughout the putative class period, each Plan participant could make Plan contributions from his or her salary, was "responsible for the allocation of his or her plan account balances among" 17 different investment options, and could "change [her] investment strategy at any time." (Ex. 3 (SIP Summary Plan Description ("SPD")) at 2, 18-21 (May 2008).)  *Accord* March 24, 2011 ERISA Order, at *3.[3]  SIP Participants were warned to "[d]iversify[] [your] [r]etirement [s]avings," and that "[i]f you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified."  (Ex. 4 (SIP Quarterly Statement Stuffer (May 23, 2007)).)

C.      **Administrative Remedies Under the SIP**

The SIP Plan Document vested the SIP Committee with the "exclusive right and discretionary authority . . . to determine any and all questions arising under the Plan or in connection with the administration thereof" (Ex. 2 (SIP Plan Document) § 10.7), and specified a detailed procedure for the submission, review, adjudication, and appeal of claims for benefits allegedly due under the Plan (*id.* § 10.8).  The Plan clearly stated that "[a]ll" claims for benefits allegedly owed under the Plan "shall" be submitted to the SIP Committee, and that "[c]laimants [have a] right to bring a civil action under ERISA Section 502(a)" only "following" an adverse determination by the Committee, whose determinations are "final, conclusive and binding."  (*Id.*)

D.      **The Allegations of the Amended Complaint**

Plaintiff contends that UBS's share price was secretly "artificially inflated," and, thus, that the UBS Stock Fund was an imprudent investment option for SIP Participants (*see* AC ¶ 175), because of UBS's (i) secret accumulation of investments in overvalued *AAA*-rated

---

[3]      The investment options included mutual funds, short-term investment funds, and the UBS Stock Fund (a fund that tracks the price of UBS AG shares).  (Ex. 3 (SIP SPD) at 18-21.)

mortgage-related securities (*id.* ¶¶ 99-140) and ARS (*id.* ¶¶ 141-54), and (ii) aiding of employees in UBS's Swiss-based, U.S. cross-border business of certain U.S. customers to avoid U.S. tax laws (*id.* ¶¶ 155-72).  But nothing in the Amended Complaint connects these allegations to any of the SIP Committee members.

### 1.    Mortgage-Related Securities

In 2005, as part of its strategy to grow its Investment Bank, UBS began to acquire a large inventory of securities backed by U.S. residential mortgages.  (AC ¶¶ 103-04.)  UBS repeatedly disclosed these investments in its SEC filings, stating that its investments in debt securities grew by (Swiss Francs) CHF 5 billion, CHF 69 billion, and CHF 50 billion in the first three quarters of 2006, respectively, all "mainly due to higher positions in . . . asset-backed securities."  (Ex. 5 (UBS, 1Q 2006 Report (Form 6-K)), at 50 (May 4, 2006); Ex. 6 (UBS, 2Q 2006 Report (Form 6-K)), at 52 (Aug. 15, 2006); Ex. 7 (UBS, 3Q 2006 Report (Form 6-K)), at 52 (Oct. 31, 2006).)  *See also* UBS Securities Opinion, at *15 (noting that in the "first three quarters of 2006," UBS "reported increases in asset-backed securities").

Plaintiff alleges that, as early as *2004*, because of "warning flags" concerning the quality of subprime loans in the U.S. residential real estate market in general, Defendants knew or should have known that UBS's then-largely AAA-rated mortgage-related investments would decline significantly in value.  (AC ¶¶ 91-98, 112.)  Plaintiff claims that, instead of taking advantage of this knowledge by logically shorting the subprime market, UBS went to extraordinary lengths to "conceal the true financial condition of UBS" and substantially (and, irrationally, given the allegations of the Amended Complaint) increased UBS's investments in those toxic securities.  (*Id.* ¶ 85.)  But, again, Plaintiff does not allege any facts showing that any member of the SIP Committee knew anything about UBS's mortgage-related securities business, let alone the alleged riskiness of that business.

As Plaintiff acknowledges, almost all of UBS's investments in residential mortgages were in then AAA-rated securities called "RMBS" and "CDOs."  (*Id*. ¶¶ 106-09.) Plaintiff also accepts that UBS invested primarily in the "super senior" tranches of these CDOs (*e.g.*, AC ¶ 106), the lowest-yielding and least-risky tranches, because they were the last to absorb losses caused by defaults on the underlying mortgages.  As the Comptroller of the Currency stated, "[t]hese better-than-triple A [super senior] tranches were supposed to be the *least* risky parts of the subprime securities pyramid."  (Ex. 8 (John C. Dugan, Comptroller of the Currency, Remarks Before the Global Association of Risk Professionals (Feb. 27, 2008)) at 1.) And, in the first quarter of 2007, when lower-rated RMBS began to decline in value (AC ¶ 113), most regulators and market participants concluded, like Federal Reserve Chairman Ben Bernanke, that "the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained."  (Ex. 9 (Ben S. Bernanke, Testimony before the Joint Economic Committee, U.S. Congress (Mar. 28, 2007)) at 2.)

As courts have recognized, market participants and regulators were generally "sideswiped by the collapse of the credit markets."  *Local 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Express Co.*, 430 F. App'x 63, 65 (2d Cir. 2011); *see also Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012) (affirming dismissal where complaint "relies on an assumption" that "executives were prescient" regarding effects on company when "the financial markets collapsed"); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011) (Sullivan, J.) (noting that "Defendants simply did not anticipate the full extent of the mortgage crisis").

Unsurprisingly, then, nearly all of UBS's peer financial institutions suffered similar—or substantially worse—share price declines, largely attributable to losses and

writedowns in mortgage-related securities. (*See* Appendix A hereto (chart of share price declines at various major financial institutions).) Tellingly, Plaintiff does not allege that the ERISA fiduciaries of any UBS peer financial institution took the extraordinary measures they claim the members of the SIP Committee should have taken, including removing company stock as an investment option, or overriding participants' own investment decisions and divesting their retirement plans of company stock.

### 2. Auction Rate Securities

Plaintiff also alleges that UBS's stock price declined because of the decline in the value of UBS's positions in ARS, another type of security that UBS marked down in the second half of 2007. (AC ¶¶ 141-54.) In the fourth quarter of 2007 and into the first quarter of 2008, demand for ARS dropped, and UBS and other financial institutions supported auctions by submitting bids for ARS, thereby increasing their ARS inventories. (*Id.* ¶ 142.) Ultimately, UBS and other banks were left holding ARS inventory that they could not sell at auction. (*Id.* ¶¶ 144-45.) In its 2007 Annual Report, UBS disclosed that, as a result of its auction support, it had accumulated an ARS exposure of $5.9 billion as of December 31, 2007. (Ex. 10 (UBS 2007 Annual Report), ch. 2, at 14.) On May 7, 2008, UBS announced that because of market illiquidity, it would write down the value of its ARS holdings by $974 million. (Ex. 11 (UBS, 1Q 2008 Report (Form 6-K)), at 7 (May 6, 2008).)

Plaintiff alleges that at some unspecified time, unspecified "UBS executives" knew that UBS's ARS positions were growing and overvalued, (AC ¶¶ 143-45), but Plaintiff does not identify a single Defendant, much less a SIP Committee member, who was involved in this alleged scheme, nor any instance where one of UBS's peer firms disclosed or wrote down its ARS exposure in an earlier reporting period than UBS.

### 3.    Cross-Border Tax Allegations

Plaintiff also alleges that UBS's share price declined during 2008 when UBS revealed that the U.S. Department of Justice ("DOJ") was investigating whether UBS aided certain U.S. clients in avoiding U.S. tax laws.  (AC ¶¶ 155-60.)  This allegation concerns UBS's Swiss-based, U.S. cross-border private banking business, which was an extremely small part of UBS's overall business, employing approximately 60 private bankers and, from 2002 to 2007, generating approximately $200 million in annual revenue.[4]  *See* UBS Securities Opinion, at *4, *30 (noting that the cross-border business was a "very small" part of UBS's global business). Although UBS announced the DOJ investigation of its cross-border private banking business in May 2008, UBS did not reach a final settlement with the DOJ until February 2009, four months after the close of the putative class period here and seven months after Plaintiff divested completely from the SIP.  (*See* Pls.' Proposed Second Consolidated Am. Class Action Compl. ¶ 155, ECF No. 58-2.)  Besides Mr. Weil, a member of the GEB, but not the SIP Committee, Plaintiff does not purport to connect any Defendant to the alleged tax scheme.

### 4.    Allegations of Fiduciary Knowledge

Plaintiff devotes an entire section of the Amended Complaint to the proposition that "Defendants [k]new or [s]hould [h]ave [k]nown that UBS [s]tock [w]as [i]mprudent."  (AC ¶¶ 176-83.)  But Plaintiff makes no allegation—in this section or, indeed, any other part of the Amended Complaint—about *what* the members of the SIP Committee "knew" or "should have known," and *when*, about the risks faced by UBS.  Instead, the Amended Complaint simply

---

[4]      Evan Perez & Carrick Mollenkamp, *Top Banker Cited in Tax-Dodge Case*, WALL ST. J., Nov. 13, 2008, at A1.  By comparison, UBS had operating income (a measure less than annual revenue) in 2007 of nearly $30 billion.  (Ex. 10 (UBS 2007 Annual Report), ch. 1, at 36.)  Thus, the revenues of UBS's U.S. cross-border business represented less than 1% of UBS's total operating income.

asserts, in conclusory fashion, that "Defendants"—as an undifferentiated whole—"knew that UBS faced dire risks" from the alleged misconduct underlying Plaintiff's claims.  (AC ¶ 175.)

## ARGUMENT

**I.  PLAINTIFF DOES NOT ALLEGE A BREACH OF THE DUTY OF PRUDENCE AS A MATTER OF LAW.**

Plaintiff does not plead sufficient "factual content that allows the court to draw the reasonable inference" that any Defendant is liable for a breach of the duty of prudence.  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Plaintiff does not adequately allege that the Appointing Defendants (UBS and the GEB members) served as ERISA fiduciaries in selecting the investment options available to SIP Participants.  Plaintiff also fails to allege that any member of the SIP Committee knew, was obligated to seek insider information to determine, or should have concluded from publicly available facts, that UBS was an imprudent investment at any time during the putative class period.  As such, Plaintiff has not "pled enough facts to state a claim to relief that is plausible on its face" against any Defendant.  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

**A.  Because the "Appointing Defendants" Had No Role in Making the UBS Stock Fund an Investment Option, They Were Not ERISA Fiduciaries.**

The Court should dismiss Count I of the Amended Complaint against the Appointing Defendants (UBS and the GEB members), because they did not serve as ERISA fiduciaries, as a matter of law, in making the option of investing in the UBS Stock Fund available to Plaintiff.

The "threshold question" in every ERISA case alleging breach of fiduciary duty is "whether [the defendant] was acting as a fiduciary . . . *when taking the action subject to complaint.*"  *Pegram*, 530 U.S. at 226 (emphasis added); *In re Lehman Bros. Sec. & ERISA*

*Litig.*, 683 F. Supp. 2d 294, 299 (S.D.N.Y. 2010) (Kaplan, J.) ("*Lehman I*") ("Fiduciaries are those (1) so named in the plan, or (2) who exercise fiduciary functions.  The latter category is defined in functional terms of control and authority over the plan.") (internal quotation marks and emphasis omitted), *aff'd on other grounds*, *Rinehart*, 722 F.3d at 154.[5]  Here, as the SIP sponsor, UBS specifically authorized the SIP Committee—and no other persons or entity—to make decisions about the Plans' investment options.  *See supra* pages 6-7.

Plaintiff cannot evade this basic rule of ERISA by alleging that the Appointing Defendants somehow could terminate the option to invest in the UBS Stock Fund through (i) their duty to monitor "the [various committee Defendants], or any other committee that oversaw the . . . Plan's assets and investments," and (ii) their "control and oversight responsibility over the activities of UBS employees that performed fiduciary functions with respect to the SIP."  (AC ¶¶ 53-54.)  As a matter of law, such appointment power did not turn the Appointing Defendants into fiduciaries with respect to Plan investment options.

*First*, the Appointing Defendants' power to appoint and to remove the committee members is irrelevant to Count I (Plaintiff's "Prudence Claim"), because fiduciary responsibility for appointment extends only to exercise of those powers.  In other words, "[p]ersons who are fiduciaries by virtue of the exercise of control and authority over a plan are subject to fiduciary duties only 'to the extent' they have or have exercised such power."  *Lehman II*, 2011 WL 4632885, at *7 (dismissing claims against Lehman directors) (quotation omitted); *Crowley ex rel*

---

[5]     In *Lehman*, Judge Kaplan issued two orders dismissing the ERISA "stock drop" case against Lehman Brothers directors and officers.  The first order, 683 F. Supp. 2d 294 (S.D.N.Y. 2010) ("*Lehman I*"), dismissed plaintiffs' claims with prejudice as to all defendants, but was later modified to allow plaintiffs to file a second amended complaint, 08 Civ. 5598, slip op. at 1 (S.D.N.Y. Sept. 8, 2010), ECF No. 141.  The second order, 2011 WL 4632885 (S.D.N.Y. Oct. 5, 2011) ("*Lehman II*"), dismissed plaintiffs' second amended complaint with prejudice.  Both orders were affirmed by the Second Circuit in *Rinehart*.  722 F.3d at 154.

*Corning, Inc. Inv. Plan* v. *Corning, Inc.*, 234 F. Supp. 2d 222, 229 (W.D.N.Y. 2002) ("The only power the Board had under the Plan was to appoint, retain, or remove members of the Committee. . . . Thus, the Board's fiduciary obligations can extend only as to those acts.").

       *Second*, Plaintiff cannot turn the Appointing Defendants into "*de facto*" ERISA fiduciaries merely by alleging that they exercised authority and control over the "activities of [their] employees that performed fiduciary functions with respect to the [Plan]." (AC ¶ 54.) As the Second Circuit held in *Citigroup*, such conclusory allegations of "*de facto*" fiduciary status are insufficient as a matter of law. 662 F.3d at 136 ("Plaintiffs allege that Citigroup had 'effective control over the activities of its officers and employees' on the Investment and Administration Committees, but do not provide any example of this 'effective control,' nor do they suggest what actions Citigroup took as a *de facto* fiduciary."). Rather, Plaintiff must allege particular "actions" taken by Defendants "as a *de facto* fiduciary." *Id.*

       Here, the Amended Complaint does not identify a single action taken by UBS or the GEB in selecting Plan investment options or managing Plan assets. As in *Citigroup*, the Amended Complaint's failure to plead such actions here requires that the Prudence Claim be dismissed as to the Appointing Defendants. *Id. Accord In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 756 F. Supp. 2d 330, 347-48 (S.D.N.Y. 2010) (Castel, J.) (dismissing claim against Bank of America and its board, because the complaint did not "allege facts to support the conclusory allegation" of "*de facto*" control).

       In short, as this Court has recognized: "[t]o accept Plaintiff's sweeping theory of fiduciary duty would impose on [UBS] not only the obligation to fairly administer claims but also to affirmatively monitor—and even interfere with—the activity of all other parties involved

in the Plan." *Levin* v. *Credit Suisse, Inc.*, 2013 WL 1296312, at *4 (S.D.N.Y. Mar. 19, 2013) (Sullivan, J.).  The Court should once again "decline[] to adopt such a theory."  *Id.*

**B.      The Members of the SIP Committee Did Not Breach Their Duty of Prudence.**

**1.      Plaintiff Does Not Allege That the Members of the SIP Committee "Knew or Should Have Known" UBS Was an Imprudent Investment.**

Unlike the Appointing Defendants, the SIP Committee is the named fiduciary for the SIP, with responsibility for selecting investment options for Plan participants.  But the Amended Complaint fails to plead a Prudence Claim against any member of the SIP Committee, because it alleges absolutely nothing showing that these individuals did not act with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

In keeping with Second Circuit precedent, this Court has already recognized that knowledge is an essential element of Plaintiff's Prudence Claim.  *See In re UBS ERISA Litig.*, 2012 WL 1034445, at *8 (S.D.N.Y. Mar. 23, 2012) (denying motion to amend as futile, because "Plaintiffs have not alleged facts showing that *members of . . . the SIP Committee knew or should have known* that UBS shares were an imprudent investment") (emphasis added); *see also Citigroup*, 662 F.3d at 140 (affirming dismissal, noting that "we must consider the extent to which *plan fiduciaries* at a given point in time reasonably could have predicted the outcome that followed") (emphasis added); Plus Plan Order, 513 F. App'x at 22 n.1 ("Of course, knowledge [of the investment's imprudence] would have to be adequately alleged as well.").

As Judge Kaplan explained in dismissing the ERISA "stock drop" case against Lehman Brothers directors and officers based on Lehman's bankruptcy:

Even assuming that the [complaint] sufficiently alleged that Lehman's collapse became imminent at some time materially before the bankruptcy filing, it contains

nothing to support the inference that [the named fiduciary] knew or should have known that.  For most of the class period, Lehman posted profits, and there are no factual allegations suggesting that [the fiduciary] knew or had inside information suggesting that any company financial reports were false or misleading.

*Lehman I*, 683 F. Supp. 2d at 302, *aff'd*, *Rinehart*, 722 F.3d at 151-52; *see also Lehman II*, 2011 WL 4632885, at *3-5 (dismissing prudence claims against named fiduciaries where allegations in the complaint "[did] nothing to connect the [named fiduciaries] to anything specific that alerted or should have alerted them to the alleged dire situation"); *Coulter* v. *Morgan Stanley & Co., Inc.*, 2013 WL 1285298, at *7 (S.D.N.Y. Mar. 28, 2013) (Batts, J.) (dismissing ERISA "stock drop" complaint where plaintiffs failed to make "specific allegations" of the relevant fiduciaries' knowledge of the challenged investment's imprudence).

Plaintiff previously maintained that this Court's and Judge Kaplan's decisions took too narrow a view of the Defendants whose knowledge was relevant, claiming that knowledge may be aggregated across an entire company, no matter how large, and should not be limited to the individuals who have fiduciary responsibility for selecting plan investment options. *See* Br. & Special App'x for Pls.-Appellants, 2012 WL 2499730, at *41 (June 25, 2012) ("[T]he District Court placed undue emphasis on the fiduciaries' subjective 'knowledge.'"); *see also* Pls.' Opp'n (ECF No. 49) at 26-27 ("Judge Kaplan restricted those with fiduciary responsibility to a single named defendant who was a member of the investment plan committee.").

But the Second Circuit's recent opinions in both *Rinehart* (affirming Judge Kaplan) and *Nokia* (affirming Judge Daniels) have squarely rejected Plaintiff's position.  In *Nokia*, plaintiffs cited an internal memorandum stating that the company was "standing on a 'burning platform,'" and that "this negative outlook was 'perhaps the worst-kept secret at Nokia,'" having "already been publicly announced by an industry analyst before [the new CEO] arrived."  2013

WL 3111263, at *3.  In affirming the dismissal of the *Nokia* complaint, *without affording the defendant-fiduciaries the benefit of a presumption of prudence*, the Second Circuit held that:

> Even if we were to assume that there existed some period of time during which Nokia insiders allegedly knew that its "platform" was "burning" while its employees and the public did not, this theory of liability fails, as the district court recognized, because **no allegations plausibly ascribe knowledge of Nokia's overall financial straits, real or perceived, to Plan fiduciaries**.

*Id.* (emphasis added) (citing *Gearren* v. *McGraw–Hill Cos.*, 660 F.3d 605, 610 (2d Cir. 2011)).

*See also Rinehart*, 722 F.3d at 148-52 (affirming dismissal because plaintiffs did not adequately plead the "Benefit Committee Defendants' [the named fiduciaries'] necessary knowledge").

To state a claim here, then, Plaintiff must adequately allege that the members of the SIP Committee—and these Defendants specifically—"knew or should have known" about the "artificial inflation" or "riskiness" embedded in UBS's share price resulting from UBS's mortgage-related and ARS investments and misconduct in the U.S. cross-border business.  But "[t]he [Amended] Complaint contains no such allegations.  Rather, it merely alleges, in conclusory fashion, that [the members of the SIP Committee] had a general awareness of the riskiness of the UBS investment strategies."  March 24, 2011 ERISA Order, at *8.

As confirmed by the Second Circuit's recent decision in *PBGC* v. *Morgan Stanley Investment Management, Inc.*, such allegations are insufficient to state a claim for a breach of fiduciary duty under ERISA.  There, plaintiff brought ERISA claims for breach of fiduciary duty under ERISA against Morgan Stanley Investment Management ("MSIM"), as fiduciary for the investments of a hospital retirement plan, on the ground that MSIM overly invested that plan in mortgage-related securities.  The Second Circuit affirmed the dismissal of the claims, without affording the fiduciaries the benefit of the *Moench* presumption of prudence, holding that allegations that MSIM "knew or should have known that . . . overexposure to high-risk, mortgage securities was imprudent" were insufficient to state a claim, because, like the Amended Complaint

here, the MSIM complaint contained "no factual allegations referring *directly* to [MSIM's] knowledge" of imprudence, or any "circumstantial" evidence of such knowledge.  712 F.3d at 718.

Here, except for identifying the SIP Committee members by name (AC ¶ 21(a)-(i)), the Amended Complaint does not contain any allegations, even one, about any of those Defendants.  Accordingly, Plaintiff plainly cannot meet her burden of pleading that the SIP Committee knew of the supposed issues that allegedly made the UBS Stock Fund an imprudent investment.  *Citigroup*, 662 F.3d at 141 ("[P]laintiffs' bald assertion, without any supporting allegations, that the [named fiduciaries] knew about Citigroup's subprime activities cannot support their claims.").

### 2. The Second Circuit Has Now Made Clear That Members of the SIP Committee Had No Duty To Seek Out and To Use Inside Information.

Having failed to allege that the members of the SIP Committee had actual knowledge showing that the UBS Stock Fund was an imprudent investment, Plaintiff cannot save Count I by alleging that Defendants "failed to conduct an appropriate investigation into whether [the UBS Stock Fund] was a prudent investment for the Plans."  (AC ¶ 181.)

*First*, even assuming that the members of the SIP Committee had a duty to investigate, the Second Circuit has held that the "failure to investigate, on its own, is insufficient to state a claim for breach of the duty of prudence."  *Rinehart*, 722 F.3d at 151; *accord Citigroup*, 662 F.3d at 141.  Instead, Plaintiff must plead facts "that, if proved, would show that such an investigation during the Class Period would have led defendants to conclude that [UBS] was no longer a prudent investment."  *Citigroup*, 662 F.3d at 141; *accord Rinehart*, 722 F.3d at 151.  But, despite ample opportunity to do so, Plaintiff fatally pleads no facts to meet her pleading burden.

*Second,* Plaintiff never explains how the members of the SIP Committee could have learned of, and acted on, knowledge of UBS's alleged misconduct in a manner consistent with the securities laws.  At bottom, the Amended Complaint rests on the bald assertion that Defendants should have used insider knowledge for the SIP's benefit.  (*E.g.*, AC ¶ 4 ("[B]y virtue of their senior positions, [Defendants] knew or should have known that UBS Stock was an imprudent means of saving for retirement.").)

But, as Plaintiff has now conceded, under now-controlling Second Circuit precedent, "an ERISA fiduciary's duty of prudence does not encompass a duty to investigate non-public information about a company."  (Pl.'s July 31 Letter at 2.)  *See Rinehart*, 722 F.3d at 147 ("Fiduciaries are under no obligation to either seek out or act upon inside information in the course of fulfilling their duties under ERISA."); *Gearren*, 690 F. Supp. 2d at 273 (rejecting theory of fiduciary breach that depends on "facilitating systemic insider trading"); *accord White* v. *Marshall & Illsley Corp.*, 714 F.3d 980, 982 (7th Cir. 2013); *Lanfear* v. *Home Depot, Inc.*, 679 F.3d 1267, 1282 (11th Cir. 2012); *Kirschbaum* v. *Reliant Energy, Inc.* 526 F.3d 243, 256 (5th Cir. 2008).  Plaintiff has no way around this controlling law.

**3.  The Amended Complaint Does Not Plausibly Allege That Publicly Available Facts Put SIP Committee Members on Notice That the UBS Stock Fund Was an Imprudent Investment.**

Because Plaintiff does not allege that any of the members of the SIP Committee possessed or had an obligation to seek out information concerning UBS's alleged secret malfeasance, Plaintiff's claim that the SIP Committee knew or should have known that the UBS Stock Fund was an imprudent investment option must be based solely on publicly available information concerning UBS's financial condition.  But Plaintiff has not come close to pleading a plausible claim based on public information.

- 19 -

*First*, Plaintiff acknowledges that UBS's stock was trading on an efficient market—the New York Stock Exchange—throughout the putative class period.  (*See* AC ¶ 86.) By faulting the members of the SIP Committee for not anticipating UBS's share price decline based on publicly available information, Plaintiff seeks to "hold [the members of the SIP Committee] liable for failing to outsmart a presumptively efficient market.  That is . . . not a sound basis for imposing liability."  *White*, 714 F.3d at 992; *Rinehart*, 722 F.3d at 149 ("A [fiduciary] is not imprudent to assume that a major stock market . . . provides the best estimate of the value of the stocks traded on it.") (quotation omitted).[6]  Moreover, UBS's share prices during the putative class period would not have signaled to the prudent fiduciary that UBS was an imprudent or risky investment, as, during this tumultuous period, UBS's share price increased on about half of all trading days (Ex. 12 (UBS share price chronology) (showing share price increases in 194 out of 405 days)), and its overall decline during the putative class period was in line with declines at peer financial institutions (App'x A (compilation of stock prices for financial institutions)).

*Second*, none of the supposed publicly available "red flags" plausibly shows that the members of the SIP Committee should have known that the UBS Stock Fund was an imprudent investment.  As a threshold matter, Plaintiff alleges no publicly available "red flags" about UBS's ARS holdings or the UBS cross-border business.  (*See* AC ¶¶ 141-172.)  With

---

[6]      Plaintiff's allegation that UBS was trading in an efficient market also means that Plaintiff cannot show that her alleged damages were proximately caused by any supposed failure to divest the Plan of the UBS Stock Fund (assuming such a divestment could have been made without violating the insider trading laws), because the market's knowledge of such divestment would have immediately depressed the stock price and Plaintiff would have suffered the same alleged loss.  *See Kirschbaum,* 526 F.3d at 256 ("[F]rom a practical standpoint, compelling fiduciaries to sell off a plan's holdings of company stock may bring about precisely the result plaintiffs seek to avoid: a drop in the stock price.").

respect to Plaintiff's claims relating to mortgage-related securities, the Amended Complaint's pre-class period "red flags" relate to the general subprime market in late 2006 and early 2007, and do not relate to UBS, or its AAA-rated holdings, at all.  (*See* AC ¶ 113 (three pages of allegations relating to general market conditions).)  The only UBS-specific "red flag" Plaintiff cites is a *Wall Street Journal* article about the closure of Dillon Read Capital Management ("DRCM") because of losses that fund sustained on mortgage-related securities in May 2007. (AC ¶¶ 114, 117.)  But, as this Court has recognized, DRCM's investments were in "*low-grade* mortgage related securities," the writedowns of which say nothing about "UBS's *high-grade* AAA-rated securities," UBS Securities Opinion, at *17, securities that, as noted *supra*, page 9, were perceived to be safe investments by market participants and regulators alike.

Therefore, as in *PBGC*, "the Amended Complaint alleges imprudence by association," contending, at bottom, that "because the whole world knows (in hindsight) that many subprime mortgages turned out to be disastrous investments," the members of the SIP Committee acted "imprudently" by not reacting to "red flags" that had nothing to do with UBS's AAA-rated securities.  712 F.3d at 723-24.  "The relevant pleading standards [even without applying the presumption of prudence] do not permit such general accusations of imprudence, unsupported by well-pleaded factual allegations."  *Id.* at 724.

## II.   ERISA § 404(C) ALSO BARS PLAINTIFF'S PRUDENCE CLAIM.

Under ERISA Section 404(c),  no fiduciary "shall be liable . . . for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control." 29 U.S.C. § 1104(c)(1)(A).  This safe harbor applies when, as here, the plan participant (i) has the right to exercise independent control over the assets in her account and in fact exercises such control, (ii) can choose from a broad range of investments, and (iii) is given or has the opportunity to obtain sufficient information to make informed decisions with regard to

investment alternatives available under the plan. *Hecker* v. *Deere & Co.*, 556 F.3d 575, 587 (7th Cir. 2009).[7] As discussed *supra* pages 6-7, the SIP meets each of these requirements.

Plaintiff claims that Section 404(c) does not apply, because that provision does not immunize fiduciaries from liability for selecting and offering the UBS Stock Fund as an investment option. (AC ¶ 291.) But, in making this assertion, Plaintiff ignores the plain language of the statute, which absolves a fiduciary from "*any* loss" resulting from the plan participant's "exercise of control." 29 U.S.C. § 1104(c)(1)(A)(ii) (emphasis added); AC ¶ 289 (conceding that participants invested in the UBS Stock Fund "as a result of *their investment directions*") (emphasis added)); *see In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 445 (3d Cir. 1996) (noting that "the statute's unqualified instruction . . . clearly indicates that a fiduciary may call upon section 1104(c)'s protection where a causal nexus between a participant's or a beneficiary's exercise of control and the claimed loss is demonstrated"); *accord Langbecker* v. *Elec. Data Sys. Corp.*, 476 F.3d 299, 311 (5th Cir. 2007).[8] Defendants respectfully submit that the courts that have held otherwise[9] have adopted an interpretation of the statute that "does not

---

[7]    Although an affirmative defense, the Section 404(c) safe harbor may be adjudicated on a motion to dismiss where, as here, Plaintiff "chose to anticipate the [§ 404(c)] defense in their Complaint explicitly and thus put it in play." *Hecker*, 556 F.3d at 588. *See* AC ¶¶ 288-92; *Day* v. *Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) (dismissing complaint on *res judicata* grounds where defense was demonstrated by complaint's and court's own records).

[8]    Plaintiff also posits that Section 404(c) does not apply because Defendants failed to provide complete and accurate information to Plaintiff to enable her to make an informed decision to invest in the UBS Stock Fund. (AC ¶ 289.) But, as this Court and the Second Circuit have recognized, this allegation is "vague" and the Amended Complaint "do[es] not adequately allege the basis of defendants' purported knowledge (actual or constructive) that the particular statements were false or misleading at the time they were made." Plus Plan Order, 513 F. App'x at 24.

[9]    *See, e.g.*, *Tibble* v. *Edison Int'l*, 711 F.3d 1061, 1073 (9th Cir. 2013); *DiFelice* v. *U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3 (4th Cir. 2007); *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 359-60 (S.D.N.Y. 2009) (Sweet, J.).

reasonably interpret § 404(c)," "contradicts the governing statutory language," and "would render the § 404(c) defense applicable only where plan managers breached no fiduciary duty, and thus only where it is unnecessary." *Langbecker*, 476 F.3d at 311.

## III.   THE COURT SHOULD DISMISS THE REMAINING COUNTS FOR FAILURE TO STATE A CLAIM.

The Court should dismiss Counts III and IV for failure to state a claim.

*First*, Plaintiff's failure to plead that the UBS Stock Fund was an imprudent investment, *see supra* pages 15-21, is just as fatal to Plaintiff's secondary liability claims alleging a breach of the duty to monitor (Count III) and for co-fiduciary liability (Count IV). *Rinehart*, 722 F.3d at 153-54; *Citigroup*, 662 F.3d at 145.

*Second*, Plaintiff's "monitoring" claim fails, because the Appointing Defendants were not fiduciaries for the purposes of the action subject to the Amended Complaint, *see supra* pages 12-15, and, because an appointing fiduciary cannot be liable unless he or she was on notice "of possible misadventure by [its] appointees." *Coyne & Delany Co.* v. *Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996) (quotation omitted). Here, Plaintiff does not allege any improper behavior by any members of SIP Committee. And, Plaintiff's theory that a duty to monitor includes providing "adequate information" (AC ¶ 254) to the SIP Committee, like the "duty of candor" claim, "do[es] not adequately allege the basis of defendants' purported knowledge (actual or constructive)," Plus Plan Order, 513 F. App'x at 24, or how such knowledge could be shared without violating the securities laws, *see Rinehart*, 722 F.3d at 146-47.

*Third*, the Amended Complaint's co-fiduciary liability claim fails, because Plaintiff does not make the required allegations of "actual knowledge" or knowing participation or concealment of a fiduciary breach. *See Donovan* v. *Cunningham*, 716 F.2d 1455, 1475 (5th Cir. 1983) (co-fiduciary liability requires "actual knowledge" that the other person is a fiduciary,

that the fiduciary participated in a fiduciary act, and that the act was a breach).   Plaintiff's

boilerplate allegations (AC ¶¶ 266-72) are inadequate as a matter of law.  *See Lee* v. *Burkhart*,

991 F.2d 1004, 1010-11 (2d Cir. 1993) (dismissing co-fiduciary liability claim for failure to

allege knowledge of co-fiduciary's breach).[10]

## IV.    ALTERNATIVELY, PLAINTIFF LACKS STANDING TO BRING SUIT HERE.

Plaintiff does not plead that she exhausted the administrative remedies available to

her under the SIP.  *See supra* page 7.  It is settled that plaintiffs generally must exhaust plan

remedies before bringing claims for benefits under ERISA.  *Kennedy* v. *Empire Blue Cross & Blue*

*Shield*, 989 F.2d 588, 594 (2d Cir. 1993) (discussing "the firmly established federal policy favoring

exhaustion of administrative remedies in ERISA cases").  Some courts have created an exception

to the exhaustion requirement where plaintiffs bring suit for "statutory violations," such as breach

of fiduciary duty claims, as opposed to supposedly "ordinary" claims for "benefits."  *See*, *e.g.*,

*Amaro* v. *Cont'l Can Co.*, 724 F.2d 747, 749 (9th Cir. 1984); *Am. Med. Ass'n* v. *United*

*HealthCare Corp.*, 2007 WL 1771498, at *14 (S.D.N.Y. June 18, 2007) (McKenna, J.).[11]  But the

better-reasoned authority has rejected any such distinction, because "[t]he strong federal policy

encouraging private resolution of ERISA-related disputes mandates the application of the

exhaustion doctrine to statutory claims for breach of fiduciary duty under ERISA."  *Powell* v. *Am.*

*Tel. & Tel. Commc'ns, Inc.*, 938 F.2d 823, 825 (7th Cir. 1991); *Lanfear* v. *Home Depot, Inc.*, 536

---

[10]     Count VI—which alleges that Plaintiff is entitled to *quantum meruit* relief against UBS—
should be dismissed because it is entirely derivative of Plaintiff's Prudence Claim, and because it
is founded on the false allegation that UBS "contribu[ted] UBS Stock to the Plans while the
value of the stock was inflated" (AC ¶ 277).  To the contrary, UBS made Plaintiff's putative
class period matching and employer contributions in cash, enabling Plaintiff to choose from
among numerous investment options.  (Ex. 3 (SIP SPD) at 4, 18.)

[11]     The Second Circuit has not yet ruled on this issue.  *Nechis* v. *Oxford Health Plans, Inc.*,
421 F.3d 96, 102 (2d Cir. 2005).

F.3d 1217, 1223-25 (11th Cir. 2008) (dismissing ERISA "stock drop" complaint, noting that "[t]he exhaustion requirement applies to complaints for breach of fiduciary duty under ERISA").

Moreover, Plaintiff purchased over 90% of her holdings in the UBS Stock Fund *before* the putative class period (Ex. 1) and, thus, before the "artificial inflation" in the UBS share price that forms the basis of her claim for breach of fiduciary duty (AC ¶¶ 81-82, 86, 116, 120, 175, 179, 189, 192, 206, 254, 263, 277).  Plaintiff then divested her entire Plan account of all assets (including the UBS Stock Fund) by July 8, 2008—(Ex. 1)—in the *middle* of the period of artificial inflation (which allegedly ended on October 16, 2008) (AC ¶ 86).  Accordingly, if the Amended Complaint's allegations are true, Plaintiff "sold the majority of her [UBS] holdings for *more money* than it was worth, thereby *benefitting* from defendants' alleged breach of fiduciary duty" and, thus, "does not have standing to pursue this lawsuit."  *Taylor* v. *Keycorp*, 680 F.3d 609, 613, 615 (6th Cir. 2012); *accord Brown* v. *Medtronic, Inc.*, 628 F.3d 451, 455-59 (8th Cir. 2010) (plaintiff whose sale price "captures the alleged artificial inflation" lacks standing); *In re Wilmington Trust Corp. ERISA Litig.*, 2013 WL 1855756, at *5-6 (D. Del. May 3, 2013) (same); *In re Bos. Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 30-32 (D. Mass. 2008) (same); *Vermeylen* v. *ProQuest Co.*, 2007 WL 1218713, at *5 (E.D. Mich. Apr. 23, 2007) (same).  *But see Almonor* v. *BankAtlantic Bancorp, Inc.*, 2009 WL 8412125, at *6 (S.D. Fla., July 15, 2009).[12]

---

[12]    Alternatively, because Plaintiff divested in the middle of the putative class period, she, at a minimum, lacks standing to seek her requested injunctive relief (i) "enjoining Defendants . . . from any further violations of their ERISA fiduciary obligations," and (ii) "requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in UBS stock."  (AC, Prayer for Relief E, F); *see, e.g.*, *Deshawn E.* v. *Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.").

## CONCLUSION

For the foregoing reasons, this Court should dismiss the Amended Complaint in

its entirety for failure to state a claim.

Respectfully submitted,

Robert J. Giuffra, Jr.
Matthew A. Schwartz
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants*

September 25, 2013

# Appendix A

| Financial Institution | Losses and Writedowns (as of June 30, 2008)[13] | Stock Price % Change (Mar. 13, 2007 to Oct. 16, 2008)[14] |
|---|---|---|
| Washington Mutual | $14.8 billion | -100% |
| Lehman Brothers | $8.2 billion | -100% |
| Bear Stearns | $3.2 billion | -93% |
| Royal Bank of Scotland | $14.9 billion | -88% |
| Wachovia | $22.5 billion | -87% |
| Merrill Lynch | $51.8 billion | -76% |
| Morgan Stanley | $14.4 billion | -68% |
| Barclays | $9.1 billion | -67% |
| Citigroup | $55.1 billion | -65% |
| **UBS** | **$44.2 billion** | **-64%** |
| Deutsche Bank | $10.8 billion | -60% |
| Bank of America | $21.2 billion | -46% |
| Credit Suisse | $10.5 billion | -34% |
| HSBC | $27.4 billion | -12% |
| JP Morgan Chase | $14.3 billion | -8.1% |
| Wells Fargo | $10 billion | -7.4% |

---

[13]     Yalman Onaran, *Banks' Subprime Losses Exceed $500 Billion as Writedowns Spread*, BLOOMBERG NEWS, Aug. 12, 2008; *see also* Yalman Onaran, *Subprime Bank Losses Reach $312 Billion with RBS, Nomura*, BLOOMBERG.COM, Apr. 28, 2008; Meg Fletcher, *Subprime Fallout Could Cost Billions,* BUS. INS. INDUS. FOCUS, Apr. 1, 2008 (noting that at least "130 companies . . . reported $257 billion in subprime-related write-downs by early February [2008]").  As of October 28, 2008, the losses reached $670 billion.  Gabi Thesing, *German Consumer Confidence Rises on Oil-Price Drop,* BLOOMBERG.COM, Oct. 28, 2008.

[14]     *See* Declaration of Robert J. Giuffra, Jr., dated March 19, 2010 (ECF No. 47), Ex. 25 (table showing share prices of major financial institutions as listed by close of business day on the New York Stock Exchange from March 13, 2007 to October 16, 2008 (adjusted for stock splits and dividends)).